# EXHIBIT 2



**Sanford Heisler Sharp, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Fax: (615) 434-7020
www.sanfordheisler.com

*Andrew Miller,* Senior Litigation Counsel          New York | Washington D.C. | San Francisco | San Diego | Nashville | Baltimore

September 19, 2019

**VIA Fed Ex**

The Honorable Tommy L. Moore, Clerk
1 W Main St #120,
Fincastle, VA 24090

**Re:    Botetourt County v. Mallinckrodt PLC.,** *et al.*

Clerk Moore:

. Please file the enclosed complaint in the above-captioned matter. It is my understanding that there is no filing fee associated with this filing because Botetourt County is the Plaintiff in this matter. If I am mistaken in that regard, please contact me at the number above.

There is no need to produce summonses at this time. Thank you for your assistance and please do not hesitate to contact me should you have any questions.

Sincerely,

Andrew H. Miller

AM:cms
Enclosures

*[handwritten notes]*
9/20/19
Per ph conversation
initiate w Amy Farmer, Bd of Sup, authorized of this action on 9/13/19.
T. Moore, Clerk

**F I L E D**
IN THE CLERK'S OFFICE    3 PM TIME
BOTETOURT COUNTY CIRCUIT COURT

TESTE:  SEP 20 2019

TOMMY L. MOORE, CLERK _____ D.C.

## COVER SHEET FOR FILING CIVIL ACTIONS
COMMONWEALTH OF VIRGINIA

Case No. ............. *19-538*

(CLERK'S OFFICE USE ONLY)

................................................................................ Circuit Court

................... Botetourt ...................

Botetourt County ........................... v./*In re*: ........................... Mallinckrodt PLC, et al

PLAINTIFF(S)                                                     DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [x] attorney for [x] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

### GENERAL CIVIL
**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [x] Other General Tort Liability

### ADMINISTRATIVE LAW
- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

### DOMESTIC/FAMILY
- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

### WRITS
- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

### PROBATE/WILLS AND TRUSTS
- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

### MISCELLANEOUS
- [ ] Amend Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[x] Damages in the amount of $ 50,000,000.00 ........................... are claimed.

09/19/2019
DATE

[ ] PLAINTIFF  [ ] DEFENDANT  [x] ATTORNEY FOR  [x] PLAINTIFF [ ] DEFENDANT

Grant Morris
PRINT NAME

700 Pennsylvania Avenue SE Suite 300, Washington D.C. 20003
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

(202) 499-5212

gmorris@sanfordheisler.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

## Civil Action Type Codes
### (Clerk's Office Use Only)

Accounting .................................................. ACCT
Adoption ....................................................... ADOP
Adoption – Foreign .................................... FORA
Adult Protection ........................................ PROT
Aid and Guidance ........................................ AID
Amend Death Certificate ........................... ADC
Annexation ................................................. ANEX
Annulment ................................................. ANUL
Annulment – Counterclaim/Responsive Pleading .. ACRP
Appeal/Judicial Review
    ABC Board ............................................... ABC
    Board of Zoning ................................... ZONE
    Compensation Board ........................... ACOM
    DMV License Suspension ........................ JR
    Employment Commission ..................... EMP
    Employment Grievance Decision ......... GRV
    Local Government ............................... GOVT
    Marine Resources ................................. MAR
    School Board ............................................ JR
    Voter Registration ............................... AVOT
    Other Administrative Appeal ............. AAPL
Appointment
    Conservator of Peace ............................ COP
    Church Trustee ..................................... AOCT
    Custodian/Successor Custodian (UTMA) ...... UTMA
    Guardian/Conservator ........................ APPT
    Marriage Celebrant ............................ ROMC
    Standby Guardian/Conservator ......... STND
Approval of Transfer of Structured Settlement ....... SS
Asbestos Litigation ........................................ AL
Attachment ................................................... ATT
Bond Forfeiture Appeal ............................... BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt ........................................... CCON
Claim Impleading Third Party Defendant –
    Monetary Damages/No Monetary Damages .......... CTP
Complaint – (Miscellaneous) ..................... COM
Compromise Settlement ........................... COMP
Condemnation ........................................... COND
Confessed Judgment ...................................... CJ
Contract Action ......................................... CNTR
Contract Specific Performance ................ PERF
Counterclaim – Monetary Damages/No Monetary
    Damages ................................................... CC
Cross Claim ................................................ CROS
Declaratory Judgment ............................... DECL
Declare Death ............................................ DDTH
Detinue ............................................................ DET
Divorce
    Complaint – Contested/Uncontested ....... DIV
    Counterclaim/Responsive Pleading .......... DCRP
    Reinstatement – Custody/Visitation/Support/
    Equitable Distribution .......................... CVS
Driving Privileges
    Reinstatement pursuant to § 46.2-427 ....... DRIV
    Restoration – Habitual Offender or
    3rd Offense .............................................. REST

Ejectment ..................................................... EJET
Encumber/Sell Real Estate ............................ RE
Enforce Vendor's Lien ............................... VEND
Escheatment .................................................. ESC
Establish Boundaries ................................ ESTB
Expungement ............................................ XPUN
Forfeiture of Property or Money ............ FORF
Freedom of Information ............................... FOI
Garnishment ............................................. GARN
Injunction ........................................................ INJ
Intentional Tort ......................................... ITOR
Interdiction ................................................. INTD
Interpleader ................................................ INTP
Interrogatory .............................................. INTR
Judgment Lien – Bill to Enforce ............... LIEN
Landlord/Tenant ............................................. LT
Law Enforcement/Public Official Petition ... LEP
Mechanics Lien ........................................ MECH
Medical Malpractice ................................... MED
Motor Vehicle Tort ....................................... MV
Name Change ................................................. NC
Other General Tort Liability ................... GTOR
Partition ...................................................... PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) ......................... PET
Product Liability ....................................... PROD
Quiet Title ....................................................... QT
Referendum Elections ............................... ELEC
Reinstatement (Other than divorce or driving
    privileges) ............................................ REIN
Removal of Case to Federal Court ........... REM
Restore Firearms Rights – Felony ......... RFRF
Restore Firearms Rights – Review ........ RFRR
Separate Maintenance ................................ SEP
Separate Maintenance – Counterclaim/Responsive
    Pleading ............................................ SCRP
Sever Order ................................................ SEVR
Sex Change .................................................. COS
Taxes
    Correct Erroneous State/Local ........... CTAX
    Delinquent .......................................... DTAX
Termination of Mineral Rights ................. MIN
Trust – Impress/Declare/Create ............... TRST
Trust – Reformation ................................. REFT
Uniform Foreign Country Money Judgments ..... RFCJ
Unlawful Detainer ........................................ UD
Vehicle Confiscation ................................... VEH
Voting Rights – Restoration ................... VOTE
Will Construction ....................................... CNST
Will Contested .......................................... WILL
Writs
    Certiorari .................................................. WC
    Habeas Corpus ..................................... WHC
    Mandamus ............................................. WM
    Prohibition ............................................... WP
    Quo Warranto ................................... WQW
Wrongful Death ............................................ WD

**VIRGINIA: IN THE CIRCUIT COURT OF BOTETOURT COUNTY**

BOTETOURT COUNTY, VIRGINIA

       Plaintiff,

    v.

MALLINCKRODT PLC; MALLINCKRODT
LLC; SPECGX LLC; RICHARD SACKLER;
BEVERLY SACKLER; DAVID SACKLER;
ILENE SACKLER LEFCOURT; JONATHAN
SACKLER; KATHE SACKLER;
MORTIMER D.A. SACKLER; THERESA
SACKLER; JOHN STEWART; MARK
TIMNEY; CRAIG LANDAU; RUSSELL
GASDIA; ENDO HEALTH SOLUTIONS,
INC; ENDO PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL COMPANIES,
INC.; PAR PHARMACEUTICAL, INC.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.; BARR
LABORATORIES, INC.; WATSON
LABORATORIES, INC.; ACTAVIS
PHARMA, INC.; ACTAVIS, LLC;
ALLERGAN PLC; ALLERGAN FINANCE,
LLC; MYLAN PHARMACEUTICALS, INC.;
MYLAN INSTITUTIONAL INC.; INDIVIOR
INC.; MCKESSON CORPORATION;
MCKESSON MEDICAL-SURGICAL INC.;
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN DRUG
CORPORATION; HENRY SCHEIN, INC.;
GENERAL INJECTABLES & VACCINES,
INC.; INSOURCE, INC.; CVS HEALTH
CORPORATION; CVS PHARMACY, INC.;
CVS TN DISTRIBUTION, L.L.C.;
VIRGINIA CVS PHARMACY, L.L.C.;
WALGREENS BOOTS ALLIANCE, INC.;
WALGREEN CO.; WALGREEN EASTERN
CO., INC.; EXPRESS SCRIPTS HOLDING
COMPANY; EXPRESS SCRIPTS, INC;
EXPRESS SCRIPTS PHARMACY, INC.;
CAREMARK RX, L.L.C.; CAREMARKPCS
HEALTH, L.L.C.; CAREMARK, L.L.C.;
CAREMARKPCS, L.L.C.;UNITEDHEALTH
GROUP INCORPORATED; OPTUM, INC.;
OPTUMRX, INC.; WALMART INC.;

Case No. CL19 - *538*

Jury Trial Demanded

ESI MAIL PHARMACY SERVICE, INC.;
RITE AID CORP.; RITE AID OF VIRGINIA,
INC.; RITE AID MID-ATLANTIC; RITE
AID OF MARYLAND, INC.; ECKERD
CORPORATION; and DOES 1-100,

     Defendants.

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Botetourt County, Virginia by and through the undersigned attorneys, (hereinafter "Plaintiff," "Botetourt County," or "Botetourt") against Defendants: Mallinckrodt PLC; Mallinckrodt LLC; SpecGx LLC; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Par Pharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Barr Laboratories, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; Actavis, LLC; Allergan PLC; Allergan Finance, LLC; KVK-Tech, Inc.; Amneal Pharmaceuticals LLC; Impax Laboratories, LLC; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals of New York, LLC; Mylan Pharmaceuticals, Inc. Mylan Institutional Inc.; McKesson Corporation, McKesson Medical-Surgical Inc.; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; Henry Schein, Inc.; General Injectables & Vaccines, Inc.; Insource, Inc.; CVS Health Corporation CVS Pharmacy, Inc.; CVS TN Distribution, L.L.C; Walgreens Boots Alliance, Inc.; Walgreen Co.; Walgreen Eastern Co., Inc.; Rite Aid Corp; Rite Aid of Virginia, Inc.; Rite Aid of Maryland, Inc.; Rite Aid Mid-Atlantic; Eckerd Corporation; Walmart Inc.; CVS Health Corporation; CVS Pharmacy, Inc. Virginia CVS Pharmacy, L.L.C.; Caremark Rx, L.L.C. Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C. d/b/a CVS/Caremark; Caremark, L.L.C ; Caremark, L.L.C.; Express Scripts, Inc.; Express Scripts Holding Company; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; OptumRx, Inc.; UnitedHealth Group Incorporated; Optum, Inc.; OptumRx Inc.; and DOES 1 through 100 inclusive (collectively, "Defendants") alleges as follows:

### I.    INTRODUCTION

1.    Defendants have caused an opioid epidemic that has resulted in economic, social and emotional damage to virtually every community in the United States and tens of thousands of

Americans. It is indiscriminate and ruthless. It has impacted across demographic lines, harming every economic class, race, gender and age group and killing more than one hundred fifteen (115) Americans every day.[1] Prescription and illegal opioids account for more than sixty percent (60%) of overdose deaths in the United States, a toll that has quadrupled over the past two decades, according to the United States Centers for Disease Control and Prevention ("CDC"). More people died from opioid-related causes in 2016 than car accidents[2] or guns.[3]  More than one hundred seventy-five (175) people die every day from drug overdoses, as if an airplane crashes killing everyone on board, every day.[4]

2.      According to the CDC, the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement due to opioid misuse *alone* is $78.5 billion a year.[5]

3.      Prescription drug manufacturers, wholesalers/distributors, pharmacy benefit managers ("PBMs"), and pharmacies have created this epidemic. The manufacturers make the opioids and lie about their efficacy and addictive properties. The wholesalers distribute the opioids from the point of manufacture to the point of delivery to the patient. The PBMs control, through their pharmacy plan design and formulary management, which drugs go where and how they are paid for. And the retail pharmacies serve as the final link in the chain by releasing the opioids into the public.

---

[1] *Opioid Overdose Crisis*, NATIONAL INSTITUTE ON DRUG ABUSE, revised March 2018, , CTRS FOR DISEASE CONTROL & PREVENTION, https://www.cdcdrugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis.
[2] *Deaths from Opioid Overdoses Now Higher Than Car Accident Fatalities*, HEALTHLINE, March 30, 2018, https://www.healthline.com/health-news/deaths-from-opioid-overdoses-higher-than-car-accident-fatalities#1
[3] Ethan Siegal, *Opioid Epidemic So Dangerous, Says CDC, It's Finally Killing As Many Americans As Guns*, FORBES, March 20, 2018, https://www.forbes.com/sites/startswithabang/2018/03/20/opioid-epidemic-so-dangerous-says-cdc-its-finally-killing-as-many-americans-as-guns/#32f5256f6c21
[4] Jerry Mitchell, *With 175 Americans dying a day, what are the solutions to the opioid epidemic?* USA TODAY NETWORK, Jan. 29, 2018, https://www.usatoday.com/story/news/nation-now/2018/01/29/175-americans-dying-day-what-solutions-opioid-epidemic/1074336001/
[5] *Supra*, note 1.

4.      Each defendant group profits enormously from the movement of opioid products. Each has incentives to move certain drugs over others. Defendants themselves create the incentives and share in their perversity—usually without disclosure to those who reasonably rely on Defendants to abide by their federal, state and common law duties. They do so at the expense of Plaintiff and communities like it nationwide.

5.      Each defendant group bears culpability in the crisis and is a necessary party to addressing the damage it has wreaked, including the costs of abatement.

6.      The devastating impact of opioid abuse cannot be overstated. After years of decreasing death rates in the United States, they are now on the rise fueled in part by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for Americans under the age of fifty (50). The number of Americans who died of drug overdose deaths in 2017 is roughly equal to the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.[6]

7.      Botetourt County has been hit hard by the opioid epidemic. For example, the rate of neonatal abstinence syndrome (NAS) in Botetourt County rose to 17.2 cases per 1,000 births in 2017.[7] That rate was significantly higher than the statewide rate of 7.7 cases per 1,000 births.[8] In 2014, the reported rate of Hepatitis C infections among 18 to 30-year-olds peaked at 249.2 cases per 100,000 people, which was more than three times higher than the statewide rate of 76.3 cases

---

[6] Nicholas Kristof, *Opioids, a Mass Killer We're Meeting With a Shrug*, NEW YORK TIMES, Jun. 22, 2017, https://www.nytimes.com/2017/06/22/opinion/opioid-epidemic-health-care-bill.html

[7] VIRGINIA DEPARTMENT OF HEALTH, VIRGINIA OPIOID ADDICTION INDICATORS (2016), https://public.tableau.com/views/VirginiaOpioidAddictionIndicators/VAOpioidAddictionIndicators?:embed=y&:display_count=yes&:showVizHome=no

[8] *Id.*

3

per 100,000 people.[9] Perhaps even more disturbingly, the rate of overdose deaths in Botetourt County has steadily risen from 9.15 deaths per 100,000 people in 2003 to 17.5 deaths per 100,000 people in 2017.[10]

8.      The acute opioid problem in Botetourt County reflects the overwhelming epidemic affecting the entire Commonwealth.  In 2016, Virginia's state health commissioner declared the state's opioid addiction problem a public health emergency.  On average, three Virginians die of a drug overdose and over two dozen receive treatment in emergency departments for drug overdoses each day.[11]  In the first half of 2016, fatal drug overdoses increased by 35% compared to the same period in 2015.[12]  More Virginians die each year from drug overdoses than from motor vehicle accidents.[13]

9.      Defendants' opioid-related misconduct causes heroin abuse.  A 2015 study found that four out of five heroin users reported that their addiction started with opioid pain relievers.[14]  In this way, prescription opioids—now, thanks to Defendants, provided to patients for everyday conditions such as chronic knee pain and dental pain—can and do operate as "gateway" drugs to heroin use and involvement with the illegal drug market.

10.     In addition, Botetourt County is now having to allocate substantial taxpayer dollars, resources, staff, energy and time to address the damage and casualties the opioid scourge has left

---

[9] *Id.*
[10] Centers for Disease Control and Prevention Drug Poisoning Mortality Rates in the United States, 1999-2016, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/.
[11] Dr. Melissa Levine, State Health Commissioner Telebriefing on Opioid Addiction Public Health Emergency (Nov. 21, 2016) (transcript available at http://www.vdh.virginia.gov/commissioner/opioid-addiction-in-virginia/).
[12] *Id.*
[13] Andrew Barnes and Katherine Neuhausen, Virginia Commonwealth University School of Medicine, "The Opioid Crisis          Among          Virginia          Medicaid          Beneficiaries," https://hbp.vcu.edu/media/hbp/policybriefs/pdfs/Senate_OpioidCrisisPolicyBrief_Final.pdf

[14] NAT'L SAFETY COUNCIL, PRESCRIPTION NATION 2016: ADDRESSING AMERICA'S DRUG EPIDEMIC 9 (2016), http://www.nsc.org/RxDrugOverdoseDocuments/Prescription-Nation-2016-American-Drug-Epidemic.pdf

in its wake. Fire and emergency medical services are over-utilized because of an increased number of opioid-related overdoses. The burden on law enforcement is increased substantially by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. Courts, social workers, school treatment centers, intervention programs, clinics, employee benefit plans, and others directly spending on opioids and opioid antagonists have all been harmed. Nearly every aspect of Botetourt County's services and budget has been significantly and negatively impacted by this Defendant-made epidemic.

11.    Defendants' efforts to deceive and make opioids widely accessible have also resulted in a windfall of profits. Opioids are now the most prescribed class of drugs; they generated $11 billion in revenue for drug companies in 2014 alone. While Americans represent only five percent (5%) of the world's population, they consume eighty percent (80%) of the world production of prescription opioids.[15]

12.    The recipe for generating sky-high revenues is clear: patients who are prescribed opioids become physically and psychologically dependent on the drugs. When these opioid-addicted patients can no longer legally obtain opioids, they seek the drugs on the black market or turn to heroin which provides a similar high to prescription opioids. Defendants have generated a loyal customer base: hundreds of thousands of patients whose addiction guarantees an insatiable demand for the drugs and consistently high profits. The scheme begins with Manufacturer Defendants who deliberately polluted the national marketplace, including in Botetourt County, with lies and misinformation about the efficacy of opioids to treat chronic pain, safety and abuse deterrent properties of their particular opioid products, and the risks of addiction. Using hired guns,

---

[15] Dina Gusovsky, *Americans Consume Vast Majority of the World's Opioids*, CNBC, Apr. 27, 2016 9:13 AM, http://www.cnbc.com/2016/04/27/americans-consume-almost-all-of-the-global-opioid-supply.html

advertising, and marketing materials, the Manufacturers promoted the fictitious concept of "pseudoaddiction," advocated that signs of addiction should be treated with more opioids, falsely claimed that opioid dependence and withdrawal could be easily managed, and denied the risks of higher and protracted opioid dosages.

13.     Even those Opioid manufacturers who may not have affirmatively polluted the national marketplace with false information about the dangers of opioids substantially contributed to the epidemic by purposefully and knowingly riding the coattails of the false narrative that had been intentionally developed by others. The generic opioid manufacturers identified in this complaint recognized the profits to be made from the lies that had been spun regarding opioid addiction and offered "spread pricing[16]" to motivate the purchase, dispensing, utilization, and reimbursement of their products by distributors, retailers, mail order pharmacies, and pharmacy benefit managers.

14.     The Distributor Defendants did nothing to stem the excess flow of opioids into Virginia and Botetourt County. Wholesale drug distributors receive prescription opioids from drug manufacturers and transfer the opioids to hospitals, pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients. Distributors are required by federal and state law to control and report unlawful drug diversions. The Distributor Defendants purposefully ignored these responsibilities, lobbied for higher reporting thresholds and pocketed profits on every opioid they moved—all at the expense of Botetourt County and other communities like it.

---

[16] "Spread pricing" is a phrase used to describe the practice of purposefully causing a reimbursement price (such as Average Wholesale Price "AWP" or Maximum Allowable Cost "MAC) to be higher than the actual acquisition cost of a drug. In a commodity marketplace, such as the retail and mail order pharmacy market for generic drugs, pharmacies generally will stock their shelves with whichever commodity generates the most profit. That profit is largely influenced by the "spread" between the price the pharmacy is reimbursed for the drug (based on AWP or MAC, for example) and the pharmacy's acquisition cost. Generic drug manufacturers compete based on spreads and intentionally set prices to maximize spread.

15.   The Pharmacy Defendants (retail and mail order) likewise did nothing to stem the flow of excess opioids into Botetourt County.  To the contrary, each of the Pharmacy Defendants dispensed opioids—and profited therefrom—through both their brick and mortar stores, and their mail order pharmacies.

16.   The Pharmacy Defendants made money on every opioid prescription they filled; even more so when filled through their mail order facilities or shipped by their own distribution centers.  Much of the money Pharmacy Defendants made came from opioid manufacturers themselves (either directly or as a result of favorable "spread pricing", *see* FN 14 above) or distributors—both of whom were likewise incentivized to maximize opioid use.

17.   The Pharmacy Defendants ignored their responsibilities under federal and state law to monitor, detect, investigate, refuse to fill, and report suspicious orders which the Pharmacy Defendants knew or should have known were likely to be diverted in and around Botetourt.

18.   The Manufacturer, Distributor, and Pharmacy Defendants' efforts to promote their scheme to distribute unnecessary opioids were purposefully facilitated by pharmacy benefit managers ("PBMs") who—in addition to operating mail order pharmacies and, at times, acting as distributors—ensured  that opioids were available, paid for, reimbursed, and at all times covered by public and private pharmacy benefit plans.

19.   PBMs are the gatekeepers to the vast majority of opioid prescriptions filled in the United States. For most of the relevant time period, Caremark, Express Scripts, and OptumRx (all named defendants here) managed the drug benefits for approximately ninety-five percent (95%)

of the United States' population or 253 million Americans.[17]  Today, they manage approximately 75%.

20.     PBMs design plans and create formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed, numbers of refills permitted, number of pills per prescription, pre-authorization requirements, generic co-pay amount, branded drug co-pay amounts and other criteria. PBMs thereafter commit to monitor their customers' utilization and to manage drug plans and overall customer wellbeing. In these ways, PBMs influence prescription drug utilization overall.

21.     Because PBMs are the intermediary between drug manufacturers, pharmacies (including their own captive mail-order pharmacies and, in CVS's case, their additional brick and mortar retail stores), and ultimately patients, these companies impact everything from pharmacy reimbursements to what drugs are covered under formularies and pursuant to what terms.[18] In these ways, the PBMs influence which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

22.     Virginia and Botetourt County have experienced a significant spike in opioid-related abuse and deaths in recent years. The CDC found that Virginia was one of the states with a statistically significant increase in drug overdose death rates from 2015 to 2016.[19] The CDC estimated that 1,405 people died from drug overdoses in Virginia in 2016.[20]

---

[17] Brittany Hoffman-Eubanks, *The Role of Pharmacy Benefit Managers in American Health Care: Pharmacy Concerns and Perspectives: Part 1*, PHARMACY TIMES, Nov. 14, 2017, http://www.pharmacytimes.com/news/the-role-of-pharmacy-benefit-mangers-in-american-health-care-pharmacy-concerns-and-perspectives-part-1
[18] Matthew Kandrach, *PBM stranglehold on prescription drug market demands reform*, THE HILL, May 2, 2017, http://thehill.com/blogs/pundits-blog/healthcare/331601-pbm-stranglehold-on-prescription-drug-market-demands-reform
[19] *Drug Overdose Death Data*, CENTERS FOR DISEASE CONTROL AND PREVENTION, last updated Dec. 19, 2017, https://www.cdc.gov/drugoverdose/data/statedeaths.html
[20] *Id.*

23.     Accordingly, Plaintiff seeks an order compelling Defendants to halt their unlawful dangerous practices and to abate and remove the foreseeable public nuisance they knowingly caused and from which they have profited mightily.

24.     Plaintiff also seeks to recover damages for the costs it has and will incur as a result of Defendants' unlawful conduct, which conduct will have multi-generational consequences for the County. Plaintiff seeks treble damages, punitive damages, disgorgement of all ill-gotten gains together with attorneys' fees and costs in addition to any other equitable relief authorized by law.

## II.     VENUE AND JURISDICTION

25.     This Court has subject matter jurisdiction over this matter pursuant to Virginia Code § 17.1-513.

26.     This Court has personal jurisdiction over Defendants pursuant to Virginia Code § 8.01-328.1 because they conduct business in Virginia, purposefully direct or directed their actions toward Virginia, caused tortious injury in Virginia, consented to be sued in Virginia by registering an agent for service of process, and/or consensually submitted to the jurisdiction of Virginia when obtaining a manufacturer or distributor license and have the requisite minimum contacts with Virginia necessary to constitutionally permit the Court to exercise jurisdiction.

27.     Venue is proper in this Court pursuant to Virginia Code § 8.01-262 in that the Defendants regularly conduct substantial business activity in Botetourt County, Virginia and the causes of action alleged herein arose in Botetourt County, Virginia.

28.     Defendants are regularly engaged in the business of manufacturing, marketing, distributing, dispensing and reimbursing prescription opioids in Virginia and, specifically, in Botetourt County, including to Botetourt County's own current and former employees. Defendants' activities in Botetourt County in connection with the manufacture, marketing,

distribution, dispensation and reimbursement of prescription opioids was, and is, continuous and systematic, and gives rise to the causes of action alleged herein.

## III.   PARTIES

### A.   PLAINTIFF

29.   Botetourt County is a political subdivision of the Commonwealth of Virginia.

30.   Botetourt County derives its governmental powers from the laws of the Commonwealth of Virginia.

### B.   MANUFACTURER DEFENDANTS

31.   Defendant, MALLINCKRODT PLC, is an Irish public limited company with its corporate headquarters in Staines-upon-Thames, United Kingdom. MALLINCKRODT PLC may be served through its registered agent in the United States: CT Corporation System, 120 South Central Avenue, Suite 400, Clayton, Missouri 63105.

32.   Defendant, MALLINCKRODT LLC, is a wholly owned subsidiary of MALLINCKRODT PLC and is a Delaware limited liability company with its principal place of business in St. Louis, Missouri. MALLINCKRODT LLC is registered to do business in Virginia and has been since at least October 4, 2013. Mallinckrodt LLC may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

33.   Defendant, SPECGX LLC is a Delaware limited liability company with its principal place of business in Clayton, Missouri and is a wholly-owned subsidiary of MALLINCKRODT PLC.  SPECGX LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. SPECGX LLC is licensed as a non-resident distributor and non-resident manufacturer with the Virginia Department of Health Professions.

34.    MALLINCKRODT PLC, MALLINCKRODT LLC and SPECGX LLC are referred to collectively as "Mallinckrodt."

35.    Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs throughout the United States. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

36.    In Virginia and nationally, Mallinckrodt is engaged in the manufacture, promotion, and distribution of Roxicodone, oxycodone, and hydrocodone, among other drugs. Mallinckrodt transacts business in Virginia, targeting the Virginia market for its products, including the opioids at issue in this lawsuit, which Mallinckrodt has sold in Virginia.

37.    On information and belief, Mallinckrodt hires employees to service the Virginia market and also directs advertising and informational materials to impact Virginia physicians and potential users of Mallinckrodt products.

38.    According to the DEA ARCOS database, nearly 29% of all opioids shipped to Virginia during the 2006-2012 time period were manufactured by Mallinckrodt. This 29% market share translates to over 11.8 billion MME. Additionally, over 30% of all opioids shipped to Botetourt during the 2006-2012 time period were manufactured by Mallinckrodt. This 30% market share translates to over 29 million MME.

39.    At all times relevant hereto, the PBM Defendants listed the brand drug Roxicodone or its generic alternative oxycodone as approved reimbursable drugs on their formularies. They imposed no pre-authorization requirements or quantity limits on prescriptions until 2014 at the earliest and even then, the limitations did not extend to the PBM commercial plans. The PBM Defendants listed other generic opioids manufactured by Mallinckrodt as approved reimbursable

drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

40.     The publicly available DEA ARCOS data reveals that Mallinckrodt's opioids were the most widely purchased opioids in the mail order pharmacy environment. From 2006-2012, Mallinckrodt sold over 7.7 billion MME to mail order pharmacies. This translates to over 938 million dosage units of opioids—all purchased for dispensing by mail nationwide. Mallinckrodt provided over 20% of all MME purchased for dispensing by mail during the 2006-2012 time period, according to the ARCOS database.

41.     The publicly available ARCOS data further reveals that the defendant PBM Mail Order Pharmacies each purchased Mallinckrodt opioids for dispensing by mail nationwide. During the 2006-2012 time period, Express Scripts Mail Order Pharmacy purchased over 2 billion MME in Mallinckrodt's opioids; Caremark Mail Order Pharmacy purchased over 1.3 billion MME and Optum Mail Order Pharmacy purchased over 426 million MME.

42.     Express Scripts and Caremark Mail Order Pharmacies purchased Mallinckrodt's opioids directly from Mallinckrodt, and indirectly through distributors. Upon information and belief, Caremark also purchased Mallinckrodt's opioids through Caremark's own distributors and repackaging companies. Upon information and belief, Caremark and Express Scripts had contracts with Mallinckrodt which governed the terms of their opioid purchases. Optum's Mail Order Pharmacy purchased Mallinckrodt's opioids through distributors.

43.     Defendant, RICHARD SACKLER, a resident of Riviera Beach, Florida, has served on the board of directors for Purdue at all relevant times and until 2018.

44.     Defendant, BEVERLY SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times and until 2017.

45.     Defendant, DAVID SACKLER, a resident of New York, has served on the board of directors for Purdue from 2012 to 2018.

46.     Defendant, ILENE SACKLER LEFCOURT, a resident of New York, has served on the board of directors for Purdue at all relevant times.

47.     Defendant, JONATHAN SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times.

48.     Defendant, KATHE SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times.

49.     Defendant, MORTIMER D.A. SACKLER, a resident of New York, has served on the board of directors for Purdue at all relevant times.

50.     Defendant, THERESA SACKLER, a resident of the United Kingdom, has served on the board of directors for Purdue at all relevant times and until 2018.

51.     At all relevant times, the aforementioned Defendants (collectively, the "Sackler Defendants") comprised a majority of the board of directors for Purdue, enabling the Sackler Defendants to exert control over Purdue's business decisions, including the implementation of deceptive sales and marketing practices associated with opioids.

52.     Defendant, JOHN STEWART, a resident of Florida, served as Purdue's CEO from 2007 to 2013.

53.     Defendant, MARK TIMNEY, a resident of Connecticut, served as Purdue's CEO from 2014 to 2017.

54.     Defendant, CRAIG LANDAU, a resident of Connecticut, served as Purdue's CEO from 2017 to the present.

55.     Defendants, JOHN STEWART, MARK TIMNEY, and CRAIG LANDAU, in their capacities as CEO of Purdue Pharma L.P. and Purdue Pharma, Inc., each directed Purdue's misconduct.

56.     Defendant RUSSELL GASDIA, a resident of Massachusetts, carried out the misconduct in his capacity as Vice President of Sales and Marketing for Purdue at all relevant times until 2014.

57.     Defendants John Stewart, Mark Timney, Craig Landau, and Russell Gasdia are collectively referred to as the "Purdue Officer Defendants". The Sackler Defendants and the Purdue Officer Defendants are collectively referred to as the "Purdue Individual Defendants."

58.     Substantially all of the Sackler Defendants (except David Sackler) were heavily involved in the conduct that led to the fines and criminal convictions in 2007. From the 1990s until 2007, they directed a decade of misconduct, which led to criminal convictions and commitments that Purdue would not deceive doctors and patients again. That background confirms that their misconduct since 2007 was knowing, purposeful, reckless, and intentional.

59.     While the Sackler Defendants relinquished their officer titles in or around 2003 to try to shield themselves from future criminal and civil liability, they remained Purdue's owners, in control of its Board of Directors, and thus in firm control.

60.     At all relevant times, at least through the end of 2018, the Sackler Defendants controlled Purdue's deceptive sales campaign. They directed the company to hire hundreds more sales representatives to visit doctors thousands more times. They insisted that sales representatives repeatedly visit the most prolific prescribers and encourage doctors to prescribe more of the highest doses of opioids. They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use them. They asked for detailed reports about doctors suspected of misconduct, how much money Purdue made from them, and how few of them Purdue had reported to the authorities.

They sometimes demanded more detail than anyone else in the entire company, so staff had to create special reports just for them. Richard Sackler even went into the field to promote opioids to doctors and supervise representatives face-to-face. In connection with a single meeting in 2011, for example, sales and marketing staff scrambled to prepare responses to questions from the Sackler Defendants: Defendant Mortimer Sackler asked about launching a generic version of OxyContin to "capture more cost sensitive patients," Defendant Kathe Sackler recommended looking at the characteristics of patients who had switched to OxyContin to see if Purdue could identify more patients to convert, and Defendant Jonathan Sackler wanted to study changes in market share for opioids, focusing on dose strength.

61.     On information and belief, the Sackler Defendants' micromanagement was so intrusive that staff begged for relief. Defendant Gasdia wrote to the CEO: "Anything you can do to reduce the direct contact of Richard into the organization is appreciated." To convince the Sackler Defendants to make him CEO, Defendant Landau wrote a plan that he titled: "SACKLER PHARMA ENTERPRISE." He started by admitting that the Sackler Defendants in fact controlled the company like chief executive officers.  The family ran "the global Sackler pharmaceutical enterprise … with the Board of Directors serving as the 'de-facto' CEO." The Sackler Defendants concealed their ongoing, extensive involvement with Purdue and its sales and marketing practices.

62.     From the money that Purdue collected as a result of its wrongful conduct, the Sackler Defendants paid themselves and their family billions of dollars. From the 2007 convictions (of certain Purdue officers) until 2018, the Sackler Defendants voted dozens of times to pay out Purdue's opioid profits to their family - in total **more than four billion dollars.**

63.     The Purdue Individual Defendants all actively participated in the common law torts and federal and state statutory violations of Purdue and benefited therefrom. The tortious conduct of the Purdue Individual Defendants was not, and could not have been through the exercise of due

diligence, known to the public until their conduct was detailed in recent court filings by the Attorney General of Massachusetts.

64.    Under the Purdue Individual Defendants, Purdue has engaged in the manufacture, promotion, and distribution of opioids, including: (a) OxyContin (oxycodone hydrochloride extended release), a Schedule II opioid agonist tablet first approved in 1995 and marketed by Purdue for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." OxyContin was indicated, or legally approved, for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time"; and (b) MS Contin (morphine sulfate extended release), a Schedule II opioid agonist tablet first approved in 1987 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

65.    Both OxyContin and MS Contin are brand drugs.   The original OxyContin formulation first faced generic competition in 2004.   MS Contin has faced generic competition since 1998.

66.    Purdue secured a new patent for an abuse-deterrent formulation of OxyContin in 2010.

67.    OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up almost four-fold from 2006 sales of $800 million. OxyContin constitutes roughly thirty percent (30%) of the entire market for analgesic drugs (painkillers).

68.    In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million. At the time, this was one of the

largest settlements with a drug company for marketing misconduct. Purdue's misconduct has continued, as alleged herein, settlement notwithstanding.

69.     Purdue transacts business in Virginia, targeting the Virginia market for its products, including the opioids at issue in this lawsuit. Purdue hires employees to service the Virginia market. For example, Purdue recently advertised online that it was seeking a Territory Business Manager to operate out of Bristol, Virginia, and another Territory Business Manager to operate out of Richmond South, Virginia.[21] On information and belief, Purdue also directs advertising and informational materials to impact Virginia physicians and potential users of Purdue products. Purdue possesses a Virginia out of state manufacturer license.

70.     According to the DEA ARCOS database, nearly 7% of all opioids shipped to Virginia during the 2006-2012 time period were manufactured by Purdue. That 7% market share translates to over 3 billion Morphine Milligram Equivalents ("MME").[22] Additionally, over 8.5% of the opioids shipped to Botetourt during the 2006-2012 time period were manufactured by Purdue. That 8.5% market share translates to over 8.2 million MME.

71.     PBM giant Express Scripts appears to have played a particularly critical role in facilitating and preserving market growth for OxyContin. From at least 2003, it has given

---

[21] https://www.google.com/search?q=purdue+pharma+job+virginia&oq=purdue+pharma+job+virginia&aqs=chrome ..69i57.7359j0j9&sourceid=chrome&ie=UTF-8&safe=active&ibp=htl;jobs&sa=X&ved=0ahUKEwjhv_fM_9_ZAhVDtFMKHUq2CakQiYsCCCkoAA#fpstate=tl detail&htidocid=7crc6THcWHB7I7Y_AAAAAA%3D%3D&htivrt=jobs

[22] MME is a value assigned to opioids to represent their relative potencies by comparing a given opioid's strength to an equivalently strong dose of morphine. While a 100 mg dose of hydrocodone would equate to a 100 MME dose due to its being comparably potent to morphine, it would take only a 769 *micro*gram dose of a fentanyl tablet to reflect a 100 MME dose due to its relatively high potency compared to morphine.

preferential formulary and plan treatment to the brand drug OxyContin, routinely making it more accessible than less addictive pain treatment alternatives.

72.     Express Scripts also facilitated reimbursement of MS-Contin through preferential formulary and plan treatment, routinely making it more accessible than less addictive pain alternatives.

73.     The publicly available DEA ARCOS data reveals that Purdue's opioids were widely purchased and dispensed in the mail order pharmacy environment. From 2006-2012, Purdue sold over 6.5 billion MME to mail order pharmacies. This translates to over 113 million dosage units of opioids- all dispensed by mail nationwide. Purdue provided over 17% of all MME dispensed by mail during the 2006-2012 time period, according to the ARCOS database.

74.     Express Scripts Mail Order Pharmacy purchased over 5 billion MME in Purdue's opioids during the 2006-2012 period, often directly buying from Purdue itself (as opposed to a distributor). This staggering number (over 82 million opioid dosage units) represented nearly 26% of all opioids purchased by Express Scripts Mail Order Pharmacy, which operated nationwide, during that time period. According to the publicly available ARCOS data, no other PBM Mail Order Pharmacy Defendant bought directly from Purdue, though both of them dispensed Purdue opioids by mail nationwide.[23]

75.     Upon information and belief, all of the foregoing was pursuant to agreements between Purdue and Express Scripts that set forth the terms of Express Scripts' services to Purdue and how it would be paid by Purdue.

---

[23] Caremark Mail Order Pharmacy purchased over 975 million MME of Purdue Opioids during the 2006-2012 period (purchased through wholesalers and, on information and belief, its own distributor and repackaging companies); Optum Mail Order Pharmacy purchased over 181 million MME of Purdue Opioids (purchased through wholesalers).

76.     Purdue's conspiring with PBMs to drive opioid use is well-documented.  As described in an October 28, 2016 article from Psychology Today entitled *America's Opioid Epidemic*:

> Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts, a defendant herein] and other pharmacy benefits managers, on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction. ... One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scenes, however, as one Purdue official openly acknowledged, the drug maker was "working with Medco (PBM) [now defendant Express Scripts] to try to make parameters [for prescribing] less stringent.[24]

77.     Upon information and belief, Purdue's practices with Medco (now Defendant Express Scripts, defined below) were not confined to West Virginia and have caused injury nationwide, including in Botetourt County.

78.     PBM Defendant Caremark (defined below) also facilitated OxyContin's market position throughout the relevant time period.  For most, if not all, of the relevant times hereto, on information and belief, Caremark maintained OxyContin as a reimbursable drug on its formulary. Caremark imposed no pre-authorization requirements or quantity limits on OxyContin prescriptions until 2014 at the earliest, and even then, the limitations were confined to public plans. Caremark also facilitated reimbursement of MS-Contin, which similarly appears not to have had pre-authorization requirements or quantity limits on prescriptions before those imposed by Medicare in 2013.

---

[24] American Society of Addiction Medicine, *America's Opioid Epidemic – Court released documents show drug makers blocked efforts to curb prescribing*, PSYCHOLOGY TODAY, Oct. 28, 2016, https://www.psychologytoday.com/blog/side-effects/201610/america-s-opioid-epidemic

79.     Upon information and belief, the foregoing treatment of OxyContin reimbursement was pursuant to agreements between Purdue and Caremark that set forth the terms of Caremark services to Purdue and how it would be paid by Purdue.

80.     PBM Defendant OptumRx (as defined below) also facilitated OxyContin and MS-Contin's market growth.   At all times relevant hereto, on information and belief, both were approved drugs on OptumRx's national formularies.

81.     The companies Rhodes Technologies, Rhodes Technologies, Inc., Rhodes Pharmaceuticals, L.P.,  and Rhodes Pharmaceuticals, Inc., referred to collectively as "Rhodes," are also effectively under the control of several Purdue Individual Defendants.

82.     Rhodes is presently among the largest producers of generic opioids in the U.S.[25] Together with Purdue, Rhodes accounted for 14.4 million opioid prescriptions in 2016, or 6% of the US Opioid market.[26]

83.     Rhodes also owns, together with Purdue, the 1991 Patent entitled "Oxycodone Compositions" and is involved in the manufacture of the active pharmaceutical ingredient used in Purdue's OxyContin.

84.     Rhodes is also now the registered holder of approved New Drug Application No. 19-891, which covers the manufacturer and sale of Dilaudid

85.     At all times relevant hereto the PBM defendants have listed the generic opioids manufactured by Rhodes on their national formularies; often without quantity or refill limits; often without any pre-authorization requirements.  The PBM defendants have made it easier to access these highly-addictive opioids than they have less-addictive alternatives.

---

[25] David Crow, *Billionaire Sackler family owns second opioid drugmaker*, FINANCIAL TIMES, Sept. 9, 2018, https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132
[26] *Id.*

86.     Rhodes manufactures, promotes, distributes and/or sells generic opioids nationally including in Virginia, and in Botetourt County, including but not limited to oxycodone, morphine sulfate, hydrocodone and hydromorphone.

87.     According to the DEA ARCOS database, nearly 1% of all opioids shipped to Virginia during the 2006-2012 time period were manufactured by Rhodes. That 1% market share translates to over 298 million MME. Additionally, nearly 0.5% of all opioids shipped to Botetourt during the 2006-2012 time period were manufactured by Rhodes. That 0.5% market share translates to over 450,000 MME.

88.     Collectively, according to the DEA ARCOS database, Purdue and Rhodes manufactured nearly 8% of the opioids shipped to Virginia during the 2006-2012 period. This translates to over 3.1 billion MME.  In addition, Purdue and Rhodes collectively manufactured over 9% of the opioids reported in Botetourt during the 2006-2012 period. This translates into nearly 8.7 million MME.

89.     Defendant, ENDO HEALTH SOLUTIONS, INC., is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Defendant, ENDO PHARMACEUTICALS, INC., is a wholly owned subsidiary of ENDO HEALTH SOLUTIONS, INC. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

90.     ENDO HEALTH SOLUTIONS, INC. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  ENDO PHARMACEUTICALS, INC. may be served  through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

91.     Defendant PAR PHARMACEUTICAL COMPANIES, INC. ("Par Pharmaceutical Cos.") is a Delaware corporation with its principal place of business in Chestnut Ridge, New York.

On information and belief, Par Pharmaceutical Cos. is a holding company and is a wholly-owned subsidiary, directly or indirectly, of Endo International plc.

92.     Defendant, PAR PHARMACEUTICAL, INC. ("Par Pharmaceutical") is a New York corporation with its principal place of business in Chestnut Ridge, New York.   On information and belief, Par Pharmaceutical is a wholly-owned subsidiary of Par Pharmaceutical Cos. and holds itself out as "an Endo International Company." Par Pharmaceutical is licensed and has been licensed as a non-resident distributor with the Virginia Department of Health Professions since 2005.

93.     Par Pharmaceutical Cos. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Par Pharmaceutical may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

94.     Par Pharmaceutical and Par Pharmaceutical Cos. are referred to collectively as "Par."

95.     Endo transacts business in Virginia, targeting the Virginia market for its products, including the opioids at issue in this lawsuit. Endo hires employees to service the Virginia market. For example, Endo recently posted online that it was seeking a Specialty Sales Consultant to work out of its Richmond, Virginia location.[27]  On information and belief, Endo also directs advertising and informational materials to impact Virginia physicians and potential users of Endo products.

---

[27]https://www.google.com/search?safe=active&ei=EumiWrqUHMjBzgKl65_ICg&q=ENDO+HEALTH+SOLUTIO
NS,+INC.+jobs+virginia&oq=ENDO+HEALTH+SOLUTIONS,+INC.+jobs+virginia&gs_l=psy-
ab.3...155352.155352.0.155764.1.1.0.0.0.0.364.364.3-1.1.0....0...1.1.64.psy-ab..0.0.0....0.Mvfb-
eZuOfE&ibp=htl;jobs&sa=X&ved=0ahUKEwjm3JmQhuDZAhUKXlMKHbpJCb0QiYsCCCkoAA#fpstate=tldetail
&htidocid=J6XwduKDNlT-vHtgAAAAAA%3D%3D&htivrt=jobs

96.    Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, throughout the United States, including Virginia. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for ten percent (10%) of Endo's total revenue in 2012. Endo, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc., also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, meperidine and hydrocodone products across the United States, including Virginia and Botetourt County.

97.    Par develops, markets, and sells prescription drugs including the brand opioid Endocet and generic opioids consisting of oxycodone, oxymorphone, hydrocodone, morphine sulfate, and fentanyl citrate, throughout the United States, including Virginia and Botetourt County.

98.    ENDO HEALTH SOLUTIONS, INC., ENDO PHARMACEUTICALS, INC., and Par are, referred to collectively as "Endo."

99.    According to the DEA ARCOS database, nearly 8.3% of the opioids shipped to Virginia during the 2006-2012 time period were manufactured by Endo and Par. That 8.3% market share translates to nearly 4 billion MME. Additionally, over 10.5% of all opioids shipped to Botetourt during the 2006-2012 time period were manufactured collectively by Endo and Par. That 10.5% market share translates to over 10.4 million MME.

100.    At all times relevant hereto, the PBM Defendants listed generic opioids manufactured by Endo as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

101.    The publicly available DEA ARCOS data reveals that Endo's opioids were widely purchased in the mail order pharmacy environment. From 2006-2012, Endo sold over 3 billion

MME to mail order pharmacies. This translates to over 309 million dosage units of opioids- all purchased for dispensing by mail nationwide. Endo provided over 8% of all MME purchased for dispensing by mail during the 2006-2012 time period, according to the ARCOS database.

102.    The publicly available ARCOS data reveals that the PBM Mail Order Pharmacies named herein each purchased Endo opioids for dispensing by mail nationwide. During the 2006-2012 time period, Express Scripts Mail Order Pharmacy purchased over 1.3 billion MME in Endo's opioids, Caremark's Mail Order Pharmacy purchased over 790 million MME and Optum's Mail Order Pharmacy purchased over 287 million MME. Each of the PBM Mail Order Defendants purchased Endo's opioids directly from Endo, and indirectly through distributors. Upon information and belief, Caremark also purchased Endo opioids through its own Caremark distributor and repackaging companies. Upon information and belief, each of the PBM Mail Order Defendants had contracts with Endo which governed the terms of their opioid purchases.

103.    Defendant, TEVA PHARMACEUTICALS USA, INC. ("Teva USA"), is a Delaware corporation with its principal place of business in North Wales, Pennsylvania and is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation.

104.    Defendant, CEPHALON, INC. ("Cephalon"), is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

105.    Defendant, BARR LABORATORIES, INC. ("Barr"), is a Delaware corporation with its principal place of business in Horsham, Pennsylvania. In 2008, Teva Ltd. acquired Barr.

106.    WATSON LABORATORIES, INC., is a Nevada corporation with its principal place of business in Parsippany, New Jersey.

107.    Defendant, ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc.

108.    Defendant, ACTAVIS, LLC, is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

109.    WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC. and ACTAVIS, LLC are wholly-owned indirect subsidiaries of Teva, Ltd., which acquired the companies in 2016. Prior to 2016, each of these companies was a subsidiary of Defendant ALLERGAN, PLC.

110.    Teva USA, has a Virginia taxpayer number and may be served through its registered agent: Corporate Creations Network Inc., 3411 Silverside Road Tatnall Building, Suite 104, Wilmington, Delaware 19810. Cephalon may be served at 41 Moores Road, Frazer, Pennsylvania 19355. Barr is registered to do business and Virginia may be served in Virginia through its registered agent: Corporate Creations Network Inc., 6802 Paragon Place Suite 410, Richmond, Virginia 23230.

111.    WATSON LABORATORIES, INC. may be served through its registered agent: Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, Nevada 89123. ACTAVIS, LLC may be served through its registered agent: Corporate Creations Network Inc., 3411 Silverside Road Tatnall Building, Suite 104, Wilmington, Delaware 19810.  ACTAVIS PHARMA, INC. is registered to do business in Virginia may be served in Virginia through its registered agent: Corporate Creations Network Inc., 6802 Paragon Place #410, Richmond, Virginia 23230.

112.    Teva USA, Cephalon, Barr, WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC. and ACTAVIS, LLC are referred to collectively as "Teva."

113.     Teva manufactures, promotes, distributes and sells both brand name and generic versions of opioids nationally, and in Botetourt County, including the following: (a) Actiq, and (b) Fentora. Teva also was in the business of selling generic opioids, including morphine, hydromorphone, tramadol, codeine, and meperidine from at least 2000, and a generic form of OxyContin from 2005 to 2009, among others. Teva transacts business in Virginia, targeting the Virginia market for its products, including the opioids at issue in this lawsuit. Teva hires employees to service the Virginia market, and operates a manufacturing plant in Lynchburg, Virginia. On information and belief, Teva also directs advertising and informational materials to impact Virginia physicians and potential users of its products.

114.     According to the DEA ARCOS database, nearly 15.5% of all opioids shipped to Virginia during the 2006-2012 time period were manufactured by Teva. That 15.5% market share translates to nearly 6.4 billion MME. Additionally, nearly 2.5% of all opioids shipped to Botetourt during the 2006-2012 time period were manufactured by Teva. That 2.5% market share translates to over 2.6 million MME.

115.     At all times relevant hereto, the PBM Defendants listed the generic opioids manufactured by Teva as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

116.     At all times relevant hereto, PBM Defendant OptumRx listed both Actiq and Fentora as approved reimbursable brand drugs on its formularies. In many years, the products had preferred brand status.

117.     OptumRx did not impose any quantity limits or pre-authorization requirements for the generic Teva OxyContin.

118.     The publicly available DEA ARCOS data reveals that Teva's opioids were the second most purchased opioid in the mail order pharmacy environment. From 2006-2012, Teva

sold over 7.6 billion MME to mail order pharmacies. This translates to over 398 million dosage units of opioids- all purchased for dispensing by mail nationwide. Teva provided nearly 20% all MME purchased for nationwide dispensing during the 2006-2012 time period, according to the ARCOS database.

119.   The publicly available Arcos data reveals that the PBM Mail Order Pharmacies named herein each purchased Teva opioids for dispensing by mail nationwide. During the 2006-2012 time period, Express Scripts Mail Order Pharmacy purchased over 5.23 billion MME of Teva's opioids; Caremark's Mail Order Pharmacy purchased over 860 million MME and Optum's Mail Order Pharmacy purchased over 350 million MME. Each of the PBM Mail Order Defendants purchased Teva's opioids directly from Teva, and indirectly through wholesalers.   Upon information and belief, each of the PBM Mail Order Defendants had contracts with Teva which governed the terms of their opioid purchases. Upon information and belief, Caremark also purchased Teva opioids through its own Caremark distributor and repackaging companies.

120.   Defendant, WATSON LABORATORIES, INC., is a Nevada corporation with its principal place of business in Corona, California, and was a wholly owned subsidiary of Defendant, ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.), is a public limited company incorporated under the laws of the State of Ireland with its headquarters and principal place of business in Dublin, Ireland.

121.   Defendant, ALLERGAN FINANCE, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) is a Nevada limited liability company with its principle place of business in Parsippany, New Jersey. ALLERGAN FINANCE, LLC is a wholly-owned indirect subsidiary of ALLERGAN PLC. ALLERGAN FINANCE, LLC may be served through its registered agent: The Corporation Trust Company of Nevada, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701.

122.   ALLERGAN PLC uses ALLERGAN FINANCE, LLC to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over the marketing and sales efforts and profits from the sale of Allergan products ultimately inure to its benefit. Prior to 2016, ALLERGAN PLC was also the parent company of Defendants WATSON LABORATORIES, INC., ACTAVIS, LLC and ACTAVIS PHARMA, INC. described above.

123.   ALLERGAN PLC and ALLERGAN FINANCE, LLC are collectively referred to as "Allergan."

124.   Allergan manufactures, promotes, sells and distributes opioids, including the branded drugs Kadian and Norco, and generic versions of Duragesic and Opana throughout the United States, including in Virginia and in Botetourt County. Allergan acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

125.   Allergan transacts business in Virginia, targeting the Virginia market for its products, including the opioids at issue in this lawsuit. Allergan hires employees to service the Virginia market. For example, Allergan recently advertised online that it was seeking a Pharmaceutical Sales Representative to operate out of Manassas, Virginia. Allergan also directs advertising and informational materials to impact Virginia physicians and potential users of its products.

126.   According to the DEA ARCOS database, nearly 12.9% of all opioids shipped to Virginia during the 2006-2012 time period were manufactured collectively by Allergan and Allergan's formerly wholly-owned subsidiaries ACTAVIS PHARMA, INC. and WATSON PHARMA, INC. That 12.9% market share translates to over 5.3 billion MME. Additionally, nearly 13.5% of all opioids shipped to Botetourt during the 2006-2012 time period were manufactured

by collectively by Allergan and Allergan's formerly wholly-owned subsidiary ACTAVIS

PHARMA, INC. That 13.5% market share translates into over 13 million MME.

127.    At all times relevant hereto, the PBM Defendants listed opioids manufactured by

Allergan as approved reimbursable drugs on their formularies, often without any quantity limits or

pre-authorization requirements; often in preferred tiers.

128.    Defendant, MYLAN PHARMACEUTICALS, INC. ("Mylan"), is a West Virginia

corporation with its principal place of business in Canonsburg, Pennsylvania.    Mylan is and has

been registered to do business in Virginia since 2010 and may be served in Virginia through its

registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia

23219.

129.    Defendant MYLAN INSTITUTIONAL INC., is an Illinois corporation with its

principal place of business in Canonsburg, Pennsylvania and is a wholly-owned subsidiary of

MYLAN INC. MYLAN INSTITUTIONAL INC. may be served in Virginia through its registered

agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

130.    MYLAN PHARMACEUTICALS, INC., and MYLAN INSTITUTIONAL INC.

are referred to collectively as "Mylan."

131.    Mylan is currently licensed as an out-of-state manufacturer/distributor with the

Virginia Department of Health Professions. Upon information and belief, Mylan manufactures,

promotes, distributes and sells generic opioids nationally, in Virginia, and in Botetourt County,

including but not limited to oxycodone, hydrocodone, and morphine sulfate.

132.    According to the DEA ARCOS database, over 7.4% of all opioids shipped to

Virginia during the 2006-2012 time period were manufactured by Mylan. That 7.4% market share

translates to nearly 3.1 billion MME. Additionally, over 15.5% of the opioids shipped to Botetourt

during the 2006-2012 time period were manufactured by Mylan. That 15.5% market share translates to over 15 million MME.

133.    At all times relevant hereto, the PBM Defendants listed generic opioids manufactured by Mylan as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

134.    The publicly available DEA ARCOS data reveals that Mylan's opioids were widely purchased in the mail order pharmacy environment. From 2006-2012, Mylan sold over 3.1 billion MME to mail order pharmacies. This translates to over 8 million dosage units of opioids- all purchased for dispensing by mail nationwide.  Mylan provided over 8.3% of all MME purchased for dispensing by mail during the 2006-2012 time period, according to the ARCOS database.

135.    The publicly available ARCOS data reveals that the PBM Mail Order Pharmacies named herein each purchased Mylan opioids for dispensing by mail nationwide.  During the 2006-2012 time period, Express Scripts Mail Order Pharmacy purchased over 951 million MME in Mylan's opioids; Caremark's Mail Order Pharmacy purchased nearly 1.4 billion MME and Optum's Mail Order Pharmacy purchased over 10 million MME.  Express Scripts and Caremark Mail Order Pharmacies purchased Mylan's opioids directly from Mylan, and indirectly through distributors.  Upon information and belief, both had contracts with Mylan which governed the terms of their opioid purchases.

136.    Defendant INDIVIOR, INC. is a Delaware corporation with its principal place of business located at 10710 Midlothian Turnpike, Suite 430, Richmond Virginia 23235. INDIVIOR, INC. is a wholly owned subsidiary of Indivior Plc, a public limited company incorporated in England and Wales.  INDIVIOR INC. is authorized to do business in Virginia and may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

30

137.   Defendant INDIVIOR INC. manufactures, markets, sells and distributes pharmaceutical drugs throughout the United States, including opioid medications such as Sublocade (buprenorphine), Subutex tablet (buprenorphine), Suboxone tablet (buprenorphine/naloxone), and Suboxone film (buprenorphine/naloxone).

138.   Upon information and belief, Endo, Actavis and Cephalon also produce generic versions of Suboxone film.

139.   In April 2019, the U.S. Department of Justice announced that Indivior Inc. was indicted for fraudulently marketing their Suboxone film opioid as safer, less divertible and less abusable than other opioid-addiction treatment drugs. Indivior was also alleged to have sought to boost profits by using a "Here to Help" program to connect opioid-addicted patients to doctors the company knew were prescribing opioids at high rates and in a clinically unwarranted manner.

140.   In July 2019, the U.S. Department of Justice and Indivior negotiated a $1.4 billion settlement of the issues presented by the indictment.[28]

141.   According to the DEA ARCOS database, over 10.6% of all opioids shipped to Virginia were manufactured by Indivior. That 10.6% market share translates to nearly 4.4 billion MME. Additionally, nearly 1.4% of all opioids shipped to Botetourt during the 2006-2012 time period were manufactured by Indivior. That 1.4% market share translates to over 1.3 million MME.

---

[28] Department of Justice Press Release, *Justice Department Obtains $1.4 Billion from Reckitt Benckiser Group in Largest Recovery in a Case Concerning an Opioid Drug in United States History*, July 11, 2019; https://www.justice.gov/opa/pr/justice-department-obtains-14-billion-reckitt-benckiser-group-largest-recovery-case.

142.     Over 1.1 billion of the total Indivior MME in Virginia during the 2006-2012 time period was associated with Suboxone film which was the subject of the U.S. Department of Justice indictment and resulted in the $1.4 billion settlement.

143.     The publicly available DEA ARCOS data reveals that Indivior's opioids were widely purchased and dispensed in the mail order pharmacy environment.   From 2006-2012, Indivior sold over 1.7 billion MME to mail order pharmacies. This translates to over 8.6 million dosage units of opioids – all dispensed by mail nationwide.  Indivior provided over 4.5% of all MME dispensed by mail during the 2006-2012 time period, according to the ARCOS database.

144.     The publicly available ARCOS data reveals that the PBM Mail Order Pharmacies named herein each purchased Indivior opioids for nationwide dispensing.  During the 2006-2012 time period, Express Scripts Mail Order Pharmacy purchased over 1 billion MME in Indivior's opioids; Caremark's Mail Order Pharmacy purchased over 411 million MME and Optum's Mail Order Pharmacy purchased over 21 million MME.

145.     The corporate defendants listed above are all engaged in the manufacturing of opioids. Together with the Purdue Individual Defendants, they are collectively referred to herein as the "Manufacturer Defendants."

146.     The failure of all Manufacturer Defendants to effectively prevent suspicious orders of prescription opioids, their aggressive misinformation and pricing campaigns aimed at maximizing the dispensing and their distribution of highly addictive opioids nationally, in Virginia, and in Botetourt County, their failure to forthrightly provide accurate information to the United States Food and Drug Administration ("FDA"), their failure to adhere to FDA regulations regarding misbranding, and their perverse utilization of so-called "patient advocacy" groups to evade FDA regulations concerning consumer drug-marketing foreseeably contributed to a vast increase in opioid overuse, diversion and addiction. Manufacturer Defendants' conduct thus

32

directly caused a public-health and law-enforcement crisis across this country, including in Botetourt County.

## C.   DISTRIBUTOR DEFENDANTS

147.   Defendant McKESSON CORPORATION ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California.

148.   McKesson has been registered to do business in Virginia since at least January 1, 2018 and does substantial business in Virginia. McKesson has a Virginia taxpayer number and may be served in Virginia through its registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

149.   McKesson is the largest pharmaceutical distributor in North America. In 2015, McKesson had a net income in excess of $1.5 billion. It distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Virginia.

150.   McKesson is one of the largest distributors of opioid pain medications in the country, including in Virginia.

151.   McKesson also has a local warehouse that it operates out of Ruther Glen, Virginia, which distributes pharmaceutical drugs including opioids in and around the Virginia.

152.   In its 2017 Annual Report, McKesson states that it "partner[s] with pharmaceutical manufacturers, providers, pharmacies, governments and other organizations in healthcare to help provide the right medicines, medical products and healthcare services to the right patients at the right time, safely and cost-effectively."[29]

---

[29] McKesson 2017 Annual Report found at investor.mckesson.com/sites/mckesson.investorhq.businesswire.com/files/report/file/2017_McKesson_Annual_R eport_0.pdf

153.    According to the 2017 Annual Report, McKesson "pharmaceutical distribution business operates and serves thousands of customer locations through a network of 27 distribution centers, as well as a primary redistribution center, two strategic redistribution centers and two repackaging facilities, serving all 50 states and Puerto Rico."[30]

154.    McKesson hires employees to service the Virginia market. For example, McKesson recently advertised online that it was seeking a Delivery Driver to operate out of Chesapeake, Virginia, a Senior Accountant to operate out of Richmond, Virginia, and a Client Service Rep to operate out of Richmond, Virginia.

155.    Defendant MCKESSON MEDICAL-SURGICAL INC. ("McKesson Medical-Surgical") is a Virginia corporation with its principal place of business in Richmond, Virginia.

156.    McKesson Medical-Surgical has been registered to do business in Virginia since at least January 1, 2018 and does substantial business in Virginia. McKesson Medical-Surgical may be served in Virginia through its registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

157.    McKesson Medical-Surgical engages in business in Virginia as a wholesale distributor of pharmaceuticals, including opioids.

158.    The DEA ARCOS database reveals that between 2006-2012, McKesson and McKesson Medical-Surgical collectively distributed over 8.4 billion MME into Virginia, across over 390 million dosage units. McKesson and McKesson Medical distributed over 32.2 million MME into Botetourt, across over 1.5 million dosage units.

---

[30] *Id.*

159.    Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio. Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Virginia.

160.    Cardinal may be served in through its registered agent: CT Corporation System, 4400 Easton Commons Way Suite 125, Columbus, Ohio 43219.

161.    Cardinal, through its many subsidiaries, including Cardinal Health Care Services, Inc., possesses out-of-state pharmaceutical distribution licenses in Virginia, has been registered to do business in Virginia since at least October 4, 2013 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

162.    Cardinal is one of the largest distributors of opioid pain medications in the country, including Virginia.

163.    The DEA ARCOS database reveals that between 2006-2012, Cardinal distributed nearly 11.5 billion MME into Virginia, across over 484 million dosage units. Cardinal shipped over 46.3 million MME into Botetourt, across nearly 1.9 million dosage units.

164.    Defendant AMERISOURCEBERGEN DRUG CORPORATION ("Amerisource") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. Amerisource distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Virginia.

165.    Amerisource has been registered to do business in Virginia since at least October 4, 2013 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060. Amerisource also has a local warehouse that it operates out of Glen Allen, Virginia, which distributes pharmaceutical drugs including opioids in and around the Virginia.

166.    According to its 2016 Annual Report, Amerisource is "one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and enhance patient care."[31]

167.    Amerisource hires employees to service the Virginia market. For example, Amerisource recently advertised online that it was seeking a Warehouse Associate I for the Night Shift to operate out of Glen Allen, Virginia, a Warehouse Associate II for the Day Shift to operate out of Glen Allen, Virginia, and a Dispatcher/Operations to operate out of Herndon, Virginia.

168.    Amerisource is one of the largest distributors of opioid pain medications in the country, including Virginia.

169.    Between 2006-2012, the DEA ARCOS database reveals that Amerisource distributed nearly 7.2 billion MME into the Commonwealth of Virginia, including into Botetourt County, across over 369 million dosage units.

170.    Defendant HENRY SCHEIN, INC. is a Delaware corporation with its principal place of business in Melville, New York. HENRY SCHEIN, INC. has been registered to do business in Virginia since 1997, and at all relevant times, it conducted business as a licensed prescription drug distributor in Virginia. HENRY SCHEIN, INC. may be served in Virginia through its registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

171.    Defendant GENERAL INJECTABLES & VACCINES, INC. ("GIV") is a Virginia corporation with its principal place of business in Bastian, Virginia. In 1998, HENRY SCHEIN,

---

[31] Amerisource 2016 Annual Report found at http://www.amerisourcebergen.com/investor/phoenix.zhtml ?c=61181&p=irol-irhome

INC. acquired GIV for an estimated $65 million dollars.[32] At all relevant times, GIV conducted business as a licensed prescription drug distributor in Virginia. GIV may be served in Virginia through its registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

172.   Defendant INSOURCE, INC. ("Insource") is a Virginia corporation with its principal place of business at the same location as GIV in Bastian, Virginia. HENRY SCHEIN, INC. is the direct parent company of Insource, and, according to the Virginia State Corporation Commission, Insource, Inc. is also an assumed name used by GIV. At all relevant times, Insource conducted business as a licensed prescription drug distributor in Virginia. Insource may be served in Virginia through its registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

173.   HENRY SCHEIN, INC., GIV, AND INSOURCE are collectively referred to as "Henry Schein."

174.   Henry Schein distributes, among other things, branded and generic pharmaceuticals to customers that include dental practitioners, dental laboratories, animal health practices and clinics, and office-based medical practitioners, ambulatory surgery centers, and other institutions. At all relevant times, Henry Schein was in the business of distributing, and redistributing, pharmaceutical products, including opioids, to consumers within Virginia.

175.   In November of 2014, Henry Schein and Cardinal Health entered into a strategic partnership, which consolidated Cardinal Health's physician office-sales organization into Henry Schein's subsidiary Henry Schein Medical. Henry Schein took responsibility for serving physician

---

[32] HENRY SCHEIN, *Henry Schein, Inc. Acquires Leading Independent U.S. Vaccine Supplier - 1998 Sales of $118 Million*, Dec. 29, 1998, http://investor.henryschein.com/phoenix.zhtml?c=74322&p=irol-newsArticle&ID=53636

offices, and through its contract with Cardinal Health, gained access to over 25,000 physical offices as customer locations.[33] As a result of this agreement, Henry Schein Medical added more than $300 million in annual sales.

176.   In 2015, Henry Schein reported that its sales reached a record $10.4 billion and that it had grown at a compound annual rate of approximately sixteen percent (16%) since becoming a public company in 1995. Overall, it is the world's largest provider of health care products and services to office-based dental, animal health, and medical practitioners.

177.   The DEA ARCOS database reveals that between 2006-2012 Schein distributed nearly 12.6 million MME into Virginia, including into Botetourt County, across over 788 thousand dosage units.

178.   Defendant CVS HEALTH CORPORATION ("CVS Health"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island. CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange, Street, Wilmington, Delaware 19801. CVS Health is named as a defendant in its capacities as a distributor, retail and mail order pharmacy, and PBM (*see* Sections D and E, *infra*).

179.   Defendant CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct parent company of CVS Pharmacy.  CVS Pharmacy has been registered to do business in Virginia since at least 1996 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen

---

[33] Raymond Davis, *Henry Schein and Cardinal*, THE J. OF HEALTHCARE CONTRACTING, Feb. 12, 2018, http://www.jhconline.com/henry-schein-and-cardinal.html

Allen, Virginia 23060. CVS Pharmacy is named as a defendant in its capacities as a distributor and retail and mail order pharmacy (*see* Section D, *infra*)

180.   Defendant CVS TN DISTRIBUTION, L.L.C. ("CVS TN") is Tennessee limited liability company whose principal place of business is at the same location as CVS Health and CVS Pharmacy. On information and belief, CVS Pharmacy is the sole member of CVS TN. CVS TN may be served through its registered agent: CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919.

181.   CVS Health, CVS Pharmacy, and CVS TN distribute pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Virginia. At all relevant times, CVS TN conducted business as a licensed prescription drug distributor in Virginia.

182.   The DEA ARCOS database reveals that between 2006-2012 CVS distributed nearly 2.1 billion MME into the Commonwealth of Virginia, across over 234 million dosage units. CVS shipped over 4.1 million MME into Botetourt, across over 745,000 dosage units.

183.   Defendant WALGREENS BOOTS ALLIANCE, INC. ("Walgreens Boots") is a Delaware corporation with its principal place of business in Deerfield, Illinois. Walgreens Boots may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Walgreens Boots is named as a defendant in its capacities as a distributor and retail pharmacy (*see* Section D, *infra*).

184.   Defendant WALGREEN CO. is an Illinois corporation whose principal place of business is at the same location as Walgreens Boots. On information and belief, Walgreens Boots is the parent company of WALGREEN CO. WALGREEN CO. has been registered to do business in Virginia since 1995 and may be served in Virginia through its registered agent: Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219. WALGREEN CO. is named as a defendant in its capacities as a distributor and retail pharmacy (*see* Section D, *infra*).

185.   Defendant WALGREEN EASTERN CO., INC. is a New York corporation whose principal place of business is at the same location as Walgreens Boots. On information and belief, Walgreens Boots is the parent company of WALGREEN EASTERN CO., INC. WALGREEN EASTERN CO., INC. may be served through its registered agent: The Prentice-Hall Corporation System, Inc., 80 State Street Albany, New York, 12207. Walgreens Boots and WALGREEN CO., in their distributor capacities, and WALGREEN EASTERN CO., INC. are collectively referred to as "Walgreens Distribution."

186.   Walgreens Distribution distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Virginia. Walgreens Distribution is currently licensed as a non-resident distributor with the Virginia Department of Health Professions.

187.   The DEA ARCOS database reveals that between 2006-2012 Walgreens distributed over 3.4 billion MME into Virginia, across 205 million dosage units.

188.   Defendant WALMART INC., formerly known as Wal-Mart Stores, Inc. ("Walmart"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart has been registered to do business in Virginia since at least 1983 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

189.   Walmart distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Virginia.

190.   The DEA ARCOS database reveals that between 2006-2012 Walmart distributed nearly 1.6 billion MME into Virginia, across over 157 million dosage units.

191.   Defendant RITE AID CORP. is a Delaware corporation with its principal place of business in Camp Hill, Pennsylvania. RITE AID CORP. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington,

Delaware 19801. RITE AID CORP. is named as a defendant in its capacities as a distributor and retail pharmacy (*see* Section D, *infra*).

192.   Defendant RITE AID OF MARYLAND, INC. is a Maryland corporation with its principal place of business in Lutherville Timonium, Maryland. On information and belief, RITE AID CORP. is the parent company of RITE AID OF MARYLAND, INC.   RITE AID OF MARYLAND, INC. may be served through its registered agent: The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264.

193.   Defendant RITE AID MID-ATLANTIC is a Maryland corporation whose principal place of business is in Perryman, Maryland. On information and belief, RITE AID OF MARYLAND, INC. is the parent company of RITE AID MID-ATLANTIC. RITE AID MID-ATLANTIC is currently licensed as a non-resident distributor with the Virginia Department of Health Professions. RITE AID CORP., in its distribution capacity, RITE AID OF MARYLAND, INC., and RITE AID MID-ATLANTIC are collectively referred to as "Rite Aid Distribution."

194.   Rite Aid Distribution distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Virginia.

195.   The DEA ARCOS database reveals that between 2006-2012 Rite Aid distributed nearly 1.2 billion MME into the Commonwealth of Virginia, across over 120 million dosage units.

196.   The distributor defendants listed above are all engaged in the wholesale distribution of opioids. The distributor defendants listed above are collectively referred to herein as the "Distributor Defendants."

197.   The Distributor Defendants purchased opioids from manufacturers, such as the Manufacturer Defendants herein, and sold them to pharmacies throughout Virginia, including in Botetourt County. The Distributor Defendants played an integral role in opioids being distributed across Virginia, including Botetourt County.

198.    The failure of all Distributor Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent the filling of invalid and medically unnecessary prescriptions greatly contributed to the vast increase in opioid overuse and addiction. Distributor Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in Botetourt County.

### D.    PHARMACY DEFENDANTS

199.    Defendants CVS Health and CVS Pharmacy, identified above in Section C regarding distributors, are also pharmacy defendants.

200.    Defendant, VIRGINIA CVS PHARMACY, L.L.C. ("Virginia CVS"), is a Virginia limited liability company whose principal place of business is at the same location as CVS Health. Virginia CVS has been registered to do business in Virginia since at least 2005 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Rd. Ste. 285, Glen Allen, Virginia 23060. Upon information and belief, Virginia CVS is a wholly owned subsidiary of CVS Pharmacy.

201.    Defendant, CAREMARK RX, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CAREMARK RX, L.L.C. is a wholly owned subsidiary of CVS Pharmacy. According to CVS Health's 2016 Annual Report, Defendant CAREMARK RX, L.L.C. is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management, infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the U.S. and its territories." CAREMARK RX, L.L.C. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange, Street, Wilmington, Delaware 19801. CAREMARK RX, L.L.C. is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

202.    Defendant CAREMARK, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. CAREMARK, L.L.C. is registered to do business in Virginia and may be served by its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060. CAREMARK, L.L.C. is a wholly owned subsidiary of CAREMARK RX, L.L.C.

203.    CAREMARK, L.L.C. is the direct or indirect parent of dozens of limited liability companies all over the U.S. that provide mail-order pharmacy services in the U.S. and in Virginia.[34] Many of these CAREMARK, L.L.C. entities are registered with the DEA to dispense controlled substances, including opioids. CAREMARK, L.L.C. is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

204.    CVS Health, CVS Pharmacy, Virginia CVS, and CAREMARK RX, L.L.C., and CAREMARK L.L.C., in their capacities as retail and mail order pharmacies, are collectively referred to as "CVS".

205.    In 2018, CVS was the largest U.S. pharmacy by total prescription revenue.[35]

206.    CVS operates dozens of retail pharmacies in Virginia. At all relevant times, CVS has sold and continues to sell prescription opioids at its retail pharmacies in Botetourt, or through its mail order pharmacies.

207.    According to the DEA ARCOS database, between 2006-2012 CVS retail pharmacies in Virginia purchased over 8.3 billion MME across over 248 million dosage units. CVS retail pharmacies in Botetourt purchased nearly 18 million MME across nearly 1.2 million dosage units during the same time period.

---

[34] CVS Health Corporation, *Annual Report (Form 10-K)* (Feb. 14, 2018).
[35] Drug Channels Institute, *Largest 15 U.S. Pharmacies, by Total Prescription Revenues, 2018*, (last visited Mar. 12, 2018), https://www.drugchannels.net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.

208.    CVS describes itself "a market leader in mail order pharmacy, retail pharmacy, specialty pharmacy, and retail clinics....**that provide unparalleled service and capabilities.**"[36]

209.    Defendant, EXPRESS SCRIPTS HOLDING COMPANY, is a Delaware corporation with its principal place of business in St. Louis, Missouri. EXPRESS SCRIPTS HOLDING COMPANY is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

210.    Defendant ESI MAIL PHARMACY SERVICE, INC., doing business as Express Scripts or ESI Distribution Services, is a Delaware corporation with its principal place of business in St. Louis, Missouri.

211.    Defendant EXPRESS SCRIPTS PHARMACY, INC., doing business as Catamaran Home Delivery or Express Scripts, is a Delaware corporation with its principal place of business in St. Louis, Missouri.

212.    Both ESI MAIL PHARMACY SERVICE, INC. and EXPRESS SCRIPTS PHARMACY, INC. are subsidiaries of defendant EXPRESS SCRIPTS HOLDING COMPANY.

213.    EXPRESS SCRIPTS HOLDING COMPANY, in its capacity as a retail and mail order pharmacy, ESI MAIL PHARMACY SERVICE, INC., and EXPRESS SCRIPTS PHARMACY, INC. are collectively referred to as "Express Scripts Pharmacy."

214.    At all relevant times, Express Scripts Pharmacy has sold and continues to sell prescription opioids through its mail order pharmacies nationwide, serving patients nationally and in Botetourt. Even though it operates no brick and mortar stores, in 2018, Express Scripts Pharmacy was the third largest pharmacy in the U.S. by total prescription revenue.[37]

---

[36] CVS Health, *CVS Caremark Announces PBM Succession Plan* (Mar. 30, 2012), https://cvshealth.com/newsroom/press-releases/cvs-caremark-announces-pbm-succession-plan-1 (emphasis added)
[37] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 35.

215.    Defendant, OPTUMRX, INC. ("OptumRx"), is a Delaware corporation with its principal place of business located in Irvine, California. OptumRx operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of OPTUM, INC. OptumRx has been registered to do business in Virginia since at least 2008 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060. OptumRx is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

216.    OptumRx is registered with the DEA to dispense controlled substances, including opioids. At all relevant times, OptumRx has sold and continues to sell prescription opioids through its mail order pharmacies in Virginia, including in Botetourt. In 2018, OptumRx was the fourth largest pharmacy in the U.S. by total prescription revenue.[38]

217.    Defendants Walgreens Boots and WALGREEN CO., identified above in Section C regarding distributors, are also pharmacy defendants. In their capacities as retail and mail order pharmacies, Walgreens Boots and WALGREEN CO. are collectively referred to as "Walgreens."

218.    In 2018, Walgreens was the second largest U.S. pharmacy by total prescription revenues.[39]

219.    Walgreens operates dozens of retail pharmacies in Virginia. At all relevant times, Walgreens has sold and continues to sell prescription opioids at its retail pharmacies in Virginia. According to the DEA ARCOS database, between 2006-2012 Walgreens' pharmacies in Virginia purchased over 4.8 billion MME across over 248 million dosage units.

220.    Defendant RITE AID CORP., identified above in Section C regarding distributors, is also a pharmacy defendant.

---

[38] *Id.*
[39] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 35.35.

221.    Defendant, RITE AID OF VIRGINIA, INC., is a Virginia limited liability company whose principal place of business is at the same location as RITE AID CORP. RITE AID OF VIRGINIA, INC. has been registered to do business in Virginia since at least 1973 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Rd. Ste. 285, Glen Allen, Virginia 23060. Upon information and belief, RITE AID OF VIRGINIA, INC. is a wholly owned subsidiary of RITE AID CORP.

222.    Defendant ECKERD CORPORATION ("ECKERD"), is a Delaware corporation whose principal place of business is at the same location as RITE AID CORP.   ECKERD CORPORATION has been registered to do business in Virginia since at least 1997 and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Rd. Ste. 285, Glen Allen, Virginia 23060.  Upon information and belief, ECKERD CORPORATION is a wholly owned subsidiary of RITE AID CORP.

223.    RITE AID CORP., in its capacity as a retail and mail order pharmacy, RITE AID OF VIRGINIA, INC. and ECKERD CORPORATION are collectively referred to as "Rite Aid Pharmacy."

224.    Rite Aid Pharmacy operates dozens of retail pharmacies in Virginia. At all relevant times, Rite Aid Pharmacy has sold and continues to sell prescription opioids at its retail pharmacies in Botetourt, or through its mail order pharmacies.

225.    According to the DEA ARCOS database, between 2006-2012 Rite Aid pharmacies in Virginia purchased over 4.8 billion MME across over 248 million dosage units.

226.    Defendant Walmart, identified above in Section C regarding Distributors, is also a pharmacy defendant.

227.   At all relevant times, Walmart has sold and continues to sell prescription opioids at its retail pharmacies in Virginia. In 2018, Walmart was the fifth largest U.S. pharmacy by total prescription revenue.[40]

228.   According to the DEA ARCOS Database, between 2006-2012, Walmart pharmacies in Virginia purchased nearly 2 billion MME across over 154 million dosage units.

229.   The pharmacy defendants listed above are all engaged in the business of retail selling opioids and other drugs. The pharmacy defendants are collectively referred to herein as the "Pharmacy Defendants."

230.   The failure of all Pharmacy Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent filling of improper prescriptions greatly contributed to the vast increase in opioid overuse and addiction.

231.   Pharmacy Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in Botetourt.

232.   As discussed further below, each of the Pharmacy Defendants has consistently failed to comply with its legal obligations concerning opioid diversion, and almost all have paid civil penalties to resolve government allegations regarding opioid diversion.

## E.   PHARMACY BENEFIT MANAGER DEFENDANTS

233.   The Pharmacy Benefit Manager Defendants ("PBM Defendants") are defined below. At all relevant times the PBM Defendants acted as the gatekeepers of prescription drugs including opioids. Pharmacy benefit managers ("PBMs") establish formularies which govern which drugs are reimbursed and how.  They determine MME quantity limits and pre-authorization requirements.   They negotiate with drug manufacturers to offer preferred drug formulary

---

[40] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 35.

placement for drugs. They establish reimbursement rates for the drugs dispensed. PBMs earn revenue from at least the following sources: fees from health plans and employers, rebates and other incentives from drug manufacturers, including but not limited to administrative fees, volume bonuses, and fees from maintaining pharmacy networks.[41] At all times relevant hereto, the reimbursement of the Manufacturer Defendants' opioids was guaranteed and facilitated by the PBM Defendants who constructed formularies and designed plans that made such opioids easily accessible. In many cases, the PBMs made it easier to obtain these highly-addictive products than a less-addictive pain alternative or OUD treatment medicine. In many cases, the PBMs failed to install reasonable quantity or refill limits on these highly addictive drugs. Often the PBMs imposed no pre-authorization requirements on the controlled substances at issue in this proceeding.

234.    On information and belief, the PBMs constructed their national offerings in this fashion because of their contractual arrangements with the Manufacturer Defendants. In all events, the PBMs failed to install reasonable and necessary controls on the reimbursement of opioids, consistent with medical literature and the PBMs' own expressed commitment to public health and safety. In so doing, the PBMs provided necessary and dangerous fuel for the opioid epidemic as described herein.

235.    Only recently, and more than three years after the March 2016 CDC Guidelines were issued, have the PBM Defendants prepared national offerings that make contact with the national health crisis the PBMs themselves helped to create.

236.    Defendants CVS Health, CAREMARK RX, L.L.C., and CAREMARK, L.L.C. identified above in Section D regarding retail and mail order pharmacies, are also PBM defendants.

---

[41] Health Policy Brief, *On behalf of payers, pharmacy benefit managers negotiate rebates from drug makers in exchange for preferred formulary placement*, HEALTH AFFAIRS, Sep. 14, 2017, https://www.healthaffairs.org/do/ 10.1377/hpb20171409.000178/full/

237.     Defendant, CAREMARKPCS HEALTH, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct or indirect parent company of CAREMARKPCS HEALTH, L.L.C. CAREMARKPCS HEALTH, L.L.C. is registered to do business in Virginia and may be served in Virginia through its registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

238.     Defendants CAREMARK RX, L.L.C. and CAREMARK, L.L.C., in their capacities as PBMs, and CAREMARKPCS HEALTH, L.L.C. are collectively referred to as "Caremark."

239.     CVS Health describes itself in a September 3, 2014 press release as a "pharmacy innovation company helping people on their path to better health. Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, we enable people business and communities to manage health in more affordable, effective ways. This unique integrated model increases access to care, delivers better health outcomes and lowers overall health care costs." In 2016, CVS Health reported an operating income of $10 billion.

240.     In the above-referenced September 3, 2014 press release CVS Health announced its change of name from CVS Caremark Corporation to CVS Health. CVS Health explained that it was changing its name "to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health." CVS Health explained that the newly-named company included "its pharmacy benefit management business, which is known as CVS/Caremark." In that same press release, CVS Health touted, "[f]or our patients and customers, *health is everything* and…we are advising on prescriptions [and] helping manage chronic and specialty conditions." [emphasis supplied]. In December 2017, CVS made a $69 billion bid to purchase Aetna. If the companies merge, the clout of CVS will grow even more.

241.   According to the Drug Channels Institute, CVS Health (Caremark) was the highest ranking PBM in 2017 with over twenty-five percent (25%) of the industry market share.[42]

242.   Caremark says the following about its "Formulary Development and Management":

> Development and management of drug formularies is an integral component in the pharmacy benefit management (PBM) services CVS Caremark provides to health plans and plan sponsors. Formularies have two primary functions: 1) to help the PBM provide pharmacy care that is clinically sound and affordable for plans and their plan members; and 2) to help manage drug spend through the appropriate selection and use of drug therapy.[43]

243.   At all times relevant hereto, CVS Health, through Caremark, derives substantial revenue providing pharmacy benefits in Virginia through several different means including, but not limited to, providing services and its formulary to the Piedmont Community Health Plan[44], the Fairfax County Public Schools,[45] and the University of Virginia Health Plan.[46]

244.   At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in Botetourt County. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Virginia, including in Botetourt County.

245.   Defendant, EXPRESS SCRIPTS HOLDING COMPANY ("ESHC"), identified above in Section D regarding retail and mail order pharmacies, is also a PBM Defendant..

---

[42] *Cigna-Express Scripts: Vertical Integration and PBMs' Medical-Pharmacy Future*, DRUG CHANNELS INSTITUTE, Mar. 9, 2018, https://www.drugchannels.net/2018/03/cigna-express-scripts-vertical.html
[43] CVS Caremark, *Formulary Development and Management at CVS Caremark*, Mar. 25, 2018, https://www.caremark.com/portal/asset/FormDev Mgmt.pdf, at 1
[44] Piedmont Community Health Plan, Prescription Drugs, https://www.pchp.net/index.php/group-coverage-providers/provider-prescription-drugs.html
[45] Fairfax County Public Schools, Prescription Benefits, https://www.fcps.edu/node/32873
[46] University of Virginia Health Plan, Important Guidelines, 2010, http://www.hr.virginia.edu/uploads/documents/media/UVA_Health_ImportantGuidelines2010.pdf

246.   Defendant, EXPRESS SCRIPTS, INC. ("ESI"), is incorporated in the State of Delaware with its principal place of business located in St. Louis, Missouri, is a pharmacy benefit management company, and is a wholly-owned subsidiary of ESHC. ESI has been registered to do business in Virginia since at least 1987 and has an active license with the Virginia Department of Health Professions (the original of which was applied for in 1991). ESI may be served in Virginia through its registered agent: The Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219.

247.   ESHC, in its capacity as a PBM, and ESI are collectively referred to as "Express Scripts".

248.   In 2012, ESI acquired its rival, Medco Health Solutions Inc., in a $29.1 billion deal. As a result of the merger, ESHC was formed and became the largest PBM in the nation, filing a combined 1.4 billion prescriptions for employers and insurers.[47] In March of 2018, ESI made a $67 billion bid to purchase Cigna. If the companies merge, the clout of ESI will grow even more.

249.   According to the Drug Channels Institute, Express Scripts was the second highest ranking PBM in 2017 with twenty-four (24%) of the industry market share.[48]

250.   Express Scripts "provides pharmacy benefits to 83 million members. Of these, more than 27 million obtain their pharmacy benefit coverage through one of Express Scripts' standard formularies and more people use the [Express Scripts'] National Preferred Formulary than any other formulary in the U.S."[49]

---

[47] Peter Frost, *Express Scripts closes $29.1-billion purchase of Medco*, LOS ANGELES TIMES (Apr. 3, 2012), http://articles.latimes.com/2012/apr/03/business/la-fi-medco-20120403
[48] *Cigna-Express Scripts: Vertical Integration and PBMs' Medical-Pharmacy Future, supra* note 42.
[49] Express Scripts, *The Value of Active Pharmacy Management: Express Scripts 2018 National Preferred Formulary*, 2018, https://www.multivu.com/ players/English/81495241-express-scripts-national-preferred-formular y-2018/, at 1.

251.     Express Scripts standard formularies are "governed by [its] National Pharmacy &
Therapeutics Committee (the 'P&T Committee'), a panel of independent physicians and
pharmacists in active clinical practice, representing a variety of specialties and practice settings
and typically with major academic affiliations."[50] Express Scripts touts that the "the P&T
Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the
P&T Committee's clinical recommendations regarding drugs that must be included or excluded
from the formulary based on their assessment of *safety and efficacy*."[51] Express Scripts "re-
evaluate[s] [its] National Preferred Formulary on an annual basis. [It] looks at the formulary first
from a clinical perspective to ensure that it provides access to *safe and effective* medications in all
therapy classes."[52]

252.     Express Scripts derives substantial revenue managing pharmacy benefits in
Virginia through several different means, including, but not limited to, providing services and its
formulary to (i) the Express Scripts Medicare for the Commonwealth of Virginia Retiree Health
Benefits Program[53], (ii) the Virginia Private Colleges Benefits Consortium, which covers as many
as 7,000 lives[54], and (iii) workers' compensation insurance programs in Virginia such as the
Virginia Association of Counties Group Self-Insurance Risk Pool ("VACORP").[55] Upon

---

[50] Express Scripts, *Express Scripts 2017 Annual Report*, https://expressscriptsholdingco.gcs-web.com/static-files/76a9c03e-2e6b-4f6b-80de-fe80d 4ebc826, at 11.
[51] *Id.*
[52] Express Scripts, *Smart Formulary Management*, Jan. 2, 2014, http://lab.express-scripts.com/lab/insights/drug-options/smart-formulary-management, at 2 (emphasis added).
[53] The Virginia Private Colleges Benefits Consortium, http://www.cicv.org/Benefits-Consortium.aspx
[54] State Retiree Health Benefits Program—Fact Sheet #8A, Prescription Drugs—Medicare—Eligible Participants. https://www.dhrm.virginia.gov/docs/default-source/benefitsdocuments/ohb/factsheets/sheet-8aA894A6CA3857.pdf?sfvrsn=0
[55] VACORP, Understanding the Virginia Workers' Compensation Claims Process, 2016, http://www.vacorp.org/wp-content/uploads/2016/02/Workers-Compensation-VACORP.pdf

information and belief, these are some of the many ways in which Express Scripts reimburses for claims in Botetourt County, including opioids.

253.    Express Scripts publishes employment vacancies related to its Virginia PBM business activities on its website.[56]

254.    At all times relevant hereto, Express Scripts offered pharmacy benefit management services, including mail-order pharmacy services, a nationwide retail pharmacy network, and maintained a national formulary or formularies that are used nationwide, including in Botetourt County. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Virginia, including in Botetourt County.

255.    Defendant, UNITEDHEALTH GROUP INCORPORATED ("UnitedHealth"), a Delaware corporation with its principal place of business located in Minnetonka, Minnesota, is a diversified managed health care company with two business platforms. UnitedHealth serves approximately 115 million individuals throughout the United States. For 2016, UnitedHealth reported an operating income of $12.9 billion.

256.    On information and belief, UnitedHealth is the parent company of UnitedHealthcare of the Mid-Atlantic, Inc., UnitedHealthcare of Wisconsin, Inc. and UnitedHealthcare Plan of the River Valley, Inc. (collectively "UHC Subs"). All of the UHC Subs

---

[56] Express Scripts employment listings in Virginia, e.g., (i) Infusion Nurse RN – Accredo, Richmond, Virginia (https://www.indeed.com/viewjob?jk=f5ccf1a9c43b2c03&tk=1c85ulcckafthav0&from=serp&vjs=3); (https://www.indeed.com/viewjob?jk=f5ccf1a9c43b2c03&tk=1c85ulcckafthav0&from=serp&vjs=3); (ii) Infusion Nurse     RN     Per     Diem     -     Accredo.     Roanoke,     Virginia (https://www.indeed.com/viewjob?jk=7d1b16bc59d5d0d0&tk=1c85ulcckafthav0&from=serp&vjs=3);(https://www.indeed.com/viewjob?jk=7d1b16bc_59d5d0d0&tk=1c85ulcckafthav0&from=serp&vjs=3); and (iii) Infusion Nurse RN – Accredo, Ashburn, Virginia (https://www.glassdoor.com/job-listing/infusion-nurse-rn-accredo-express-scripts-JV_IC1130338_KO0,25_KE26,41.htm?jl=2627435077&ctt=1520618868067)(https://www.glassdoor.com/job-listing/infusion-nurse-rn-accredo-express-scripts-JV_IC1130338_KO0,25_KE26,4 1.htm?jl=2627435077&ctt=1520618868067)

are registered to do business in Virginia, are licensed with the Virginia State Corporation Commission's Bureau of Insurance and may be served in Virginia through their registered agent: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

257.   Defendant, OPTUM, INC., is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OPTUM, INC. is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OPTUMRX, INC. On information and belief, OPTUM, INC. is a subsidiary of UnitedHealth.

258.   UnitedHealth and OPTUM, INC. may be served through their registered agent: CT Corporation System, Inc., 1010 Dale Street North, St. Paul, Minnesota 5517.

259.   Defendant OptumRx, identified above in Section D regarding retail and mail order pharmacies, is also a PBM defendant.. OptumRx operates as the PBM for UnitedHealth.

260.   According to the Drug Channels Institute, OptumRx was the third highest ranking PBM in 2017 with twenty-two percent (22%) of the industry market share.[57]

261.   In one case, OptumRx, which is owned by UnitedHealth, suggested that a member taking Butrans consider switching to a "lower cost alternative," such as OxyContin or extended-release morphine, according to a letter provided by the member. Mr. Wiggin, the UnitedHealthcare spokesman, said the company's rules and preferred drug list "are designed to ensure members have access to drugs they need for acute situations, such as post-surgical care or serious injury, or ongoing cancer treatment and end of life care, as well as for long-term use after alternatives are tried."[58]

---

[57] *Cigna-Express Scripts: Vertical Integration and PBMs' Medical-Pharmacy Future, supra* note 42.

[58] Katie Thomas and Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers*, THE NEW YORK TIMES, Sep. 17, 2017, https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurance-companies.html?mwrsm=Email

262.    "UnitedHealthcare places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."[59]

263.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Virginia through several different means, including, but not limited to, providing services and formulary management for (i) the Eastern Virginia Medical School,[60] and (ii) the Washington Metropolitan Area Transit Authority (WMATA) Employee Health and Welfare Plan[61] and Prescription Drug Benefits.[62]

264.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in Botetourt County. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Virginia, including in Botetourt County.

265.    The PBM Defendants managed the reimbursement for the vast majority of opioids at issue in this case. Without the PBM Defendants' reimbursement for the opioids at issue herein, the opioids likely would not have entered the marketplace and the entire scheme would have failed.

---

[59] Id.
[60] Eastern Virginia Medical School, Student Wellness Program, 2017, http://www.evms.edu/about_evms/administrative_offices/human_resources/student_health_insurance/; Eastern Virginia Medical School, Student Injury and Sickness Insurance Plan, 2014-2015, https://www.uhcsr.com/uhcsrBrochures/Public/ClientBrochures/2014-193-1_Brochure.pdf
[61] Washington Metropolitan Area Transit Authority ("WMATA") Transit Employees' Health and Welfare Plan, Plan Benefit Overview, http://www.tehw.org/plan-benefits/plan-benefit-overview.aspx
[62] Washington Metropolitan Area Transit Authority ("WMATA") Transit Employees' Health and Welfare Plan, Prescription Drug Benefits, http://www.tehw.org/plan-benefits/health-and-welfare-benefits/prescription-drug-benefits.aspx

F.     **DOE DEFENDANTS**

266.     Doe DEFENDANTS 1 to 100 are sued herein under fictitious names because after diligent and good faith efforts their names, identities, and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiff. Plaintiff will make the names or identities of said Defendants known to the Court after the information has been ascertained. Plaintiff is informed and believes, and based thereupon alleges, that each of the Defendants designated herein as a DOE DEFENDANT has taken part in and participated with, and/or aided and abetted, some or all of the other Defendants in some or all of the matters referred to herein and the Plaintiff is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

## IV.     FACTUAL ALLEGATIONS

A.     **BACKGROUND ON PRESCRIPTION OPIOIDS**

267.     The term opioid includes (a) all drugs derived in whole or in part from the morphine-containing opium poppy plant such as morphine, laudanum, codeine, thebaine, hydrocodone, oxycodone, and oxymorphone, and (b) synthetic opioids like fentanyl or methadone.[63]

268.     Prior to the 1990's, doctors prescribed opioid pain relievers sparingly, and only in the short term, for cases of acute injury or illness, during surgery, or for end-of-life ("palliative") care.[64] Doctors' reluctance to use opioids for an extended period of time was due to the legitimate fear of causing addiction.[65]

---

[63] 21 U.S.C. § 812 Schedule II (2012).
[64] Meldrum ML, *Progress in Pain Research and Management*, Vol. 25 Seattle, WA: IASP Press; 2003.
[65] *Id.*

269.   Beginning in the late 20th century, however, and continuing through today, the pharmaceutical industry acted to dramatically expand the marketplace for opioids. As set forth below, pharmaceutical actors facilitated this expansion in three ways. *First*, pharmaceutical manufacturers engaged in a misinformation campaign which altered public perception of opioids, and deceived doctors, federal regulators, and the general public about their addictive qualities. *Second*, opioid manufacturers and wholesalers/distributors flouted their federally imposed requirements to report suspicious opioid orders to the United States Drug Enforcement Administration ("DEA") and appropriate state agencies. These facilitated an explosion in the illegitimate marketplace for prescription opioids. *Third*, PBMs ensured that opioids were widely available, regularly prescribed and reimbursed, while failing in their obligation to monitor inappropriate drug utilization.

270.   As a result of Defendants' wrongful conduct, the number of prescriptions for opioids increased sharply, reaching nearly 250 million prescriptions in 2013, almost enough for every person in the United States to have a bottle of pills. This represents an increase of three hundred percent (300%) since 1999.

**B.     IMPACT ON VIRGINIA AND BOTETOURT COUNTY**

271.   While the Defendants have profited from the alarming rate of opioid use in the United States, communities across the country, especially those in lower-income areas,  have suffered. According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012. Based on the latest data, nearly two million

Americans met criteria for prescription opioid abuse and dependence in 2013.[66] Aggregate costs for prescription opioid overdose, abuse, and dependence were estimated at over $78.5 billion (in 2013 dollars).[67]

272.    While Defendants were reaping billions of dollars in profits from their wrongful conduct, Plaintiff has been required to allocate substantial public monies and resources to combat the opioid crisis in Botetourt County and deal with its fallout.

273.    Plaintiff has incurred and continues to incur substantial costs because of Defendants' conduct as described herein, including, but not limited to, costs of increased services with respect to law enforcement and first responders, such as emergency medical services; Botetourt health facilities, including hospitals and clinics; detention centers and jails; Botetourt courts, including drug courts; diversion programs; prevention and treatment centers; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention programs in schools; inmate services including housing, health and support staff; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs.

274.    According to the CDC, in Virginia there were 1,405 drug overdose deaths in 2016, a 34.7 percent increase over drug overdose deaths in 2015, with opioids being the main driver.[68]

275.    The CDC in 2012 reported that there were between 72 and 82.1 painkiller prescriptions per 100 people in Virginia.[69]

---

[66] Wolters Kluwer Health, *Costs of US prescription opioid epidemic estimated at $78.5 billion*, SCIENCE DAILY, Sept. 14, 2016, https://www.sciencedaily.com/releases/2016/09/160914105756.htm
[67] *Id.*
[68] CDC Drug Overdose Data, https://www.cdc.gov/drugoverdose/data/statedeaths.html
[69] German Lopez, *The growing number of lawsuits against opioid companies, explained*, VOX, Feb. 27, 2018, https://www.vox.com/policy-and-politics/2017/6/7/15724054/opioid-companies-epidemic-lawsuits

276.    The CDC reports that Botetourt County's mortality rates due to drug poisoning rose drastically in the fourteen-year period between 2003 and 2017.[70]  These drug-related deaths grew steadily from a rate of 9.15 deaths per 100,000 population in 2003 to a rate of 17.5 deaths per 100,000 population in 2017.[71]  During the same period (2003-2017) the population increased from 31,454 in 2003 to 33,192 in 2017, meaning that not only the rate of overdose deaths was increasing, but that a higher percentage of a larger group of people were being killed by opioids in Botetourt County.

277.    Data reveals a dramatic increase in opioid abuse and deaths in recent years.  The Virginia Department of Health numbers estimates there were 1,136 overdose deaths from prescription painkillers, heroin, and heroin synthetics statewide in 2016,representing a 40 percent increase from the 811 deaths from the same cause in 2015.[72]  In just the first nine months of 2016, the state recorded 822 opioid overdose deaths compared with 811 in all of 2015.[73]  There was a 77% increase in fatal opioid overdoses in the five years from 2011-2016.[74]  "[T]he [statewide] numbers are so big they almost don't seem real," declared Attorney General Mark Herring in 2017, "[w]e have too many empty bedrooms, too many empty chairs at kitchen tables."[75]

278.    There are several factors that point to the severity of the opioid crisis in Virginia.  A recent Virginia Commonwealth University study found that "[a]t least two Virginians die from

---

[70] Centers for Disease Control and Prevention Drug Poisoning Mortality Rates in the United States, 2003-2017, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/
[71] Id.
[72] AG Mark Herring announces policy proposals on heroin and opioid abuse, DAILY PRESS, September 18, 2017, http://www.dailypress.com/health/dp-nws-herring-heroin-20170918-story.html
[73] Katie Demeria, Va. board creates new opioid prescription guidelines, RICHMOND TIMES-DISPATCH, Feb. 20, 2017, http://www.richmond.com/life/health/va-board-creates-new-opioid-prescription-guidelines/article_34ceace4-24f7-5125-9445-680f6f7bede4.html
[74] Dr. Melissa Levine, State Health Commissioner Telebriefing on Opioid Addiction Public Health Emergency (Nov. 21, 2016) (transcript available at http://www.vdh.virginia.gov/commissioner/opioid-addiction-in-virginia/).
[75] Patricia Sullivan, Va. attorney general urges collaboration in battling opioid crisis, THE WASHINGTON POST, May 26, 2017, https://www.washingtonpost.com/local/virginia-news/va-attorney-general-urges-collaboration-in-battling-opioid-crisis/2017/05/24/2c1ca6b2-3fcc-11e7-9869-bac8b446820a_story.html?utm_term=.a760b4a4fa85

prescription opioid and heroin overdoses every day."[76]   The state estimates that its Medicaid

program spent $26 million on opioid use and misuse in 2013.[77] The number of babies in Virginia

born with neonatal abstinence syndrome (NAS), resulting from opioids being used during

pregnancy, has continued to rise with the NAS birth rate doubling from 2.9 per 1,000 live births

in 2011 to 6.1 per 1,000 live births in 2015.[78] In 2016, state health officials found that more than

770 Virginia newborns, out of nearly 96,000 live births, were diagnosed with NAS.[79] The number

of infants diagnosed with NAS quadrupled from 2012-2016.[80] In Botetourt County, the problem

is even more severe, with the NAS rate far exceeding the statewide rate every year since at least

2011.[81]

279.    Like other Virginia localities, Botetourt County has also had to allocate resources

to preventing and addressing opioid abuse by children and teenagers. A study of child overdose

deaths in Virginia between 2009 and 2013 found that "[n]early two-thirds of child overdose

victims were teenagers between the ages of 13 and 17."[82] Prescription medications, specifically

methadone and oxycodone, "caused or contributed to more child deaths than any other substance

(68%)."

---

[76]Andrew Barnes and Katherine Neuhausen, Virginia Commonwealth University School of Medicine, "The Opioid Crisis Among Virginia Medicaid Beneficiaries," https://hbp.vcu.edu/media/hbp/policybriefs/pdfs/Senate_OpioidCrisisPolicyBrief_Final.pdf
[77] Id.
[78] Virginia Neonatal Perinatal Collaborative Receives State Support For Pregnant Women With Substance Use Disorders, Infants With Neonatal Abstinence Syndrome, June 28, 2017, http://www.alexandrianews.org/2017/06/new-virginia-neonatal-perinatal-collaborative-committed-to-improving-birth-outcomes-receives-state-support-to-enhance-care-for-pregnant-women-with-substance-use-disorders-and-infants-with-neonatal-ab/
[79] Id.
[80] Id.
[81] VIRGINIA DEPARTMENT OF HEALTH, VIRGINIA OPIOID ADDICTION INDICATORS (2016), https://public.tableau.com/views/VirginiaOpioidAddictionIndicators/VAOpioidAddictionIndicators?:embed=y&:display_count=yes&:showVizHome=no
[82] Id.

280. With the increase in prescription opioid abuse, Virginia localities such as Botetourt County have seen a rise in illegal drug use, including the use of heroin and fentanyl, and an increase in drug-related arrests.

281. As a result of the increase in opioid-related criminal activity, Botetourt County's correctional and incarceration costs have been exceedingly high over the last five years. The opioid epidemic has not only impacted Botetourt County's law enforcement and correctional costs, but has also had a startling impact on other costs. For example, the influx of opioids into Botetourt County has led to a rise in the need for foster care and other child placement services in the County, as well as a rise in the need for emergency response services in the County.

282. Retail drug summary reports publicly available through the DEA's Automation of Reports and Consolidated Orders System ("ARCOS") confirm that Botetourt County has experienced the same startling trend of soaring opioid use as is seen nationwide. The ARCOS Data table below reflects transactional data for selected opioid drugs submitted by the drug manufacturers and distributors doing business in Virginia. The volume of selected opioid drugs distributed in Botetourt County between 2001 and 2016 reflects a startling increase of almost 100% in annual opioid consumption during that period.[83]

---

[83] The ARCOS transactional data reflected in this chart includes the following drugs categorized as opioids: codeine, buprenorphine, dihydrocodeine, oxycodone, hydromorphone, hydrocodone, levorphanol, meperidine (pethidine), methadone, morphine, opium (powdered), oxymorphone, alfentanil, remifentanil, sufentanil base, tapentadol, and fentanyl base. The ARCOS transaction data reflected in this chart includes the following regions of Virginia: City of Roanoke, Floyd County, Montgomery County, Franklin County, Giles County, Botetourt County, Henry County, Patrick County, Bedford County, Pittsylvania County, Pulaski County, and Roanoke County.



## C. PARTICULARS REGARDING EACH DEFENDANT GROUP'S ROLE IN THE OPIOID EPIDEMIC

### 1. The Manufacturer Defendants' Campaign of Deception

#### a. The Manufacturer Defendants' Campaign to Normalize Widespread Opioid Use

283.   Unsatisfied with the market for opioid use in the context of acute and palliative care, the Manufacturer Defendants introduced new opioid drugs during the 1980s and 1990s and began promoting their use for chronic pain therapy in an effort to increase the number of people taking opioids.

284.    Those new drugs included, but were not limited to: Purdue's MS Contin (introduced 1987) and OxyContin (1995); Cephalon's Actiq (1998) and Fentora (2006); and Endo's Opana and Opana ER (2006).

285.    Recognizing the enormous financial possibilities associated with expanding the opioid market, the Manufacturer Defendants rolled out a massive and concerted campaign to misrepresent the addictive qualities of their product, and to push opioids as safe, effective drugs for the treatment of pain associated with conditions such as everyday back pain, tooth aches, sprains, headaches and the like.

286.    In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or minimize the risks of opioids while overstating the benefit of using them for chronic non-cancer related pain. As just one example, on information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

287.    Further, each Defendant promoted the use of opioids for pain through sales representatives who visited individual doctors and medical staff in their offices and through the implementation of small group speaker programs.  Defendants devoted massive resources to direct such sales contacts with doctors.  In 2014 alone, Defendants spent $168 million on detailing branded opioids to doctors, including $108 million by Purdue, $13 million by Cephalon, $10 million by Endo, and $2 million by Allergan.  These amount to twice as much as Defendants spent on detailing in 2000.

288.    The deceptive marketing schemes included, among others, (a) the hiring of certain physicians, or "hired guns," to pollute the marketplace with false information regarding the efficacy and risks of opioids for chronic pain treatment; (b) false or misleading materials, speaker programs, webinars, and brochures by purportedly neutral third parties that were actually designed

and distributed by the Manufacturer Defendants; (c) false or misleading direct, branded advertisements and marketing materials; and (d) the misuse of treatment guidelines.

289.    The Manufacturer Defendants' misinformation campaign worked as intended. Across the country, demand for prescription opioids exploded, including in Botetourt County. Doctors and medical professionals, swayed by the Manufacturer Defendants' sophisticated propaganda machine, began prescribing prescription opioids for ailments ranging from headaches to neck pain to fibromyalgia. That unleashed a wave of addiction—further increasing the demand for opioids. The Manufacturer Defendants' profits soared.

### b.    The Manufacturer Defendants' Hired Guns

#### i.    Dr. Portenoy and Webster

290.    The Manufacturer Defendants' campaign of deception to downplay the addictive nature of opioids was rooted in two pieces of purportedly "scientific" evidence. The first piece of evidence was a five-sentence letter to the editor published in 1980 in the New England Journal of Medicine. The letter was drafted by Hershel Jick, a doctor at Boston University Medical Center, with the help of a graduate student, Jane Porter. It noted, anecdotally, that a review of "current files" did not indicate high levels of addiction among hospitalized medical patients who received narcotic preparation treatment. In full, the letter reads:

> Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well-documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients, Percodan in one, and hydromorphone in one. We conclude that despite widespread use

of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.[84]

291.    The second major piece of "evidence" used by Manufacturer Defendants was a 1986 study by Dr. Russell Portenoy in the medical journal Pain. The study, which had a patient cohort of merely 38 patients, claimed that opioids could be used for long periods of time to treat non-cancer related pain without any risk of addiction. The rationale behind the study was that patients in pain would not become addicted to opioids because their pain drowned out the euphoria associated with opioids. As such, the study concluded that opioids should be freely administered to patients with fibromyalgia, headaches, finicky backs, and a host of other issues. According to Portenoy and his co-author, Dr. Kathleen Foley, "opioid maintenance therapy can be a safe, salutary and more humane alternative … in those patients with intractable non-malignant pain and no history of drug abuse."[85]   Portenoy's study also cited Jick's one-paragraph letter to the New England Journal of Medicine.

292.    Dr. Portenoy's study dovetailed perfectly with Manufacturer Defendants' marketing strategy and, within a decade, Dr. Portenoy was financed by "at least a dozen companies, most of which produced prescription opioids."[86]

293.    Dr. Portenoy went on to serve as one of the pharmaceutical industry's most vocal advocates, regularly appearing at conferences and gatherings of medical professionals to promote the use of opioids for chronic, long-term pain.

---

[84] *Addiction rare in patients treated with narcotics*, 302(2) New Eng. J. Med. 123 (Jan. 10, 1980).

[85] Portenoy RK, Foley KM, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25 Pain 171 (1986).

[86] Meier B., Pain Killer: A Wonder Drug's Trail of Addiction and Death, New York, NY: St. Martin's Press; 2003.

294.    The Manufacturer Defendants disseminated fraudulent and misleading messages to reverse the popular and medical understanding of opioids and their associated risks. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, through unbranded marketing and through industry-funded front groups.

295.    These statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC based on that same evidence.

296.    Hired guns like Dr. Portenoy promoted opioid analgesics and the myth that opioids could be liberally prescribed for non-cancer related pain, without any risk of addiction.

297.    Others like Dr. Portenoy would speak at academic conferences to primary care physicians in an effort to destigmatize opioids and encouraged liberal prescription of narcotics for the treatment of non-cancer related pain. They claimed that opioid analgesics have no "ceiling dosage" in that prescribing physicians should increase dosages for patients as high as necessary to treat non-cancer chronic pain. Invariably, the key piece of "data" cited in support of the proposition that opioids could be safely used to treat pain was the New England Journal of Medicine article.

298.    The Manufacturer Defendants also paid Dr. Lynn Webster, the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah, to promote opioids. Dr. Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous continuing medical education programs ("CMEs") sponsored by Cephalon, Endo and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

66

299.    In the years that have followed, both the New England Journal of Medicine letter and Dr. Portenoy's 1986 study have been expressly disavowed. Neither article actually demonstrates that opioids can be safely prescribed for long-term, non-cancer related pain.

300.    In a taped interview in 2011, Dr. Portenoy admitted that the information the Manufacturer Defendants were pushing was false. "I gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," Dr. Portenoy told a fellow doctor in 2010. "It was the wrong thing to do."[87]

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would cite. I would cite 6 to 7 maybe 10 different avenues of thought or evidence, *none of which represents real evidence.* And yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in total and feel more comfortable about opioids in a way they hadn't before ... Because the primary goal was to de-stigmatize, *we often left evidence behind.*
>
> *It was clearly the wrong thing to do* and to the extent that some of the adverse outcomes now are as bad as they have become in terms of endemic occurrences of addiction and unintentional overdose death, it's quite scary to think about how the growth in that prescribing driven by people like me led, in part, to that occurring.[88]

301.    As to the New England Journal of Medicine letter, Dr. Jick, in an interview with Sam Quinones decades after the letter was published, stated: "[t]hat particular letter, for me, is very near the bottom of a long list of studies that I've done. It's useful as it stands because there's nothing else like it on hospitalized patients. But if you read it carefully, it does not speak to the level of addiction in outpatients who take these drugs for chronic pain."[89]

---

[87] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal (Dec. 17, 2012).

[88] Live interview with Dr. Russell Portenoy. Physicians Responsible for Opioid Prescribing. https://www.youtube.com/watch?v=DgyuBWN9D4w. Accessed December 3, 2017 (emphases added).

[89] Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, BUSINESS INSIDER, Mar. 26, 2016, http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5

302.    The New England Journal of Medicine itself has since disavowed the letter, stating, "[the letter] was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy."[90] "We believe," the journal provided, "that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy."[91]

### c.    Defendant-Funded Organizations

303.    Manufacturer Defendants also funded multiple organizations to advocate for the use of opioids to treat chronic pain. The names of the organizations suggest neutrality, but they were anything but. They included the American Pain Foundation ("APF"); the American Academy of Pain Management (which received funding from Manufacturer Defendants Endo and Purdue); the American Pain Society ("APS"), the American Geriatrics Society ("AGS"), and the Pain Care Forum ("PCF").

### i.    The American Pain Foundation

304.    The most prominent nonparty advocate for opioids funded by Defendants was the American Pain Foundation ("APF"). APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

305.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign — through radio, television, and the

---

[90] 376 New Eng. J. Med. 2194, 2194–95 (2017).
[91] *Id.*

internet — to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Virginia consumers, physicians, patients, and third-party payers.

306.    Dr. Perry Fine (an opioid advocate from the University of Utah who received funding from Cephalon, Endo, and Purdue), Dr. Portenoy, and Dr. Scott Fishman (an advocate the University of California who authored *Responsible Opioid Prescribing*, a publication sponsored by Cephalon and Purdue), all served on APF's board and reviewed its publications. Another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

307.    In 2009 and 2010, more than eighty percent (80%) of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of a total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from Defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

308.    APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for Defendants' promotional activities, including for Purdue's "Partners Against Pain." But in reality, APF functioned as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, as early as 2011, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

309.    APF caught the attention of the United States Senate Finance Committee in May 2012 as the Committee sought to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation raised red flags as to APF's credibility as an objective and neutral third party; the Manufacturer Defendants stopped funding it. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[92]

### ii.    The American Academy of Pain Medicine

310.    The American Academy of Pain Medicine ("AAPM"), with the assistance, prompting, involvement, and funding of the Manufacturer Defendants, issued treatment guidelines and sponsored and hosted CME programs for doctors essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

311.    AAPM has received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate in activities and conferences. Defendants Endo, Purdue, Cephalon, and Allergan were members of the council.

312.    AAPM was viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its corporate events, and distributed its publications. The conferences sponsored by AAPM promoted opioids – 37 out of roughly 40 sessions at one conference alone were opioid-focused.

---

[92] Charles Ornstein and Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, WASH. POST, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html

313.   AAPM's presidents have included the same opioid advocates mentioned above, *i.e.* Drs. Fine, Portenoy, Webster and Fishman. Dr. Fishman, a past AAPM president, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are ... small and can be managed."[93]

314.   AAPM's staff understood that they and their industry funders were engaged in a common task.  The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid advocates within the organization.

### iii.   The Pain Care Forum

315.   On information and belief, the Manufacturer Defendants also combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." APF President Will Rowe described the forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

316.   PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, and Purdue); doctors and nurses in the field of pain care; professional organizations (including AAPM, APS, and American Society of Pain Educators); patient advocacy groups (including APF and American Chronic Pain Association ("ACPA")); and other like-minded organizations, almost all of which received substantial funding from the Manufacturer Defendants.

317.   PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA

---

[93] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829

mandated in 2009 to communicate the risks of opioids to prescribers and patients. This was critical because a REMS that went too far in narrowing the uses or benefits or highlighting the risks of chronic opioid therapy would undermine the Manufacturer Defendants' marketing efforts. On information and belief, the recommendations claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers." The Manufacturer Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, not undermine, their deceptive marketing of opioids for chronic pain.

318.    All of these purportedly neutral, industry-funded organizations took aggressive stances to convince doctors and medical professionals that America was suffering from an epidemic of untreated pain — and that opioids were the solution. Their efforts were successful nationwide, including in Botetourt County.

### d.    The Manufacturer Defendants' False and Misleading Direct Advertising and Marketing of Opioids

319.    The Manufacturer Defendants have intentionally made false and misleading statements regarding opioids in their advertising and marketing materials disseminated nationwide, including in Botetourt County. They have, among other things, (1) downplayed the serious risk of addiction; (2) created and promoted the imaginary concept of "pseudoaddiction," advocating that when signs of actual addiction begin to appear, the patient should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher dosages; (6) described their opioid products as "steady state" – falsely implying that these products are less likely to produce the high and lows that fuel addiction – or as less likely to be abused or result in addiction; (7) touted the effectiveness of screening or monitoring patients as a strategy for

managing opioid abuse and addiction; (8) stated that patients would not experience withdrawal if they stopped using their opioid products; (9) stated that their opioid products are effective for chronic pain without disclosing the lack of evidence for the effectiveness of long-term opioid use; and (10) stated that abuse-deterrent formulations were safer,  less divertible and less abusable than other opioids or treatment drugs.

320.    The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, despite there being no scientifically reliable evidence to support the Manufacturer Defendants' claims.

321.    The Manufacturer Defendants engaged in deceptive direct-to-physician marketing, promoting the use of opioids for chronic pain through controlled and trained sales representatives who visited individual doctors and medical staff in their offices and small group speaker programs.

322.    On information and belief, throughout the relevant time period these sales representatives have spread (and may continue to spread) misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors.

323.    Allergan was notified by the FDA in 2010 that certain brochures were "false or misleading because they omit and minimize the serious risks associated with the drug, broaden and fail to present the limitations to the approved indication of the drug, and present unsubstantiated superiority and effectiveness claims." The FDA also found that "[t]hese violations are a concern from a public health perspective because they suggest that the product is safer and more effective than has been demonstrated."[94]

---

[94] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf

324.   Through these means, and likely others still concealed, the Manufacturer Defendants collaborated to spread deceptive messages about the risks and benefits of long-term opioid use in patient education brochures and pamphlets, websites, ads and other marketing materials

325.   For example:

(a)   Allergan's predecessor caused a patient education brochure, *Managing Chronic Back Pain*, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Allergan's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Allergan continued to use this brochure in 2009 and beyond.

(b)   Cephalon and Purdue sponsored *APF's Treatment Options: A Guide for People Living with Pain* (2007), which suggests that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative prescriptions, or theft. This publication is available today.[95]

(c)   Endo sponsored a website, "*PainKnowledge*," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

(d)   Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."

(e)   Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online.[96]

(f)   Consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for the Manufacturer Defendants in Virginia have minimized or omitted and continue to minimize or omit any discussion with doctors or their medical staff in Virginia about the risk of addiction; misrepresented the

---

[95] Available at https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf
[96] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers- guide.pdf

potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

(g)     Endo, on information and belief, has distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement

(h)     On information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

(i)     The New York Attorney General found in its settlement with Purdue that through March 2015, the Purdue website *In the Face of Pain* failed to disclose that doctors who provided testimonials on the site were paid by Purdue,[97] and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.[98]

326.     The Manufacturer Defendants falsely instructed doctors and patients that the signs of addiction should not be seen as warnings but are actually signs of undertreated pain and should be treated by prescribing more opioids. The Manufacturer Defendants called this phenomenon "pseudoaddiction" and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Dr. Webster was a leading proponent of this notion, stating that the only way to differentiate the two was to increase a patient's dose of opioids.[99]

---

[97] *See New York State Office of the Attorney General, A.G. Schneiderman Announces Settlement with Purdue Pharma That Ensures Responsible and Transparent Marketing Of Prescription Opioid Drugs By The Manufacturer* (August 20, 2015), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-purdue-pharma-ensures-responsible-and-transparent (last accessed December 20, 2017)

[98] The New York Attorney General, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the New York Attorney General found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Upon information and belief, Endo continues to make these false statements elsewhere.

[99] Lynn Webster & Beth Dove, Avoiding Opioid Abuse While Managing Pain (2007).

327.    Other examples of the Manufacturer Defendants' advocacy for the fictional concept

of "pseudoaddiction" include, but are not limited to:

(a)    Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. The 2012 edition of *Responsible Opioid Prescribing* remains for sale online.[100]

(b)    Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

(c)    Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug- seeking behaviors] in patients who have pain that has not been effectively treated."

(d)    Upon information and belief, Purdue sponsored a CME program titled "*Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse.*" In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long acting opioid.

328.    However, Defendants' own hired gun has now conceded that pseudoaddiction is

fictional. Dr. Webster has acknowledged that "[pseudoaddiction] obviously became too much of

an excuse to give patients more medication."[101].

329.    The 2016 CDC Guidelines also reject the concept of pseudoaddiction. The

Guidelines explain that "[p]atients who do not experience clinically meaningful pain relief early

in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians

---

[100] *See* Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2d ed. 2012).
[101] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012

should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."[102]

330.    The Manufacturer Defendants also falsely claimed that there were addiction risk screening tools – such as patient contracts, urine drug screens, and other similar strategies – that allowed them to reliably identify and safely prescribe opioids to patients predisposed to addiction.

331.    In addition, the Manufacturer Defendants widely spread misleading information about the risks of addiction associated with increasing dosages of opioids over time, and downplayed the risks created by the tolerance for opioids that patients would develop after consuming the drugs over a period of time.

332.    For example,

(a)    On information and belief, Allergan's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."

(b)    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available online.[103]

(c)    Endo sponsored a website, "*PainKnowledge*," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

(d)    Endo distributed a pamphlet edited by an opioid advocate entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I

---

[102] *CDC Guidelines for Prescribing Opioids for Chronic Pain,* available at https://www.cdc.gov/drugoverdose/prescribing/guideline.html
[103] Available at, https://assets.documentcloud.org/documents/277605/apf- treatmentoptions.pdf

really need it?" The response is, "The dose can be increased. . . .You won't 'run out' of pain relief."[104]

     (e)    On information and belief, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

     (f)    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.[105]

     (g)    In 2007, Purdue sponsored a CME entitled *Overview of Management Options* that was available for CME credit and available until at least 2012. It taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

     (h)    Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, APF and others argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[106]

333.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guidelines, "[t]here is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[107]

334.    The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs so that doctors and patients nationwide, and in Botetourt County, would look to opioids first for the treatment of chronic pain. The Manufacturer Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from opioids.[108]

---

[104] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

[105] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers- guide.pdf

[106] Brief of the American Pain Foundation (APF), the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) at 9

[107] 2016 CDC Guidelines *supra* note 83.

[108] *See, e.g.*, Case Challenges in Pain Management: Opioid Therapy for Chronic Pain (Endo) (describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending opioids), http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (last accessed December 19, 2017).

335.   The Manufacturer Defendants also promoted their products with a disregard for the truth about their safety and despite known risks of diversion and abuse.  For example, Indivior developed Suboxone Film around 2007 as a patent-protected alternative to the tablet form of Suboxone, which was then about to face generic drug competition.  The primary ingredient in both Suboxone Film and tablets is buprenorphine, a highly potent opioid.  According to the USDOJ indictment, Indivior promoted Suboxone Film as safer and less-divertible than its tablet form, even though the company lacked any scientific evidence to support those claims.  In particular, Indivior aggressively marketed Suboxone Film, without an established basis, as having a "lower risk of child exposure" and "less divertible/abusable formulation".  The indictment alleges Indivior made these and other false and misleading claims in marketing materials and through representations throughout the country.  The indictment also alleges that, to further its scheme, Indivior announced a "discontinuance" of its tablet form of Suboxone based on supposed "concerns regarding pediatric exposure to" tablets, when in fact Indivior executives knew the primary reason for the discontinuance was to delay the Food and Drug Administration's approval of generic tablet forms of the drug.[109]

336.   Indivior's scheme, as alleged in the indictment, was highly successful, converting thousands of opioid-addicted patients over to Suboxone Film and causing substantially increased utilization of the product.  In addition, until earlier in 2019, when Suboxone Film became subject to generic competition, Indivior retained a high portion of the opioid- addiction treatment market.

337.   The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading. The history of

opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Manufacturer Defendants and their PBM allies had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on actual medical evidence that conclusively expose the known falsity of the Manufacturer Defendants' misrepresentations.

338.    Notwithstanding their knowledge, in order to maximize profits, the Manufacturer Defendants continued to advocate in the false and deceptive manners described herein with the goal of increasing opioid use, purposefully ignoring the foreseeable consequences of their activity in terms of addiction and public health throughout the United States, and in Botetourt County.

339.    The Manufacturer Defendants intentionally used these false and deceptive representations to maximize profits and utilization of opioids.

340.    According to the US DOJ indictment, Defendant Indivior additionally used its "Here to Help" internet and telephone program as part of its scheme to induce physicians to write prescriptions for Suboxone Film. Touted as a resource for opioid- addicted patients, Indivior used the program in part to connect patients to doctors it knew were prescribing Suboxone and other opioids to more patients than allowed by federal law, at high doses, and in suspect circumstances. The indictment alleges that Indivior executives and employees knew from statistic and numerous firsthand reports that some doctors in the Here to Help referral system were issuing prescriptions in a careless and clinically unwarranted manner.

341.    A very recent study in the Journal of the American Medical Association has further confirmed the falsity of defendants' representations. This study followed patients with chronic

back, hip or knee pain who were treated with opioids and non-opioids over a 12-month period.  The study concluded that there was no significant difference in pain control, but that pain intensity was significantly better for non-opioid users, while adverse medication-related side effects were significantly more common for opioid users.  The Study recommended against initiation of opioid therapy for moderate to severe chronic osteoarthritis pain.[110]

### e.   Manufacturer Defendants' Misuse of Treatment Guidelines

342.   In addition, treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants, who are neither experts nor trained in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Allergan, and Purdue discussed treatment guidelines with doctors during individual sales visits including visits throughout Virginia and Botetourt County.

### i.   Federation of State Medical Boards (FSMB)

343.   The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline

---

[110] Erin E. Krebs, MD, MPH; Amy Gravely, MA; Sean Nugent, BA; et al, *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients With Chronic Back Pain or Hip or Knee Osteoarthritis Pain*, JAMA, March 6, 2018

physicians. .The FSMB finances opioid- and pain-specific programs through grants from Defendants.

344.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies" and taught not that opioids could be appropriate in limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

345.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in Botetourt County.

346.    The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as the "leading continuing medication (CME) activity for prescribers of opioid medications."[111]

347.    Defendants relied on 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would

---

[111] Scott M. Fishman, *Responsible Opioid Prescribing*, Scott M. Fishman published by Waterford Life Services (2007)

be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

### ii. AAPM/APS Guidelines

348. American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement, *The Use of Opioids for the Treatment of Chronic Pain*, that endorsed opioids to treat chronic pain and claimed that the there was little risk of addiction or overdose in pain patients. [112] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was Dr. Portenoy. The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website and remained until 2011; it was taken down only after a doctor complained, though it lingers on the internet elsewhere.

349. AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including Dr. Portenoy and Dr. Fine, received support from Defendants Cephalon, Endo, and Purdue.

350. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache and Neurological Institute, resigned from the panel because of his concerns that the

---

[112] The Use of Opioids for the Treatment of Chronic Pain, APS & AAPM (1997). Available at http://opi.areastematicas.com/generalidades/OPIOIDES.DOLORCRONICO.pdf (as viewed 3/31/2016).

2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated nationwide and in Botetourt County during the relevant time period, were reprinted in the *Journal of Pain* and are still available online.

351.    The Manufacturer Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

352.    The extent of the Manufacturer Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines – the authors of which did not accept drug company funding – reached very different conclusions.

353.    The 2012 Guidelines for *Responsible Opioid Prescribing* in Chronic Non- Cancer Pain, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence

monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvements in physical and functional status and minimal adverse effects."[113]

354.    Similarly, the 2011 Guidelines for the *Chronic Use of Opioids*, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence."[114]

355.    The Clinical Guidelines on Management of Opioid Therapy for Chronic Pain, issued by the United States Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review revealed a lack of solid evidence-based research on the efficacy of long-term opioid therapy.[115]

### 2.    Manufacturer, Distributor, and Pharmacy Defendants Violated their Requirements to Prevent Diversion and Report Suspicious Orders under Virginia and Federal Law.

356.    In addition to their common law duties, Manufacturer, Distributor, and Pharmacy Defendants are subject to statutory and regulatory requirements under Virginia law. Virginia imposes numerous substantive requirements on parties involved in the distribution chain of opioids and other controlled substances. These requirements include providing adequate inventory control and security of opioids to prevent diversion, and reporting suspicious orders of opioids to the Virginia Board of Pharmacy. Virginia law also explicitly requires parties involved in the

---

[113] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).

[114] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids* (2011).

[115] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010). Available at http://www.healthquality.va.gov/guidelines/Pain/cot/COT_312_Full- er.pdf (accessed March 31, 2016).

distribution chain of controlled substances such as opioids to comply with the requirements of the Controlled Substances Act, 21 U.S.C. § 801 et seq. (the "CSA"), and its implementing regulations. Virginia, in adopting the requirements of the CSA and its implementing regulations, indicated that it, like Congress when it passed the CSA, had concerns about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572.

357.    The opioid epidemic was further fueled by Defendants' failure to follow the specific mandates in Virginia law and the CSA requiring them to help ensure that highly addictive drugs are not diverted to illegal use. The brunt of the opioid epidemic could have been, and should have been, prevented if Defendants had fulfilled their duties set by statute, regulation, and common law. Defendants, who operate at every level of the opioid supply chain, had an obligation and duty to act. They did not—and the country, including Botetourt County, paid the price as excess opioids were diverted into the black market.

358.    Recognizing that highly addictive drugs like opioids can be easily abused and diverted to the black market, Virginia enacted the Virginia Drug Control Act, and Congress enacted the CSA.

359.    First, the DEA sets limits on the quantity of Schedule II controlled substances – such as opioids – that may be produced in the United States in any given year. *See* 21 U.S.C. § 826(a); 28 C.F.R. § 0.100. The DEA determines these quotas based on a variety of data including sales, production, inventories, and exports. The DEA can and does lower quotas as a means of addressing abuse and diversion.

360.    Second, Congress anticipated that highly addictive prescription drugs like opioids could be abused and diverted to the black market. The CSA thus sought to combat diversion of prescription narcotics by providing for a closed system of drug distribution in which

manufacturers, wholesalers/distributors, and retail pharmacies must register with the Virginia Board of Pharmacy and the DEA. Every registrant, in turn, is charged with being vigilant in deciding whether a customer, be it a pharmacy, wholesaler, or end customer, can be trusted to deliver or use controlled prescription narcotics only for lawful purposes. *See, e.g.* Va. Code Ann. § 54.1-3435; Va. Code Ann. § 54.1-3303; 21 U.S.C. § 823(e). Specifically, every registrant is required to "maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1).

361.    In particular, the CSA and its implementing regulations require all registrants to (1) report suspicious orders of prescription opioids to the DEA, and (2) perform required due diligence prior to filling any suspicious orders. See 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b). Registrants must further report to the Virginia Board of Pharmacy any time they cease distribution of a suspicious order pursuant to CSA requirements. Va. Code Ann. § 54.1-3435.

362.    In addition, the Code of Federal Regulations requires all registrants—including defendant manufacturers and wholesalers/distributors—to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21. C.F.R. § 1301.74(b). Virginia regulations require that registrants "provide and maintain appropriate inventory controls in order to detect and document any theft, counterfeiting, or diversion of prescription drugs." 18 VAC 110-50-90.

363.    Virginia law also imposes certain specific requirements on pharmacy retailers who are intended to serve as the last line of defense against diversion and abuse of controlled substances. Pharmacies are to dispense prescriptions for controlled substances only for legitimate medicinal or therapeutic purposes, and before dispensing an opioid prescription, a pharmacist or healthcare practitioner is required to confirm that the prescription is bona fide and that it was issued pursuant to a bona fide prescriber-patient relationship. Va. Code Ann. § 54.1-3303.

364.   On information and belief, Manufacturer and Distributor Defendants knowingly, recklessly, and/or negligently supplied suspicious quantities of prescription opioids to obviously suspicious physicians and pharmacies in and around Botetourt County, without disclosing suspicious orders as required by regulations and otherwise circumventing their statutory obligations under Virginia and Federal law.

365.   Similarly, on information and belief, the Pharmacy Defendants knowingly, recklessly, and/or negligently dispensed suspicious prescriptions and suspicious quantities of prescriptions to customers who showed obvious indicators of opioid addiction and/or who received prescriptions that were manifestly not written pursuant to a bona fide patient-prescriber relationship.

366.   Defendants' refusal to report and investigate suspicious orders had far-reaching effects. The DEA is required to annually set production quotas for regulated drugs. In the context of opioids, however, the DEA has cited the difficulty of determining an appropriate production level to ensure that adequate quantities are available for medical use. That is because there are no direct measures available to establish medical need. The DEA's difficulty in setting production quotas was compounded by the fact that the Manufacturer and Distributor Defendants failed to report suspicious orders of opioids and failed to maintain effective controls against diversion. The Defendants' deliberate failures thus prevented the DEA from realizing the full extent of opioid diversion for years.

367.   As a direct result of Defendants' failures, excess amounts of Defendants' opioids were shipped into Virginia, causing a public-health and law-enforcement crisis in Botetourt County.

368.   The Defendants could have (and should have) reported and stopped the flow of prescription opioids into the black market. But Defendants intentionally, recklessly, and/or

negligently failed to investigate, report, and halt suspicious orders. Accordingly, as a direct result of the Defendants' misconduct, substantial and dangerous quantities of prescription opioids were illegally diverted to and overprescribed in Botetourt County.

### a. MANUFACTURER DEFENDANTS

369. The Manufacturer Defendants are required to design and operate a system to detect suspicious orders, and to report such orders to law enforcement. *See* 21 C.F.R. § 1301.74(b); 21 U.S.C. § 823. They have not done so.

370. Upon information and belief, the Manufacturer Defendants collected, tracked, and monitored extensive data concerning suspicious physicians and pharmacies, obtained from the Distributor Defendants who supplied the Manufacturer Defendants with distribution data in exchange for rebates or other incentives so Manufacturer Defendants could better drive sales.

371. In return for these incentives, the distributor identified to the manufacturer the product, volume and the pharmacy to which it sold the product.

372. For example, IMS Health furnished Purdue and other Manufacturer Defendants with detailed information about the prescribing habits of individual doctors and the ordering habits of individual pharmacies.

373. The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion, but instead they utilized the data to understand which regions and which doctors to target through their sales force.

374. With the knowledge of improper diversion, the Manufacturer Defendants could have but failed to report each instance of diversion to the DEA, as they were required to do, instead rolling out marketing campaigns to churn its prescription opioid sales.

375.    Indeed, upon information and belief, the Manufacturer Defendants withheld from the DEA information about suspicious orders – and induced others to do the same – to obfuscate the extent of the opioid epidemic. Upon information and belief, the Manufacturer Defendants knew that if they or the other defendants disclosed suspicious orders, the DEA would become aware that many opioids were being diverted to illegal channels, and would refuse to increase the production quotas for opioids.

376.    The Department of Justice has confirmed the suspicious order obligations clearly imposed by law, fining Mallinckrodt $35 million in 2017 for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[116] Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report suspicious orders for controlled substances – orders that are unusual in their frequency, size, or other patterns. . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[117]  Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[118]

---

[116] *See* U.S. Dep't of Justice, *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations*, Jul. 11, 2017, https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

[117] *Id.* (internal quotation omitted).

[118] 2017 Settlement Agreement between the United States of America and Mallinckrodt, plc,   at p. 2-3, https://www.justice.gov/usao-edmi/press-release/file/986021/download.

377.   Indeed, the DEA ARCOS database shows that between 2003 and 2011 Mallinckrodt sold 53 million orders of opioids.   Yet, only 33 were halted and reported as suspicious.

378.   Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of thousands of doctors and could identify doctors who displayed red flags for diversion, such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.[119] Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times*,[120] Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described internally as "an

---

[119] *See* Scott Glover and Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, LOS ANGELES TIMES, Aug. 11, 2013, http://articles.latimes.com/2013/aug/11/local/la-me-rx-purdue-20130811

[120] *See* Harriet Ryan et al., *More than 1 million OxyContin pills ended up in the hands of criminal and addicts. What the drugmaker knew*, LOS ANGELES TIMES, Jul. 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/

organized drug ring" until years after law enforcement shut it down. In doing so, Purdue protected its own profits at the expense of public health and safety.

379.    In 2016, the New York Attorney General found that, between January 1, 2008 and March 7, 2015, Purdue's sales representatives, at various times, failed to timely report suspicious prescribing and continued to detail those prescribers even after they were placed on a "no-call" list.[121]

380.    As Dr. Mitchell Katz, director of the Los Angeles County Department of Health Services, said in a *Los Angeles Times* article, "Any drug company that has information about physicians potentially engaged in illegal prescribing or prescribing that is endangering people's lives has a responsibility to report it."[122] The New York Attorney General's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

381.    Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the New York Attorney General found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

---

[121] *See* NY Purdue Settlement, at 6-7, available at https://ag.ny.gov/pdfs/Purdue- AOD-Executed.pdf

[122] Glover and Girion, *supra* note 109.

382.    The New York Attorney General also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so.

383.    On information and belief, the other Manufacturer Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.   They used faulty algorithms to flag questionable orders and frequently handed oversight to customer service employees and account managers, whose pay was tied to drug sales. For example, Teva's suspicious order program was called "DefOps", short for "Defensible Operations".   A Teva representative has testified that the program was designed to keep Teva out of trouble and because it "sounded good."   Mallinckrodt's suspicious orders were investigated by national account managers whose compensation was linked to sales. Defendant manufacturer emails reveal that the companies were aware that assigning sales staff to monitor suspicious orders created a conflict of interest. The practice nevertheless continued.

384.    The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders caused excess shipments of the Manufacturer Defendants' opioids into Botetourt County and enabled the excess opioids to be unlawfully diverted . As a result, Botetourt County suffered substantial harm and damages.

b.    **DISTRIBUTOR DEFENDANTS**

385.    The Manufacturer Defendants realized early on that the cooperation of the Distributor Defendants was necessary to ensure the success of efforts to flood the market with addictive opioids – specifically, to move opioids from the manufacturers to pharmacies (retail and

mail order) and patients, the Manufacturer Defendants needed the Distributor Defendants, a necessary link in the chain of supply.

386.    As early as 1996, Purdue recognized that over 80 percent of the distribution drug market was controlled by four players (McKesson, Bergen, Cardinal and Amerisource), and that Purdue would need to build relationships with these "wholesaler trading partners" to ensure that OxyContin was available across the country.

387.    The Distributor Defendants were willing participants in the scheme to flood the country with opioids, and the relationship was an instant success.   The Manufacturer and Distributor Defendants' supply chain partnership enabled a meteoric rise in the number of opioid prescriptions – for example, total prescriptions for OxyContin increased from about 316,000 in 1996 to approximately 14 million in 2001-02.   Translated into dollars, OxyContin sales rose from $44 million in 1996 to combined sales of nearly $3 billion in 2001-02.[123]

388.    The Distributor Defendants partnered with the Manufacturer Defendants both directly and through industry associations.  Each of the Distributor Defendants was a member of the Healthcare Distribution Alliance, or HDA, and most were also members of the National Association of Chain Drug Stores, or NACDS.  These industry associations were valuable tools in efforts to accomplish the Manufacturer and Distributor Defendants' shared objectives.

389.    For example, the HDA was a member of the Pain Care Forum, or PCF, which as discussed above was one of the Manufacturer Defendants' primary vehicles to grow the opioid market.

---

[123] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 (vol. 2) Am. J. Public Health 221 (2009).

390.   The industry associations also played a key role by enabling the Distributor Defendants to efficiently coordinate their efforts to fight back against regulation of the supply of opioids.

391.   Indeed, while the Manufacturer and Distributor Defendants' objective to flood the country with opioids was extremely successful, by 2005 the supply chain faced an endemic threat, a braking mechanism that threatened to slow or potentially halt the widespread distribution of prescription opioids – namely, the legal duties to prevent diversion and to monitor, report, and prevent suspicious orders of prescription opioids under Virginia and federal law, and the accompanying oversight and regulatory authority of the DEA.

392.   All opioid distributors are required to maintain effective controls against opioid diversion, generally referred to as Suspicious Order Monitoring, or SOM. The SOM requirements obligate distributors to create and use a system to identify and report to law enforcement downstream suspicious orders of controlled substances, such as orders of unusually large size, orders that are disproportionate, orders that deviate from a normal pattern, and/or orders of unusual frequency. To comply with these requirements, distributors must know their customers, must conduct due diligence, must report suspicious orders, and must terminate orders if there are indications of diversion.

393.   Under Virginia law and the CSA, anyone authorized to handle controlled substances must track their shipments. The DEA's ARCOS is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from the point of manufacture through distribution to the point of sale. ARCOS accumulates data on distributors 'controlled substances and transactions, which are then used to identify diversion. Each person or entity that is registered to distribute controlled substances such as opioids must report each acquisition and distribution transaction to the DEA. See 21 U.S.C. § 827; 21 C.F.R. § 1304.33.

Each registrant must also maintain a complete, accurate and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of.

394.    Each registrant must also comply with the security requirements to prevent diversion set forth in 18 VAC 110-50-90 and 21 C.F.R. § 1301.71.

395.    In 2005, concerned that these obligations were not being met, the DEA launched "the Distributor Initiative," an effort to warn distributors (and other partners in the supply chain) about SOM requirements.  In 2006 and 2007, these warnings were communicated to distributors and others in a series of letters from the DEA.

396.    The DEA then began cracking down in 2007, suspending AmerisourceBergen's registration to distribute from its Lakeland, Florida distribution center, and following up with suspensions of the registrations of McKesson and Cardinal Health in 2008.

397.    The Manufacturer and Distributor Defendants orchestrated a joint response to this existential threat to the supply chain and opioid profits, both directly and through their trade association fronts.

398.    While not intended to be a complete recitation of every negligent, unlawful or conspiratorial act of each Distributor Defendant, the conduct at issue includes at least the following.

399.    Manufacturer Defendants, including Purdue, Teva and Mallinckrodt, took affirmative steps to support their distributor partners directly.  Communications during this time period show that the Manufacturer Defendants were committed to keeping the supply chain open, regardless of the consequences.

400.    Purdue explained that its "primary focus" was helping a distributor facing suspension "protect its registration and its business in general and especially in distributing our products."  Purdue explained that the "responsibility for making the decision to ship rests with the

supplier ... that is why we must collaborate." Purdue observed that, "[w]e need to convince [distributors that] they should talk to us when our product is involved and make it a joint decision, etc. just as we need to consult with them from our end." Purdue made clear that it wanted "no interruption in the supply chain."

401.     In 2008, Purdue met with AmerisourceBergen to discuss communication and cooperation in relation to Suspicious Order Monitoring. Purdue met with Cardinal Health "to collaborate and support [Cardinal] on any accounts that we feel might require further assessment, etc." Purdue met with McKesson in 2009 and proposed a "collaborative effort" regarding Suspicious Order Monitoring.

402.     In August of 2009 a Purdue employee communicated with Cardinal Health and another drug distributor and said "[w]e should gang up on DEA in Portland, OR," a reference to a pharmaceutical industry conference on DEA diversion.

403.     In 2012, Cardinal Health's registration was suspended and more discussions were held with Purdue and others in furtherance of their "mutual support" objectives – in their own words, "...we are all in this together – manufacturers and wholesalers/distributors – as well as retail customers, of course."

404.     As noted, these efforts were not limited to Purdue. Teva released held orders because "we need to supply our customer with product" because they would not be able to fill their customer's demand without it.

405.     Mallinckrodt received an email from a distributor who had received an overnight shipment of 1200 bottles of oxycodone and wrote, ***"Keep 'em comin'! Flyin' out of here. It's like people are addicted to these things or something. Oh, wait, people are ..."*** A Mallinckrodt employee responded, ***"Just like Doritos keep eating. We'll make more."***

406.   Endo and Teva communicated with Distributor Defendants about suspicious order monitoring programs, both in person and through questionnaires about their programs.

407.   The net goal of these communications and efforts was to protect the supply chain at all costs. McKesson even advised Purdue that it did not use the word "suspicious" because that term of art could trigger legal obligations on the part of a distributor. Instead, McKesson used terms like "questionable" or "noteworthy." McKesson had even directly advised its employees to "refrain from using the word 'suspicious' in communications. Once we deem an order and/or customer suspicious, McKesson is required to act."

408.   At one point, Mallinckrodt noted that half of the orders identified as "peculiar" in its system were from McKesson, AmerisourceBergen and Cardinal, and that many were from CVS, Walgreens and Walmart. But Mallinckrodt did not elevate the orders from "peculiar" to "suspicious."

409.   And these were just the efforts that were (incorrectly) cast as efforts to comply with SOM requirements. The fact was that many distributors had no compliance program at all, or programs that for all practical purposes were ineffective, notwithstanding the clear requirements of Virginia and federal law.

410.   Purdue documents showed that any review was well after shipment because the only data received by their program was a month old. In April of 2019, Purdue's vice president and chief security officer was questioned under oath and could only recall one instance in which an order was cut or blocked due to size, frequency or pattern. A 2016 audit of Purdue's monitoring program identified critical deficiencies, including that it used arbitrary thresholds and put review of pending orders in the hands of entities that had sales and marketing as their core mission.

411.    Mallinckrodt had no suspicious order program in place in 2008-09 (aside from verifying that the customer had DEA 222 forms), and no mechanism in place to halt suspicious orders.

412.    As of September 2012, Teva had never had a written monitoring program in place and had never reported a suspicious order to the DEA.

413.    An outside audit determined that in 2010 Endo Defendant Par had no SOM program at all.

414.    McKesson acknowledged to the DEA that from 2009-17 it did not "identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious ...."

415.    Cardinal faced numerous DEA enforcement actions and did not have any policy to stop shipment of suspicious orders at all before 2008.

416.    Cardinal Health, Amerisource Bergen and McKesson all had early warning systems in place to alert their pharmacy customers when thresholds were being reached so that orders could be adjusted and manipulated to avoid triggering SOM obligations and the attendant "supply chain disruption." In certain instances, a pharmacy could request threshold increases or delays to the next cycle, which were granted.

417.    This was critical to the Distributor Defendants, since at various relevant times the national pharmacies provided a huge percentage of the Distributor Defendants' revenue. Currently, CVS provides 25 percent of Cardinal's revenue, over $34 billion. From 2006-12, Walgreens accounted for approximately 21 percent of Cardinal's revenue. From 2008-18, CVS was McKesson's largest customer, accounting for almost 20 percent of McKesson's revenues, over $41 billion, in 2018 alone.

418.    The failure to implement appropriate SOM procedures was not limited to Cardinal, McKesson and AmerisourceBergen.

419.    From 2006 through August 2010, CVS had no written DEA Standard Operating Procedures to identify suspicious orders.  Even after that period its procedures were critically deficient.  During a DEA investigation commenced in 2013, CVS admitted that it had reported only seven suspicious orders in the entire country.  Also during 2013, a CVS employee highlighted the under-staffing on the monitoring program, advising fellow employees that "I do NOT have any backup … If something happens to me via act of nature or illness, the current daily SOM process would come to a complete halt."

420.    Even though Walmart operated licensed distribution centers supplying its pharmacies with controlled substances from 2000 until 2018, before 2011 Walmart had no formal system in place to identify suspicious orders.  Walmart and its representatives have stated that, prior to 2011, hourly associates responsible for filling orders at distribution centers would monitor orders, which consisted of letting a supervisor know if an order looked like "it was kind of high," based on the associates' memories.  Upon information and belief, there is no evidence of Walmart reporting any suspicious order prior to 2011.

421.    After allegedly introducing an SOM system in 2011, in 2014 Walmart acknowledged that it had no "process in place" to comply with government obligations and that this deficiency represented a "severe" risk to the company.  During this time, and until approximately 2015, Walmart simply flagged orders of 5000 dosage units or more, or more than 2000 dosage units per week if those orders were 30 percent higher than a rolling 4-week average.  But orders were not held; instead they were simply cut to the thresholds and shipped.  These cut orders were not reported to the DEA.  After 2015, the same system remained in place, but Walmart

simply added store-specific thresholds – the limits remained high, and pharmacies could still order up to 2000 dosage units per week (or nearly 8000 per month) without triggering the system.

422.    Until 2012, Walgreens took the approach of shipping suspicious orders and then sending an after-shipment report to the DEA, even though it was advised that this approach was not in compliance with the law.  The failures did not end after 2012.  In 2013, a Walgreens employee observed that most suspicious orders identified under the new program had already shipped.  In 2014, Walgreens ended its own direct distribution efforts and instead entered into a new arrangement with AmerisourceBergen whereby Walgreens acquired enough of AmerisourceBergen's stock to be deemed a "related party" by the SEC and AmerisourceBergen became Walgreens' exclusive distributor.  The question of whether this new arrangement solved Walgreens' SOM deficiencies is answered by an AmerisourceBergen employee's comment during the transition: "I'm trying to think of everything we can do to prevent having a bunch of orders reported to the DEA and held."

423.    Rite-Aid reported zero suspicious orders, nationwide, from 1995-2014.

424.    Manufacturer and Distributor Defendants Purdue, Mallinckrodt, Cardinal, McKesson, CVS, and Walgreens have each admitted to breaking the law and violating their CSA duties.

425.    In fact, the DEA initiated 178 registrant actions between 2008 and 2012, 76 orders to show cause were issued by the Office of Administrative Law Judges, and 41 actions involved immediate suspension orders.[124]

---

[124] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, The Drug Enforcement Administration's Adjudication of Registrant Actions 6 (2014), available at https://oig.justice.gov/reports/2014/e1403.pdf (last accessed January 8, 2018)

426.    The specifics of the Distributor Defendants' wrongful conduct and inaction include,

but are not limited to, at least the following:

(a)    In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

(b)    In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.

(c)    On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

(d)    On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

(e)    On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

(f)    On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

(g)    In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.[125]

---

[125] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, WASH. POST, Jan. 11, 2017, https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.0c8e17245e66

(h)    On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

(i)    In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

(j)    In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act.[126] On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

(k)    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center in Florida amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.[127]

(l)    In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

427.    Rather than comply with the law, the Distributor Defendants and their manufacturing partners have focused on diverting the attention and focus of the DEA or, in one key instance, simply working to change the law to remove the regulatory burden.

428.    When the DEA's crackdown began, the Distributor Defendants worked with their trade association, the HDA, to publish Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances." These ICGs emphasized the critical role of each member of the supply chain in distributing controlled substances, stating "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due

---

[126] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016, https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act
[127] *AmerisourceBergen Plant license pulled*, BOSTON NEWS, Apr. 25, 2007, http://archive.boston.com/news/education/higher/articles/2007/04/25/amerisourcebergen_plant_license_pulled/

diligence in order to help support the security of controlled substances they deliver to their customers."

429.    But the ICGs were not binding on the industry or HDA members.  The evidence supports a conclusion that they actually were drafted primarily with the purpose of convincing the DEA that the Distributor Defendants were trying to address the problem and distracting the DEA from its crackdown on violations of the CSA and failure to adopt compliant SOM programs. Indeed, HDA knew that large member entities such as AmerisourceBergen and Cardinal Health would not implement the Guidelines and yet did not reveal that to the DEA during the many discussions it held with the enforcement agency.

430.    The HDA ultimately admitted that the ICGs were never intended to constitute an industry standard and even removed them from the trade association's website.

431.    The ICGs were just the first step, however.  The Distributor Defendants decided that the best option to remove the threat of penalties for failure to comply with SOM requirements was simply to change the law.

432.    On February 19, 2014, acting at the behest of industry lobbyists, U.S. Representative Tom Marino introduced the "Ensuring Patient Access and Effective Drug Enforcement Act" as a supposed effort to define "imminent danger" in the 1970 act. A DEA memo noted that this bill would essentially destroy the agency's power to file an immediate suspension order of any suspicious drug shipments.

433.    This bill required that the DEA show the company's actions had demonstrated a "substantial likelihood of an immediate threat," whether in death, serious bodily harm or drug abuse before a suspension order could be sought. It also gave drug companies the ability to submit "corrective action" plans before any penalties could be issued. The law essentially makes it

impossible for the DEA to halt any suspicious narcotic shipments before opioids are diverted to the illegal black market.

434.    Whereas prior to passage of the Marino Act the DEA had the power to issue an immediate suspension order against a manufacturer or distributor whose unlawful conduct posed an imminent danger to the community, the Marino Act effectively stripped the DEA of this power.

435.    At the same time, via the HDA, the Distributor Defendants retained public relations consultants to help polish the public image of the companies responsible for flooding the country with addictive opioids.

436.    The HDA exercised strict supervision over consultants to ensure the messaging matched the objectives of the Distributor Defendants.  When a consultant refused to give HDA editorial control over a study related to drug diversion and regulation, the project was terminated.

437.    The HDA, along with the NACDS, was also instrumental in pushing back against stricter controls and enforcement on a number of additional fronts, including challenging the reclassification of hydrocodone combination products, or HCPs, from Schedule III to the more strictly-controlled Schedule II.  In sum, the HDA worked hard at its goal of "help[ing] ease DEA pressure on our members for SO monitoring."

438.    Ironically, these events occurred even as opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion.

439.    McKesson has admitted that the opioid epidemic is a significant interference with public health.  In a corporate presentation, McKesson described the opioid epidemic as the "deadliest drug epidemic on record in our nation's history."  McKesson stated, "[t]he drug problems of the past decades pale when compared to the current opioid epidemic which has killed 165,000 Americans from 2000 to 2014."

440.    In that same presentation, McKesson described how on an average day more than 650,000 opioid prescriptions are dispensed; 3,900 people initiate non-medical use of prescription opioids and—at that time—78 people died from an opioid-related overdose.

441.    McKesson has acknowledged to its own employees that abuse of prescription drugs has risen 66% since 2000.

442.    McKesson witnesses have testified as to their awareness that opioid abuse and addiction are gateways to heroin use and addiction.

443.    A McKesson representative has testified that it "gives you pause" to be selling opioids in the midst of an opioid epidemic.

444.    ABS similarly has acknowledged "some 7.4 million people- almost 3% of the U.S. Population-aged 12 or over had an illicit drug use disorder" and that "the most commonly misused products were hydrocodone products."   ABC has also acknowledged that "Oxycodone was misused by almost 4 million Americans."

445.    Cardinal likewise has admitted that prescription drug abuse is "an unparalleled epidemic and public health crisis."  It has told its employees that "[i]t's an epidemic that affects all of us, professional and personally" and "a public health crisis".

446.    Cardinal's website calls the opioid epidemic a "national public health crisis" and recognizes the "devastation opioid misuse has caused American families and communities".

447.    Henry Schein's website acknowledges that "the statistics for opioid addiction are alarming" and acknowledges that "between 21-29% of patients prescribed opioids for chronic pain misuse them".  It recounts that "more than 2 million Americans have become dependent on or abused prescription pills and street drugs."

448.    Henry Schein expressly acknowledges that "[s]cientific evidence is lacking for the benefits [of opioids] to treat chronic pain."

106

449.    Distributor defendants have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

450.    Cardinal Health has expressly stated the epidemic is "one that our company is deeply committed to help solve." It has told its employees, "[a]s front line employees, you are an integral part of our ability to deliver on this commitment." It has described its "responsibility and [its]obligations to society around this national challenge."

451.    Cardinal has acknowledged, "[w]e are part of a complex healthcare system and everyone in that chain, including us, must help stem the crisis."

452.    In these same PR materials, Cardinal has boasted, "[w]e are a leader in implementing anti-diversion controls and prevention programs."

453.    On their face, these assurances – of identifying and eliminating criminal activity and curbing the opioid epidemic – create a duty for the Distributor Defendants to take reasonable measures to do just that.

454.    Yet the Distributor Defendants failed to take necessary steps to prevent the damage caused by addictive opioids and instead took affirmative steps to increase and maintain the flow of opioids to the end users.

455.    Given the addictive powers of opioids and the corresponding risks of misuse, addiction and death, the Distributor Defendants' actions in the distribution and sale of opioids as part of the closed supply chain breached their duties to the Plaintiff, created and maintained an ongoing public nuisance, and were at the very least negligent and unlawful, as further alleged below in Counts I - XII.   These actions damaged Plaintiff.

456.    The additional failure to maintain appropriate SOM programs, to comply with Virginia and federal law regarding the regulation of addictive opioids, is a further basis for liability.

457.   Moreover, the Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion and misuse created an enormous black market for prescription opioids, which extended to Botetourt County. Each Distributor Defendant knew or should have known that the opioids reaching Botetourt County were not being consumed for medical purposes alone and that the amount of opioids flowing to Botetourt County was far in excess of what could be consumed for medical purposes.

458.   The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Botetourt County; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies, and using a little bit of common sense.

459.   It was reasonably foreseeable that the Distributor Defendants' conduct in flooding the market in and around Botetourt County with highly addictive opioids would allow opioids to fall into the hands of children, addicts, and other unintended users.

460.   It is reasonably foreseeable that when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdose, and death.

461.   The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by Botetourt

County, and would create access to opioids for inappropriate uses, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

462.   The Distributor Defendants were aware of widespread prescription opioid abuse in and around Botetourt County, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas and in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were being consumed in gross excess.

463.   The use of opioids by Botetourt County's citizens who were addicted could not occur without the knowing cooperation and assistance of the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, Botetourt County would have avoided significant injury.

464.   The Distributor Defendants made enormous profits over the years based on the diversion of opioids into Botetourt County.

465.   The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to Botetourt County showed an intentional or reckless disregard for the safety of Botetourt County and its citizens. Their conduct poses a continuing threat to the health, safety, and welfare of Botetourt County.

### 3.   The Retail and PBM Mail-Order Pharmacy Defendants

466.   Pharmacy Defendants (retail and mail order) earned profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet, instead of taking any meaningful action to stem the flow of opioids into the communities, they continued to participate in the oversupply and profit from it.

467.    Each of the Pharmacy Defendants does substantial business throughout the U.S., including in Virginia. This business includes the distribution and dispensing of prescription opioids.

468.    The Pharmacy Defendants developed and maintained extensive data on the opioids they distributed and dispensed. Though this data, Pharmacy Defendants had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, and in Botetourt. They used the data to evaluate their own sales activities and workforce. On information and belief, the Pharmacy Defendants also provided Manufacturer Defendants with data regarding, *inter alia*, individual doctors in exchange for rebates or other forms of consideration. The Pharmacy Defendants' data is a valuable resource that they could have used to help stop diversion, but failed to do so.

### a.    The Pharmacy Defendants Have a Duty to Prevent Diversion

469.    Each participant in the supply chain of opioid distribution, including the Pharmacy Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

470.    The Pharmacy Defendants, including PBM mail-order pharmacies and retail pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[128] In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Because pharmacies themselves are registrants under the

---

[128] *See* 21 C.F.R. § 1301.71(a).

CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

471.    The Pharmacy Defendants owe a duty under both federal law[129] and Virginia Law, to monitor, detect, investigate, refuse to fill, and report suspicious orders which the Pharmacy Defendants knew or should have known were likely to be diverted in and around Botetourt.

472.    Specifically, pharmacy retailers are required to ensure that controlled substances are dispensed only pursuant to valid prescriptions and for legitimate medicinal or therapeutic purposes.[130] Before dispensing an opioid prescription, a pharmacist or healthcare practitioner is required to confirm that the prescription is bona fide and that it was issued pursuant to a bona fide prescriber-patient relationship.[131]

473.    Further, in order to prevent the abuse of invalid or illegitimate prescriptions, and to generally prevent diversion of opioids, pharmacy retailers are required to keep and maintain thorough records of their receipt and dispensation of all opioids, and of the persons to whom they dispense opioids and certain other drugs.[132]

474.    The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

475.    Pharmacies have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose.

---

[129] 21 U.S.C. § 823; 21 CFR 1301.74
[130] Va. Code Ann. § 54.1-3303.
[131] Id.
[132] Va. Code Ann. § 54.1-3404.

476.    Suspicious pharmacy orders include orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

477.    Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; and (8) prescriptions containing different handwriting. Typically, these attributes are easy to detect and easily recognizable by pharmacies.

478.    The industry guidance tells pharmacists how to recognize: (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

479.    Suspicious pharmacy orders are red flags for if not direct evidence of diversion.

480.    Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Pharmacy Defendants themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, or oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

481.    According to industry standards, federal and state law, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

112

482.    Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

483.    In 2015, CVS publicly stated that abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities.

484.    Similarly, in 2016, Walgreens issued a press release captioned "Walgreens Leads Fights against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Death."

485.    Despite knowing and even warning of these risks, Pharmacy Defendants recklessly or negligently permitted diversion to occur. In failing to take adequate measures to prevent substantial opioid-related injuries to the nation, Pharmacy Defendants have breached their duties under federal and state statute and regulations, under the reasonable care standard of Virginia common law (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), and professional duties under the relevant standards of professional practice.

486.    For example, one official at Walgreens tasked with monitoring suspicious orders said his department was "not equipped" for that work. Walgreens created lists of suspicious orders that ran thousands of pages but, startlingly and against all statutory obligations, then merely shipped the suspicious orders without further review.

487.    An official at CVS who was listed as the company's DEA compliance coordinator admitted that it was not her real job. CVS compliance was relegated to "pickers and packers", i.e. the warehouse workers at distribution centers who appeared to have no formal training in

monitoring and rarely held up orders.  In the CVS distribution center, approximately two orders per year were flagged as suspicious between 2006-2014.

488.    Upon information and belief, Walmart had no real system to monitor suspicious orders before 2011.  Walmart explains that it relied on its hourly employees for this work but there is no evidence of training or a suspicious order policy.  Walmart installed a suspicious order monitoring system in 2015 but it was so forgiving that a store could order 10 dosages of 10 milligrams of oxycodone in one month and 7,999 dosages the next without raising red flags.  In other litigation, Walmart has endeavored to minimize the impact of its laxity by arguing that it has a relatively low market share but Walmart was responsible for nearly 10% of all MME in Virginia.

489.    Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the nation, in part because of their history of being penalized for violating their duties in other jurisdictions.

490.    Despite their legal obligations in common law, and as registrants under the CSA, the Pharmacy Defendants failed to meet their obligations and allowed widespread diversion to occur – and they did so knowingly. They knew they made money by filling prescriptions. They knew they made money by making it easy for doctors to refer patients to them to fill drug prescriptions, not by making it difficult for doctors to refer patients to them to fill prescriptions.

491.    Upon information and belief, performance metrics and prescription quotas adopted by the Pharmacy Defendants for their retail stores contributed to their failure. For instance, under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. The result is predictable: opioids flowed out of Pharmacy Defendants and into communities throughout the country. The

Pharmacy Defendants had no incentive to stop the outflow, and every financial incentive to further it. Their policies and practices remained in place even as the epidemic raged.

492. Upon information and belief, Plaintiff alleges that the Pharmacy Defendants also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

493. Upon information and belief, Plaintiff alleges that the Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

494. Upon information and belief, Plaintiff alleges that the Pharmacy Defendants also failed to conduct adequate internal or external audits of their opioid sales in order to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or, if they conducted such audits, they failed to take any meaningful action as a result.

495. Upon information and belief, Plaintiff alleges that the Pharmacy Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

496. The Pharmacy Defendants were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

497.   In failing to take adequate measures to prevent substantial opioid-related injuries that have affected Botetourt, Pharmacy Defendants have breached their duties under the "reasonable care" standard and their professional duties under the relevant standards of professional practice.

498.   It was reasonably foreseeable to Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to Botetourt.

499.   It was reasonably foreseeable to Pharmacy Defendants that, when unintended users gain access to opioids, tragic yet preventable harm will result, including the type of harm for which Botetourt seeks redress.

500.   At all relevant times, Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion

501.   At all relevant times, Pharmacy Defendants engaged in these activities, and continue to do so, knowing full well that Botetourt would be harmed thereby and would be constrained to provide essential County services in response, including paying for additional law enforcement services, social services, and emergency services.

502.   It was foreseeable to Pharmacy Defendants that Botetourt would be forced to bear substantial expenses and suffer serious socio-economic harm as a result of Pharmacy Defendants' acts.

503.   Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct, in part because of their history of being penalized for violating their duties and legal requirements in other jurisdictions.

504. The Pharmacy Defendants each have one or more pharmacies that fill prescriptions for opioids which are operating within or in close proximity to Botetourt, or are sending prescriptions to Botetourt via their mail service.

### b. Multiple Enforcement Actions against the Retail Pharmacy Defendants Confirms Their Compliance Failures.

505. The Pharmacy Defendants have long been on notice of their failures to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Several of the Pharmacy Defendants have been repeatedly penalized for their illegal prescription opioid practices. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and inadequate control practices of the Pharmacy Defendants.

### i. CVS

506. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. CVS manages medications for more than 92 million lives at over 9,900 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants and contrary to its public pronouncements, CVS sought profits over patient safety.

507. CVS is a repeat offender; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless appears to have treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

508.     As recently as July 2017, CVS entered into a $5 million settlement with the U.S.

Attorney's Office for the Eastern District of California regarding allegations that its pharmacies

failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[133]

509.     This fine was preceded by numerous others throughout the country.

510.     In February 2016, CVS paid $8 million to settle allegations made by the DEA and

the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under

the CSA by filling prescriptions with no legitimate medical purpose.[134]

511.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in

Connecticut failed to maintain proper records in accordance with the CSA.[135]

512.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts

Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription

monitoring program website and review a patient's prescription history before dispensing certain

opioid drugs.[136]

---

[133] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. DEP'T OF JUST. (July 11, 2017), https://justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violationscontrolled-substance-act.

[134] Press Release, U.S. Attorney's Office Dist. of Md., *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. DEP'T OF JUST. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-millionsettlement-agreement-cvs-unlawful-distribution-controlled.

[135] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations*, U.S. DEP'T OF JUST. (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-actallegations.

[136] Dialynn Dwyer, *CVS will pay $795,000, strengthen policies around dispensing opioids in agreement with state*, BOSTON.COM (Sept. 1, 2016), https://www.boston.com/news/localnews/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-inagreement-with-state.

513.   In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[137]

514.   In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The U.S. alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.[138]

515.   In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purpose by a health care provider acting in the usual course of professional practice." CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need.[139]

516.   In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations that in the State of Texas it had filled 153 prescriptions written by a doctor whose

---

[137] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacies Filled Fake Prescriptions*, U.S. DEP'T OF JUST. (June 30, 2016), https://www.justice.gove/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filledfake-prescriptions.
[138] Press Release, U.S. Attorney's Office Dist. of R.I., *Drug Diversion Claims Against CVS Health Corp. Resolved with $450,000 Civil Settlement*, U.S. DEP'T OF JUST. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.
[139] Press Release, U.S. Attorney's Office M. Dist. of Fla., *United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. DEP'T OF JUST. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

controlled-substances registration within the Texas Department of Public Safety had expired.[140] The alleged violations of the Comprehensive Drug Abuse Prevention and Control Act occurred in the spring and summer of 2012.

517.   In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[141]

518.   Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[142]

### ii.   Walgreens

519.   Walgreens is the second-largest retail pharmacy store chain in the U.S. behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,000 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

520.   Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history -- $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations

---

[140] Patrick Danner, *H-E-B, CVS Fined Over Prescriptions*, SAN ANTONIO EXPRESS-NEWS (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVSfined-over-prescriptions-5736554.php.
[141] Andrew Knittle, *Oklahoma pharmacy board stays busy, hands out massive fines at time*, NEWSOK (May 3, 2015), http://newsok.com/article/5415840.
[142] Press Release, U.S. Attorney's Office W. Dist. of Okla, *CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act*, U.S. DEP'T OF JUST. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penaltyclaims-involving-violations-controlled.

of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.[143]

521.   As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct.[144]

522.   The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

523.   Walgreens' Florida operations highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 – more than ten times the average amount.[145]

524.   The subject pharmacies increased their orders over time, in some cases as much as 60% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet, Walgreens corporate officers not only turned a blind eye, but provided pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreen's attitude that profit outweighed compliance with the CSA or the health of communities.[146]

---

[143] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. DEP'T OF JUST. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-recordsettlement-80-million-civil-penalties-under-controlled.
[144] *Id.*
[145] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf'd Admin. Sept. 13, 2012).
[146] *Id.*

525.    Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.[147]

526.    The six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate use.[148]

527.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[149]

528.    The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk. As a result, Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[150]

iii.    **Rite Aid**

---

[147] *Id.*

[148] *Id.*

[149] *Walgreens to pay $200,000 settlement for lapses with opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

[150] *Id*

529.    On January 11, 2009 Rite Aid entered into an agreement to pay $5 million in civil penalties for CSA violations and to enter into a Compliance Plan to ensure compliance with all requirements of the CSA and applicable DEA regulations and to prevent diversion of controlled substances.  This action was based on systemic violations of Rite Aid's obligation to prevent diversion across 53 Rite Aid locations.

530.    On March 9, 2017 Rite Aid entered into an agreement to pay $834,200 in civil fines for CSA violations.

### c.    PBM Mail Order Pharmacies

531.    Each of the PBM Defendants operate lucrative mail order pharmacies that have purchased, dispensed and profited from the movement of the brand and generic opioids at issue in this litigation.

532.    During the 2006-2012 time period, PBM mail order pharmacies purchased more than 38 billion MMEs, spread over more than 2.1 billion dosage units.



National Mail Order MME by Defendant Manufacturer
ARCOS Data 20106-2012

533.   The DEA Arcos Database reveals that over 51% of the 45+ billion MMEs moved through the mail order channel were purchased by Express Scripts Mail Order pharmacies. Specifically, during the 2006-2012 time period, Express Scripts mail order pharmacies bought 19,674,412 MMEs spread over 993 million opioid dosage units.

534.   Not surprising given their lengthy collaboration with regard to OxyContin, nearly 26% of Express Scripts Mail Order MME purchases were for Purdue opioids.

535.   26.59% of Express Scripts' mail order opioid purchases were for Teva generics; 13.55% were for Mallinckrodt generics; 6.62% were for Endo generics; 5.1% were for Indivior generics; and 4.84% were for Mylan generics.  Express Scripts dispensed these opioid products by mail to patients nationwide, including in Botetourt.



**Express Scripts National Mail Order MME by Defendant Manufacturer**
ARCOS Data 2006-2012

536.    The publicly available ARCOS data also reveals that nearly 20% of the 38+ billion mail order MMEs were purchased by Caremark's mail order pharmacy.  Specifically, during the 2006-2012 time period, Caremark mail order pharmacies bought 7,666,788,043 MMEs spread over 447,097,994 opioid dosage units.

537.    19.54% of Caremark's Mail Order opioid purchases were for Mylan generics; 18.08% were for Mallinckrodt generics; 16.67% were for Mylan generics; 12.73% were for Purdue products; 11.23% were for Teva generics;10.32% were for Endo generics; and 5.37% were for Indivior products.  Caremark dispensed these opioid products by mail to patients nationwide, including in Botetourt.





Caremark National Mail Order MME by Defendant Manufacturer
ARCOS Data 2006-2012

538.    The publicly available ARCOS data also reveals that 4.39% of the 45+ billion mail order MMEs were purchased by Optum's mail order pharmacy.  Specifically, during the 2006-2012 time period, Optum mail order pharmacies bought and sold 1,685,881,413 MMEs spread over 142,490,200 opioid dosage units.

539.    25.29% of Optum's Mail Order opioid purchases were for Mallinckrodt generics; 20.78% were for Teva generics; 17.02%  were for Endo generics; 10.76% were for Purdue products; and 1.25% were Indivior products. Optum dispensed these opioid products by mail to patients nationwide, including in Botetourt.



540.   PBM Mail Order pharmacies earn particularly large profits from their purchase and dispensing of generic drugs, including the generic opioids at issue in this litigation.

541.   They earn these profits in assorted ways including but not limited to manipulation of maximum allowable cost (MAC) pricing lists; spread pricing practices; repackaging; and negotiating discounts for generic purchases that are not shared with their customers.

542.   As a general proposition, drugs dispensed from mail order pharmacies account for a minority of PBM's prescriptions but more than half of their per-prescription profits.

4.    **The PBM Defendants Ensured that Opioids Were Regularly Prescribed and Flooded the Market.**

543.    PBMs are the middlemen between the defendant drug manufacturers and the availability of opioids. The PBM plan designs determine what drugs (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what level of authorization will be required; and (f) what beneficial drugs or treatments will not be available.

544.    PBMs not only control the majority of this country's prescriptions through their benefit plan design and formulary management, they generate massive profits from that work. PBMs are paid by drug companies to move product. "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And, most of these rebates directly benefited the PBM."

545.    In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

546.    PBMs have incentives to move both brand and generic opioids. On the brand side, as stated above, PBMs collude with manufacturers who pay fees in the form of rebates, administrative fees and other incentives in exchange for favorable formulary placement. The more favorable the formulary placement, the greater the utilization. Utilization inures to the financial benefit of the PBMs and manufacturers. It also leads to more prescriptions and more pills available to the general public, many of which find their way to the black market. PBMs make additional profits through imprecise definitions of what constitutes a brand drug, particularly one facing generic competition, as in this case. PBMs treat such brand drugs as "true brands" for purpose of

pricing through their mail order facilities (thereby earning additional profit at a higher reimbursement price); they treat such brands as generics when called upon to make a reimbursement payment themselves to an unaffiliated retailer.

547.   On the generic side, PBMs make substantial profits through their interactions with, and operation of, mail order and retail pharmacies.   At all times relevant hereto, the PBM Defendants were operating both and dispensing or reimbursing generic opioids through both. PBMs routinely pocket the spreads between the reimbursement it receives for generics from its clients as compared with the price the PBM pays the pharmacy for that same drug (including when that pharmacy is the PBM's own captive mail order pharmacy).   In this way the PBM profits from every generic it sells or reimburses.

548.   PBMs also routinely reimburse brick and mortar retail pharmacies based on the lowest available published prices but pay their own captive mail order pharmacies based on a higher published price—for the very same NDC.   Through this disparate reimbursement, the PBM enhances what it earns on any opioid it dispenses. This gamesmanship creates an incentive for the PBM to drive customers towards its own mail order delivery system.   The practice is all the more pernicious given that mail order drugs are most commonly maintenance drugs used to treat chronic conditions.   It is well established that there is no support for the proposition that opioids are effective to treat chronic pain.   Thus, the PBMs – rather than doing all they could in their "unique position to help abate the opioid crisis" – did all they could to maximize opioid use and profits for themselves.

549.   The ARCOS data confirms that the PBMs were moving opioids through their national mail order pharmacies.

550.   PBMs also escape the pricing constraints imposed by MAC lists by repackaging certain drugs.

551.    At all times relevant hereto, PBMs have had the ability to limit the number of opioid pills, refills, and daily MME made available.  PBMs were well aware of their influence over utilization as a result of benefit plan design, formulary placement, and drug utilization management.  They knew and understood that through their self-dealing, more addictive opioids—brand and generic—would enter the marketplace and more addicts would be created.  Indeed, PBMS have now expressly acknowledged that they are "uniquely positioned to help address the opioid epidemic."  Yet, for over a decade they elected to construct national offerings designed to maximize access to the most dangerous, addictive, overused and oversupplied drugs at issue in this national epidemic.

552.    The power of the PBMs has evolved over time. Originally mere claims processors, PBMs now play a major role in managing pharmaceutical spending and enhancing health benefits for end-users. Drug manufacturers recognize the power of the PBMs to drive utilization.

553.    PBMs quietly became an integral part of the pharmaceutical supply chain – that is, the path a drug takes from the manufacturing facility to a bathroom medicine cabinet – following the passage of the Medicare Modernization Act in 2003.

554.    Today, the big three PBMs manage the drug benefits for nearly 95% of the population.[151] They drive what drugs are covered by virtually all health insurance providers for over 260 million people. PBMs made almost $260 billion last year.[152] In 2015 they covered most of the 4 billion retail prescriptions that were covered in the United States.[153] They are key

---

[151] Hoffman-Eubanks, *supra* note 16.
[152] John Breslin, *Health care experts call for more transparency into PBMs*, PATIENTDAILY, Dec. 20, 2017, https://patientdaily.com/stories/511298841-health-care-experts-call-for-more-transparency-into-pbms
[153] Lydia Ramsey and Skye Gould, *A huge pharma middleman just lost its biggest customer — and it shows how drug pricing really works*, BUSINESS INSIDER, Apr. 25, 2017, http://www.businessinsider.com/express-scripts-esrx-anthem-not-renewing-pbm-2017-4

participants and play a crucial role in the administration and reimbursement of prescription drugs.[154]

555.    PBMs influence results from the lack of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and several segments in the United States pharmaceutical distribution system are highly concentrated.[155]

556.    In this environment, the top three PBMs have substantial if not exclusive control over the dissemination of opioids. In concert with drug manufacturers who provide them with assorted complicated payments as incentives,[156] PBMs design benefit plans determining which drugs will be paid for, reimbursed, or covered by public and private pharmacy benefit plans, allowing the drugs to enter the marketplace to be abused.

557.    For example, notwithstanding its express assurance to its customers that it "agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of [its PBM contract] and any negotiations related thereto,"[157] OptumRx proceeds to define its formulary as follows:

> "A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ('Formulary')... [T]he drugs included on the PBM's Formulary may be modified by PBM . . . from time-to-time as a result of factors including, but not limited to, medical appropriateness, *manufacturer rebate arrangements* and patent expirations."[158][emphasis added]

---

[154] Health Policy Brief, *supra* note 29.
[155] Neeraj Sood, Tiffany Shih, Karen Van Nuys, Dana Goldman, *Follow the Money: The Flow of Funds In the Pharmaceutical Distribution System*, HEALTH AFFAIRS, Jun. 13, 2017, https://www.healthaffairs.org/do/10.1377/hblog20170613.060557/full/
[156] Health Policy Brief, *supra* note 37.
[157] United Healthcare Services, Inc. and Employees Retirement System of Texas, *Pharmacy Benefit Management Services Executed Contract*, Section 2.3 (2016), https://ers.texas.gov/Doing-Business-with-ERS/PDFs/Contract-for-Pharmacy-Benefit-Management-Services-for-the-HealthSelect-Prescription-Drug-Program.pdf
[158] *Id.* at Section 4.1(h)(i).f

558.    Notably, OptumRx does not explain how "manufacturer rebate arrangements" impact its formulary design.

559.    Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product.* Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, *Express Scripts also receives administrative fees* from pharmaceutical manufacturers participating in the rebate program discussed above. *The services provided to participating manufacturers include* making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments. The administrative fees paid to Express Scripts by manufacturers for participation in the rebate program do not exceed 3.5% of the AWP of the rebated products.[159]

560.    It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees.  Nor does it explain all of the services for which it receives the administrative fees.  Nor does it explain how any of these payments actually influence its formulary design. Also noteworthy is that Express Scripts pegs its administrative fees to Average Wholesale Price (AWP), which is a reported price higher than any Express Scripts customer pays for any drug.

---

[159] Express Scripts, Inc. and Oklahoma City Municipal Facility Authority, Pharmacy Benefit Management Agreement, pg. 30, Exhibit E (2008),   http://nationalprescriptioncoveragecoalition.com/wp-content/uploads/2017/07/WebPage-2.pdf

561.    Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> "[I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for [its customers]. *ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues* described in the Financial Disclosure and, accordingly, *[customer] acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues*"[160]

562.    A standard Caremark PBM Contract reflects similar perverse incentives. It explains that "'Manufacturer' means a pharmaceutical company that has contracted with Caremark (or its affiliate or agent) *to offer discounts for pharmaceutical products in connection with Caremark's Formulary Services.*"[161][emphasis added]

563.    And, "Manufacturer Payments" include revenues received by Caremark,

> [F]rom each of the following sources: 1) payments received in accordance with agreements with pharmaceutical manufacturers for formulary placement and, if applicable, drug utilization; 2) rebates, regardless of how categorized; 3) market share incentives; 4) commissions; 5) any fees received for the sale of utilization data to a pharmaceutical manufacturer; 6) educational grants; 7) administrative management fees; and 8) all compensation from manufacturers including rebates paid by a manufacturer as a result of product inflation caps and/or guarantees negotiated by the Service Provider.[162]

564.    Caremark's standard PBM contract further explains:

---

[160] *Id.* at pp. 8-9, Section 6.4.

[161] CaremarkPCS Health, L.P. and the National Association of Counties, Managed Pharmacy Benefit Service Agreement, pg. 10, Section 10(f) (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf

[162] CaremarkPCS Health, L.L.C. and Florida Department of Management Services, *Pharmacy Benefit Management Services contract*, pg. 7, Section 1.1 (2015), https://www.dms.myflorida.com/content/download/107930/607791/2015_PBM_Contract_REDACTED_FINAL.pdf

> [T]hat, in lieu of billing Member County a 'per Claim' fee for Services, Caremark shall retain 100% of the Rebates as reasonable compensation for the Services. Customer and Member County understand and agree that neither they nor any Participant will share in the Rebate monies collected from Manufacturers by Caremark.[163]

565.    Caremark also explains that it will encourage the use of its "Preferred Drugs" (those where it has the most lucrative arrangement with a drug manufacturer) over "non-Preferred" drugs. Its standard contract language states that Caremark will encourage the use of "Preferred Drugs" by:

> (i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Participant and the prescriber to request that the prescription be changed to the Preferred Drug. A Preferred Drug is one on the Performance Drug List, which has been developed by Caremark as a clinically appropriate *and economically advantageous subset of the Caremark Formulary*, as revised by Caremark from time to time.[164] [emphasis added]

566.    The harm caused by the PBMs is not just monetary: "The PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[165]   PBMs also fail to control quantities, or numbers of refills for highly addictive drugs and ignore or neglect their duties to ensure patient wellness.

567.    PBMs also provide discount drug cards so individuals can directly purchase medications without going through insurance companies. This allows individuals to fill multiple prescriptions while avoiding the oversight that insurance coverage brings, thus fueling the epidemic. PBMs allow this loophole because they are paid for every prescription filled in this manner.

---

[163] CaremarkPCS Health, L.P. and the National Association of Counties, Managed Pharmacy Benefit Service Agreement, pg. 4, Section 2.1 (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf
[164] CaremarkPCS Health, L.P. and the National Association of Counties, *Managed Pharmacy Benefit Service Agreement*, pg. 3, Section 1.11 (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf
[165] Jonathan Wilcox, *PBMs Must Put Patients First*, HUFFINGTON POST, Feb. 28, 2017, https://www.huffingtonpost.com/entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc

568.  MedPageToday, a source for clinical and policy coverage that directly affects the lives and practices of health care professionals, describes the PBMs' complicity in the opioid crisis this way:

> We live in a world where payers -- not physicians -- determine what drugs and treatments patients receive.  If patients have a life-threatening condition, it is not unusual for a payer to demand that a physician first prescribe a cheaper and less effective alternative. Physicians know that the drugs they are allowed to use may not work very well, but frequently, payers demand that they be tried first anyway. .
>
> What happens if the patient doesn't respond to the cheap drug? Often, the physician continues to prescribe it, because -- to gain access to the more effective drug -- physicians need to go through a painful process of preauthorization. For many practitioners, it isn't worth it.
>
> So we spend more for healthcare than any other country in the world, but Americans do not get the care they need. There is a simple reason. Treatment decisions are not being driven based on a physician's knowledge or judgment. They are being driven by what payers are willing to pay for.[166]

569.  Thus, people with chronic pain are at the mercy of PBMs,  yet PBMs make it easier to get opioids than to get other pain medication that is less addictive, because opioids are generally cheaper than non-opioid alternatives and opioid manufacturers have provided rich incentives, as described above. According to a study by the New York Times and ProPublica, of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.[167]

570.  Even when they were asked to limit accessibility to opioids, PBMs refused. The seeds of the opioid epidemic were sown with early over prescription of OxyContin. In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured

---

[166] Milton Packer MD, *Are Payers the Leading Cause of Death in the United States?*, MEDPAGETODAY, Nov. 1, 2017, https://www.medpagetoday.com/blogs/revolutionandrevelation/68935
[167] Thomas and Ornstein, *supra* note 49.

OxyContin, to require pre-authorization, Purdue refused.[168] Using the financial quid pro quo it had

with the West Virginia PBM, it paid Merck Medco (now Express Scripts) to prevent insurers from

limiting access to the drug. This practice was consistent nationwide.

> The strategy to pay Merck Medco extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin. The payments were in the form of "rebates" paid by Purdue to the companies. In return, the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.

> "That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview. "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."[169]

571.    PBMs are "driving patients to opioids, away from abuse-deterrent form (ADF) and

less addictive forms of opiates through formulary and pricing strategies."[170]

572.    Not only do PBMs place roadblocks in the way of limiting excessive opioid

prescriptions, they also make it more difficult to obtain ADF opioids. These pills are more difficult

to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.[171]

The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids, while CVS

Caremark, which has nearly 90 million members, carries none.[172] A study by Tufts CSSD found

that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.[173]

---

[168] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic*, STAT, Oct. 26, 2016, https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/
[169] *Id.*
[170] Charles L. Bennett MD PhD MPP, *Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses*, COLLABRX, Dec. 27, 2017, http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctor-illnesses/
[171] Pitts, *supra* note 17.
[172] Bennett, *supra* note 104.
[173] Pitts, *supra* note 17.

573.     Making matters worse, in addition to making it easy to obtain generic highly addictive opioids, PBMs make it *harder* to obtain *treatment*. The NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive substances themselves.[174] Only after being subject to much public pressure and congressional investigations did some insurers remove the barriers to addiction treatment.

574.     As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."[175]

575.     A 2008 study by the Mayo Clinic[176] found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but other do not.[177]

576.     In addition to their role designing prescription drug benefit programs, one responsibility of all PBMs and their employed pharmacists is to properly monitor and control the distribution of prescription opioids. PBMs market their abilities to ensure that the medications they dispense are appropriately dosed, and monitored for drug interactions, therapeutic duplications, and possible misuse or abuse.

577.     PBMs also market their ability to manage and oversee the quality of the retail pharmacies that are contracted to be in their network. At critical times, PBMs were – at best – asleep at the switch when it came to auditing pharmacies that were dispensing huge quantities of

---

[174] Thomas and Ornstein, *supra* note 16.

[175] Pitts, *supra* note 171.17.

[176] Available at https://www.ncbi.nlm.nih.gov/pubmed/18804915

[177] Barry Meier and Abby Goodnough, *New Ways To Treat Pain Meet Resistance*, THE NEW YORK TIMES, Jun. 22, 2016, https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html ?mcubz=1,

opioids. The fact that very few if any "pill-mill" pharmacies or over-prescribing physicians were reported by PBMs to the State Boards of Pharmacies or State Medical Boards is testament to the PBMs' lack of oversight of opioids.

578.   In fact, OptumRx has recently been transparent with its knowledge that 45% of 'first fill' opioid prescriptions nationwide are not in compliance with CDC guidelines.[178]

579.   There have always been steps available for the PBMs to reduce opioid misuse and encourage less addictive alternatives for pain treatment. They could have made it easier to access other non-addictive forms of pain relief. They could have required doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could have covered alternative, non-medication treatments for pain. They could have made addiction treatment more accessible. They could have monitored prescriptions. They could have forbidden 90-day supplies of opioids absent doctor's orders. They could have audited pharmacies. They could have required doctors and pharmacies in their networks to use PDMPs. They could have made their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons.

580.   The PBM defendants expressly recognize that they have the ability to abate the opioid epidemic. OptumRx admits that PBMs are "uniquely positioned to help address the opioid epidemic."[179] Express Scripts admits that "we have the ability to make a significant impact."[180]

581.   Yet PBMs have not voluntarily done all they (easily) can to halt the improper dispensing of opioids and expand access to treatments for opioid overdose and addiction.

---

[178] OptumRx, *OptumRx Opioid Risk Management*, 2018, https://www.optum.com/resources/library/opioid-risk-management0.html, at 3.
[179] OptumRx, *Confronting the Opioid Epidemic*, 2018, https://www.optum.com/resources/library/opioid-e-book.html?s3=rxopioid, at 9.
[180] Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients*, Jan. 11, 2018, http://lab.express-scripts.com/lab/insights/drug-safety-and-abuse/reducing-inappropriate-selection-and-excessive-dispensing-of-opioids, at 2.

582.    Each of the PBM Defendants recently began offering opioid management programs for certain customers that they claimed (falsely) are consistent with the March 2016 U.S. Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016, 65 Morbidity and Mortality Weekly Report 1 (2016) ("CDC Guideline").

583.    In truth, even these new opioid management programs did not apply across the board to all customers and still fell woefully short of the CDC Guideline and all current medical literature regarding the highly dangerous properties of opioids.

584.    None of the big three PBMs' new opioid management programs were consistent with the CDC Guideline – they still permitted the largely unchecked prescribing of opioids for chronic pain (the CDC says opioids are not proven effective for chronic pain); still provided seven-day quantity limits for acute pain (when the CDC says "three days or less will often be sufficient" and the PBMs themselves acknowledge that "a few days" can make a difference in whether one becomes addicted); still permitted opioid prescriptions to be delivered through mail-order pharmacies for conditions outside of active cancer, end-of-life or palliative care (which typically supply maintenance drugs for chronic conditions; it is well-established that except for active cancer, end-of-life or palliative care, opioids should not be dispensed for chronic pain); did not adhere to CDC MME/day recommendations; did not cover high dosage nonopioid alternatives; did not require step therapies; and did not require prior authorizations for the most commonly prescribed immediate-release opioids.

585.    At the same time, even when their new OM programs were launched, the PBMs continued to impose unnecessary restrictions on access to treatments for opioid overdose and addiction.

586.    These failures and the delay in offering national programs that are consistent with the CDC Guideline have contributed mightily to the roots of the opioid epidemic and its ongoing impact today.

587.    The PBMs own documents confirm the important role PBMs play in implementing the CDC Guideline.

588.    Nearly one year after the CDC Guideline was issued, Caremark publicly acknowledged that, "[p]harmacy benefit managers (PBMs) play an important role in implementing the CDC [G]uideline, and helping ensure access and patient safety" and assured its customers that it had "taken a thoughtful, evidence-based approach to implementing the CDC guideline into our utilization management (UM) criteria with consideration of the needs of those with chronic pain, as well as the potential for harm from these powerful medications."[181]

589.    Caremark also assured the public that its "UM criteria reinforce [the CDC] principles and encourage appropriate use of opioids by patients and prescribers. They provide coverage that fosters safe use of opioids, consistent with the ... CDC [G]uideline, to support plans helping members on their path to better health."[182]

590.    Express Scripts similarly boasts that its Advanced Opioid Management program "is based on CDC prescribing guidelines" and "promot[es] greater compliance with CDC guidelines."[183]

591.    OptumRx likewise claims that its "utilization management edits are tightly aligned with Centers for Disease Control (CDC) prescribing guidelines."[184]

---

[181] CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE, Feb. 28, 2017, https://payorsolutions.cvshealth.com/insights/balancing-act, at 1 (emphasis added).
[182] *Id.* at 5 (emphasis added).
[183] Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients, supra* note 180 at 1.
[184] *OptumRx Opioid Risk Management, supra* note 203.

592.   The foregoing assurances of fostering "safe use of opioids" consistent with the CDC Guideline are false.

593.   In sum, because PBMs are the intermediary between drug manufacturers, pharmacies, and ultimately patients, these companies influence everything from pharmacy reimbursements, to what drugs are covered under formularies.  In these ways, the PBMs drive which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

594.   PBMs' complicity in the overall fraudulent scheme is knowing and purposeful. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements and other hurdles that would slow down flow. A review of the defendant PBM formularies confirms that they include all of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

595.   Caremark has three basic formularies: Standard Control, Advanced Control, and Value.[185]

596.   A wholly owned Caremark subsidiary (SilverScript) also manages two basic formularies for Medicare Prescription Drug Plans ("PDPs"), Choice and Plus.[186] Each of Caremark's basic formularies include opioids.

597.   Caremark's Standard Control formulary contains no step therapies, prior authorization requirements or quantity limits for opioids on its face.[187]

---

[185] CVS Health, *Formulary Management*, https://payorsolutions.cvshealth.com/programs-and-services/cost-management/formulary-management (last visited Sept. 10, 2018)

[186] SilverScript, *Compare 2018 Plans – SilverScript,* https://www.silverscript.com/plan/compare-module.aspx (last visited Sept. 10, 2018)

[187] *See* CVS Caremark, *Performance Drug List – Standard Control,* July 2018, https://www.caremark.com/portal/asset/caremark_recaprxclaimsdruglist.pdf (last visited Sept. 10, 2018) at 1;

598.    It imposes no three-day limitations for acute pain.[188]

599.    It does not limit the use of opioids for chronic pain outside active cancer, end-of-life and palliative care.[189]

600.    The prescribing guide for the Standard Control formulary refers clinicians to 2017 prescribing guidelines, but even those do not require nonopioid step therapies for treatment of chronic pain or three-day limits for acute pain.[190]

601.    As late as 2018, although Caremark's Standard Control formulary covers methadone, and multiple buprenorphine and naloxone treatments, it did not cover any naltrexone treatments and it is unclear what utilization management or cost-sharing requirements may apply.[191]

602.    Caremark's Standard Control formulary does not cover the higher strength prescription dosages of the following nonopioid pharmacological options, useful in many step therapies: ibuprofen, topical lidocaine, amitriptyline, doxepin, desipramine, diflunisal, choline magnesium trisalicylate, salsalate, etodolac, sulindac, indomethacin, celecoxib, meclofenamate, and nabumetone.[192]

603.    Caremark's Advanced Control formulary contains no step therapies, prior authorization requirements or quantity limits for opioids on its face.[193]

---

[188] *Id.*
[189] *Id.*
[190]    *See* CVS Caremark, *Prescribing Guide – Standard Control 2018,* https://www.caremark.com/portal/asset/Prescribing_Guide_Un-Authenticated.pdf (last visited Sept. 10, 2018) at 11.
[191] *See* CVS Caremark, *Performance Drug List – Standard Control, supra* note 187 at 1, 3.
[192] *Id.*
[193] *See* CVS Caremark, *Advanced Control Formulary,* July 2018, https://www.caremark.com/portal/asset/Advanced_Control_Formulary.pdf, at 1.

604. The Advanced Control formulary does not include many of the following prescription nonopioid pain treatment alternatives: capsaicin, diflunisal, choline magnesium trisalicylate, salsalate, etodolac, sulindac, indomethacin, meclofenamate, and nabumetone.[194]

605. Caremark's Value Formulary contains no step therapies for any immediate release opioids.[195]

606. It has prior authorization requirements for some opioids, but not the most widely abused: hydrocodone-acetaminophen, oxycodone-acetaminophen and codeine-acetaminophen.[196]

607. The Value Formulary points to the same lax 2017 opioid prescribing guidelines.[197]

608. Caremark's Value Formulary imposes both prior authorization and/or quantity limits on the majority of pharmacologic treatments for opioid addiction and overdose.[198]

609. This Value formulary (like Caremark's other commercial offerings) excludes an array of nonopioid pain relief options including: topical lidocaine, choline magnesium trisalicylate, salsalate, indomethacin, celecoxib, and meclofenamate.[199]

610. Even with its new Opioid Utilization Management Program, Caremark does not require step therapy as a pre-condition for coverage of immediate-release opioids.[200]

611. Caremark does not impose three-day limits on opioids prescribed for acute pain.[201]

---

[194] *Id.*
[195] *See* CVS Caremark, *CVS Caremark® Value Formulary Effective as of 07/01/2018*, https://www.caremark.com/portal/asset/Value_Formulary.pdf, at 9-10.
[196] *Id.*
[197] *Id.* at 9.
[198] *Id.* at 10, 22-23.

[199] *Id.*
[200] *See* CVS Caremark, *CVS Caremark Opioid Quantity Limits Pharmacy Reference Guide*, Jan. 2018, https://www.caremark.com/portal/asset/Opioid_Reference_Guide.pdf.
[201] *Id.*

612.    Caremark does not require prior authorization when opioids are prescribed for chronic pain.[202]

613.    Caremark limits the quantity of opioids prescribed per day, but only to 90 MME/day,[203] a quantity the CDC says should be avoided.[204]

614.    Caremark does not require prior authorization prior to dispensing immediate-release opioids, *i.e.*, hydrocodone-acetaminophen, oxycodone-acetaminophen, codeine-acetaminophen.[205]

615.    Caremark merely allows for an "emergency supply" of buprenorphine-naloxone products while it processes prior authorization, rather than broadly waiving such requirements.[206]

616.    The standard commercial Express Scripts formulary contains no restrictions whatsoever on the majority of opioids covered – no quantity limits, no step therapies, no prior authorization requirements.

617.    Express Scripts recently updated its National Preferred Formulary to exclude coverage for two long-acting opioid oral analgesics (Opana ER and Oxycodone ER) and two narcotic analgesics (Buprenorphine Patches and Butrans) but, even there, Express Scripts presents no fewer than six "preferred alternatives," each of which are highly addictive opioids available in extended-release forms.[207]

---

[202] *Id.*

[203] *Id.*

[204] *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 MORBIDITY AND MORTALITY WEEKLY REPORT 1 (2016) at 16, 22, 23.

[205] *See Performance Drug List – Standard Control, supra* note 187; *Prescribing Guide – Standard Control 2018, supra* note 190; *Advanced Control Formulary, supra* note 193; *CVS Caremark® Value Formulary Effective as of 07/01/2018, supra* note 195*SilverScript Choice, Supra* note 212.

[206] *See* CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE, Feb. 28, 2017, https://payorsolutions.cvshealth.com/insights/balancing-act, at 6.

[207]    *See* Express Scripts, *2018 National Preferred Formulary Exclusions*, https://www.express-scripts.com/art/pdf/Preferred_Drug_List_Exclusions2018.pdf (last viewed Sept. 10, 2018) at 1.

618.    The National Preferred Formulary indicates that certain naloxone (Narcan nasal spray) and buprenorphine Suboxone Sublingual Film and Zubsolv sublingual tablets) treatments are available, but does not list any methadone or naltrexone treatments.[208]

619.    The Express Scripts National Preferred formulary does not cover numerous highly effective prescription nonopioids including: doxepin, desipramine, diflunisal, choline magnesium trisalicylate, etodolac, sulindac, indomethacin, and meclofenamate.[209]

620.    For an additional fee, Express Scripts now offers customers its Advanced Opioid Management Program.

621.    Even in this program, Express Scripts does not impose a three-day limit for first-time users dealing with acute pain; does not require step therapy prior to dispensing immediate-release opioids; and does not require prior authorization for immediate-release opioids.[210]

622.    Express Scripts limits the dosage of opioids prescribed per day, but only to 200 MME/day, more than double the dosage which the CDC Guideline says should be avoided.[211]

623.    Nowhere does any Express Scripts formulary advise that opioids are inappropriate for chronic pain treatment outside active cancer, end-of-life or palliative care.[212] To the contrary,

---

[208] *See* Express Scripts, *2018 Express Scripts National Preferred Formulary*, https://www.express-scripts.com/art/open_enrollment/INTEL_NPFList.pdf (last viewed Sept. 10, 2018).
[209] *Id.*
[210] *See* Express Scripts, *Putting the brakes on the opioid epidemic*, https://my.express-scripts.com/opioids.html; Express Scripts, *A Comprehensive Solution to Reduce Opioid Abuse*, June 7, 2017, http://lab.express-scripts.com/lab/insights/industry-updates/a-comprehensive-solution-to-reduce-opioid-abuse; Nicholas Hamm, *Express Scripts Limits Opioid Prescriptions*, DRUG TOPICS, Aug. 17, 2017, http://www.drugtopics.com/clinical-news/express-scripts-limits-opioid-prescriptions; and Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients, supra* note 180.
[211] Nicholas Hamm, *Express Scripts Limits Opioid Prescriptions*, DRUG TOPICS, Aug. 17, 2017, http://www.drugtopics.com/clinical-news/express-scripts-limits-opioid-prescriptions, at 1.
[212] *See 2018 National Preferred Formulary Exclusions, supra* note 207; *2018 Express Scripts National Preferred Formulary, supra* note 208; Saver Plan Formulary, Value Plan Formulary and Choice Plan Formulary, *supra* note **Error! Bookmark not defined.**.

virtually every opioid analgesic on every Express Scripts formulary (commercial or Medicare) is available through its mail order pharmacy.[213]

624.    OptumRx offers five basic formularies, each of which includes opioids.[214]

625.    OptumRx's 2018 Generic Centric Formulary appears to have no limits whatsoever surrounding the dispensing of opioids.[215]

626.    OptumRx's other commercial formularies require prior authorization only on some opioids, not including the most popular immediate-release drugs.[216]

627.    They do not appear to require step therapy for immediate-release opioids or a three-day limit for acute pain treatment.[217]

628.    They do not advise against the dispensing of opioids for chronic pain.[218]

629.    OptumRx currently limits immediate-release opioids for patients new to opioid therapy to 49 MME a day. However, patients not new to opioid therapy may receive 90 MME per day, a limit the CDC Guideline recommends should avoided.

630.    These formularies have very few quantity limits, as well, including no apparent limits on the popular opioids identified above.[219]

631.    OptumRx offers its OptumRx Opioid Risk Management program for an additional fee. Only through enrollment in that program, for extra money, will its commercial customers receive services that OptumRx's falsely claims are compliant with the CDC Guideline. Even in its

---

[213] *Id.*

[214] *See* OptumRx, *Formulary and drug lists,* https://professionals.optumrx.com/resources/formulary-drug-lists.html (last visited Sept. 10, 2018)

[215] OptumRx, *2018 Generic Centric Formulary,* July 1, 2018, https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/resources/forms/Generic-Centric%20Formulary.pdf, at 7-9.

[216] *See* OptumRx, *Formulary and drug lists, supra* note 214.

[217] *Id.*

[218] *Id.*

[219] *Id.*

Opioid Risk Management Program, OptumRx does not appear to limit acute treatment to three-days and does not require step therapy for opioid treatment of chronic pain.[220]

632.   As with the manufacturer, distributor, and pharmacy defendants, PBMs must contribute to rectify the damage their intentional and purposeful conduct in the context of pharmacy benefit management has foreseeably caused plaintiff.

**V.   CAUSES OF ACTION**

**COUNT I**
**PUBLIC NUISANCE**
**VIOLATION OF VA. CODE ANN. § 15.2-900**
**(AGAINST ALL DEFENDANTS)**

633.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

634.   This action is brought by Plaintiff pursuant to Va. Code Ann. § 15.2-900 to abate the public nuisance created by Defendants, and to recover costs Plaintiff has already incurred and future costs the Plaintiff expects to incur in its provision of emergency services that are reasonably required to abate the public nuisance created by Defendants.

635.   Each Defendant, acting alone or with one or more co-defendants, created a condition of a grossly excessive amount of opioids in circulation that was and continues to be dangerous to the public and has injured those inhabitants of Botetourt County who have come within its influence.  Each Defendant, acting alone or in concert, injured the property of Botetourt County.

636.   The Manufacturer Defendants knew or should have known that their promotion of opioid use would create a public nuisance:

---

[220] *OptumRx Opioid Risk Management, supra* note 203.

(a)     The Manufacturer Defendants have engaged in massive production, promotion, and distribution of opioids for use by the residents of Botetourt County;

(b)     The Manufacturer Defendants' actions created and expanded the market for opioids, promoting their wide use for pain management;

(c)     The Manufacturer Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs; and

(d)     The Manufacturer Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

637.    The Manufacturer Defendants' actions were a substantial factor in making opioids widely available and widely used. The Manufacturer Defendants' actions were a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. The Manufacturer Defendants' actions caused excess opioids to be shipped to Botetourt County, and these excess opioids were diverted into the black market. Without the Manufacturer Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

638.    The Manufacturer Defendants also knowingly, intentionally, recklessly, and/or negligently funneled massive quantities of prescription opioids to physicians and other prescribers who they knew or should have known wrote suspicious prescriptions and/or wrote prescriptions for known abusers of prescription opioids.

639.    The Manufacturer Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids to distributors who they knew or should have known failed to implement effective controls and procedures to guard against theft, diversion, and abuse of prescription opioids.

148

640.   The Manufacturer Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

641.   The Manufacturer Defendants knowingly and intentionally financially incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

642.   The Distributor and Pharmacy Defendants' nuisance-causing activities include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and failing to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

643.   The Distributor and Pharmacy Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

644.   The PBM Defendants knowingly and intentionally designed benefit plans that would maximize the number of opioids in the marketplace.

645.   The PBM Defendants knowingly, intentionally, recklessly and/or negligently failed to manage and/or monitor these plans to minimize the use and abuse of opioids.

646.   The PBM Defendants knowingly and intentionally chose to include opioids on their formularies that were more addictive to users. This led directly to the increased likelihood of addiction.

647.   The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in

149

order to inject them) instead of ADFs which tended to be more expensive. This choice directly led to the ease with which the pills could be misused.

648.   The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. This led directly to the increased sale and use of opioids.

649.   The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

650.   The PBM Defendants chose not to cover or provide less coverage for drug treatment.

651.   The PBM Defendants knowingly and intentionally created their formularies to ensure that an excessive number of pills were made available to users for use and abuse.

652.   The Purdue Individual Defendants, who are officers, directors and/or equity holders of Purdue and affiliates, directed and participated in the tortious conduct of Purdue and are individually liable.

653.   The public nuisance created by the Defendants endangers the life, health and safety of Botetourt's residents.

654.   The public nuisance created by Defendants interferes with the reasonable and comfortable use of Botetourt's property and resources.

655.   The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the community that includes but is not limited to:

   (a)   Opioid-related drug overdose deaths;

   (b)   The disease of opioid addiction and other diseases related to long-term opioid use;

   (c)   Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

150

(d)     Other child abuse and neglect resulting from opioid abuse;

(e)     Crime associated with illegal drug use and opioid sales;

(f)     Unemployment resulting from an inability to work while addicted to opioids;

(g)     Blight, vagrancy, property damage, and property crime.

656.    Defendants controlled the creation and supply of a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' actions is not only an explosion of prescription opioids on the black market, but also a marked increase in the availability of heroin and synthetic opioids.

657.    The diversion of opioids into the secondary, criminal market by Defendants and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of Botetourt County.

658.    Adults and children in Botetourt County who have never taken opioids have also suffered the costs of the Defendants' public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

659.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in Botetourt.

660.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

661.    Botetourt has incurred significant costs to date in its efforts to provide services that were reasonably necessary to abate the public nuisance created, perpetuated, and maintained by Defendants. Botetourt expects to incur significant costs going forward to ameliorate the harm caused by Defendants.

662.    As a direct and proximate result of the public nuisance, Botetourt County has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

## COUNT II
## COMMON LAW PUBLIC NUISANCE
### (AGAINST ALL DEFENDANTS)

663.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

664.    This action is brought by Plaintiff to abate the public nuisance created by Defendants, and to recover costs Plaintiff has already incurred and future costs the Plaintiff expects to incur in its provision of emergency services that are reasonably required to abate the public nuisance created by Defendants.

665.    Under common law, a public nuisance is a condition that is dangerous to the public. A public nuisance adversely impacts an entire community or significant portion of the public. Therefore, a cause of action for public nuisance exists where a defendant's conduct negatively affects the community at large. The public nuisance complained of herein includes the oversaturation, unlawful availability, and abuse of opioids in Botetourt County as well as the adverse social and environmental outcomes associated with widespread and/or illegal opioid use.

152

666.     Each Defendant, acting alone or with one or more co-defendants, knowingly, intentionally, recklessly, and/or negligently created a condition of a grossly excessive amount of opioids in circulation that was and continues to be dangerous to the public and has injured those inhabitants of Botetourt County who have come within its influence. By causing dangerously addictive drugs to flood into the community, and to be diverted for illicit purposes, in contravention of federal and state law, each Defendant has injuriously affected rights common to the general public, including the Botetourt County public health, public safety, public peace, public comfort, and public convenience. The public nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public.

667.     The Manufacturer Defendants knew or should have known that their promotion of opioid use would create a public nuisance:

(a)     The Manufacturer Defendants have engaged in massive production, promotion, and distribution of opioids for use by the residents of Botetourt;

(b)     The Manufacturer Defendants' actions created and expanded the market for opioids, promoting their wide use for pain management;

(c)     The Manufacturer Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs; and

(d)     The Manufacturer Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

668.     The Manufacturer Defendants' actions were a substantial factor in making opioids widely available and widely used. The Manufacturer Defendants' actions were a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. The Manufacturer Defendants' actions caused excess opioids to be shipped to Botetourt County, and these excess opioids were diverted into the black market. Without the Manufacturer Defendants' actions, opioid use would not have become so widespread,

and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

669.   The Manufacturer Defendants also knowingly, intentionally, recklessly, and/or negligently funneled massive quantities of prescription opioids to physicians and other prescribers who they knew or should have known wrote suspicious prescriptions and/or wrote prescriptions for known abusers of prescription opioids.

670.   The Manufacturer Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids to distributors who they knew or should have known failed to implement effective controls and procedures to guard against theft, diversion, and abuse of prescription opioids.

671.   The Manufacturer Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

672.   The Manufacturer Defendants knowingly and intentionally incentivized the PBM Defendants to place their opioids on the PBMs' formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

673.   The Distributor and Pharmacy Defendants' nuisance-causing activities include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and failing to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

674.   The Distributor and Pharmacy Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black

market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

675.    The PBM Defendants knowingly and intentionally designed benefit plans that would maximize the number of opioids in the marketplace.

676.    The PBM Defendants knowingly, intentionally, recklessly and/or negligently failed to manage and/or monitor these plans to minimize the use and abuse of opioids.

677.    The PBM Defendants knowingly and intentionally chose to include opioids on their formularies that were more addictive to users. This led directly to the increased likelihood of addiction.

678.    The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of ADFs which tended to be more expensive.  This choice directly led to the ease with which the pills could be misused.

679.    The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain.  This led directly to the increased sale and use of opioids.

680.    The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

681.    The PBM Defendants chose not to cover or provide less coverage for drug treatment.

682.    The PBM Defendants knowingly and intentionally created their formularies to ensure that an excessive number of pills were made available to users for use and abuse.

683.    The public nuisance created by the Defendants endangers the life, health and safety of Botetourt County's residents.

155

684.    The public nuisance created by Defendants interferes with the reasonable and comfortable use of Botetourt County's property and resources.

685.    The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the community that includes but is not limited to:

        (a)    Opioid-related drug overdose deaths;

        (b)    The disease of opioid addiction and other diseases related to long-term opioid use;

        (c)    Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

        (d)    Other child abuse and neglect resulting from opioid abuse;

        (e)    Crime associated with illegal drug use and opioid sales;

        (f)    Unemployment resulting from an inability to work while addicted to opioids;

        (g)    Blight, vagrancy, property damage, and property crime.

686.    Defendants' controlled the creation and supply of a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' actions is not only an explosion of prescription opioids on the black market, but also a marked increase in the availability of heroin and synthetic opioids.

687.    The diversion of opioids into the secondary, criminal market by Defendants and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of Botetourt County.

688.    Adults and children in Botetourt County who have never taken opioids have also suffered the costs of the Defendants' public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of

companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

689.   Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in Botetourt.

690.   The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

691.   Botetourt County has incurred significant costs to date in its efforts to provide services that were reasonably necessary to abate the public nuisance created, perpetuated, and maintained by Defendants.  Botetourt County expects to incur significant costs going forward to ameliorate the harm caused by Defendants.

692.   As a direct and proximate result of the public nuisance, Botetourt County has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

## COUNT III
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
## VA. CODE ANN. § 59.1-196, *ET SEQ.*
## (AGAINST MANUFACTURER DEFENDANTS)

693.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

694.    The Virginia Consumer Protection Act ("CPA") seeks to provide a remedy to unfair and unethical standards of business interactions between suppliers and the consuming public. Va. Code Ann. § 59.1-197.

695.    The CPA specifically prohibits sellers from "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits." Va. Code Ann. § 59.1-200(A)(5). As alleged herein, each Manufacturer Defendant violated the CPA by representing that opioids have uses or benefits in treating chronic pain that they do not have, and by representing that opioids do not have the characteristic of being dangerously addictive.

696.    Defendants engaged in the above-described acts intentionally and with knowledge that harm might result, and thus willfully violated the CPA under Va. Code Ann. § 59.1-204.

697.    Unless enjoined from doing so, Defendants will continue to violate the CPA.

698.    Plaintiff seeks reimbursement of all monies paid for Defendants' products by Plaintiff and its residents.

699.    Pursuant to the CPA, Plaintiff is entitled to three times the damages it sustained by the Defendants, as the Defendants' willfully and knowingly violated the CPA. Va. Code Ann. § 59.1-204(A).

700.    As a proximate result of Defendants' deceptive acts, Defendants have caused Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include, but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

## COUNT IV
## FRAUD
## (AGAINST MANUFACTURER DEFENDANTS)

701.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

702.   Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth herein.

703.   Defendants' representations and assertions to Plaintiff, healthcare providers, and consumers contained intentional misrepresentations and material omissions as to the risks associated with opioids.

704.   Defendants intentionally made inaccurate representations regarding the adverse medical conditions associated with the use of opioids and such false representations were made with the intent to mislead.

705.   Defendants knew or reasonably should have known that the representations made to Plaintiff and the public-at large regarding the risks of opioids were false or incomplete and misrepresented material facts regarding the use of opioids for chronic pain.

706.   Defendants had a duty to provide accurate information regarding the risks and side effects associated with opioids to consumers, including healthcare providers and the Plaintiff.

707.   Defendants willfully, knowingly, and deceptively withheld material facts regarding the risks and side effects associated with opioids from Plaintiff, healthcare providers, and consumers.

708.   Plaintiff and its residents reasonably relied on the representations made by Defendants, which caused excess opioids to flood into Botetourt County and be diverted into the black market. Plaintiff, through its programs, departments, and agencies, incurred increased costs attempting to stop the flow of excess opioids into Botetourt County and bearing the costs of cleaning them up, including, but not limited to the costs of healthcare, emergency medical

services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

709.    Plaintiff, healthcare providers, and consumers were justified in their reliance on Defendants to educate them as to the risks and dangerous and potentially life-threatening side effects associated with opioid use.

710.    Defendants' conduct was willful, wanton, and malicious and was directed at Plaintiff and their residents.

711.    The reprehensible nature of the Defendants' conduct further entitles Plaintiff to an award of punitive damages.

712.    As a proximate and legal result of Defendants' fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer damages and is therefore entitled to recover for those damages.

### COUNT V
### COMMON LAW CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

713.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

714.    The Defendants acted in concert for the purpose of increasing the use of opioids and fraudulently selling and distributing as many opioids as possible, thereby causing significant harm to Botetourt County.

715.    The Manufacturer and Distributor Defendants violated Virginia law and the CSA by, *inter alia*:

      (a)    fraudulently making false or misleading statements, falsely marketing opioids as safe for treatment of chronic pain; falsely representing that their opioids were less likely to be abused or were safer; suppressing evidence to the contrary, and improperly inducing physicians to prescribe opioids for chronic pain;

(b)     evading controls on opioid diversion, increasing opioid quotas; and

(c)     failing to design and operate a system to disclose suspicious orders of controlled substances, failing to provide and maintain appropriate inventory controls.

716.    The conspiracy would not have succeeded absent the PBM's control of the flow of opioids from manufacturer to the end user.   The PBM's plan design, including formulary placement, controlled which opioids were paid for, reimbursed, and covered by public and private pharmacy benefit plans.  The PBMs exacerbated the opioid crisis by (a) intentionally designing benefit plans that would maximize the number of opioids in the marketplace, (b) failing to manage and/or monitor these plans to minimize the use and abuse of opioids, and (c) choosing drugs to put on their formularies that provided the largest profit to themselves, regardless of the addictive quality of the drug and whether there was an alternative available and limiting access to competing less-additive alternatives.

717.    The PBM and Manufacturer Defendants coordinated to ensure that the maximum number of Manufacturers' opioids were prescribed and sold, and the PBM Defendants got the maximum profit at the expense of patients.

718.    The conspiracy also would not have succeeded absent the Pharmacy Defendants, which coordinated with the Distributor Defendants to enable the theft, diversion and misuse of prescription opioids.

719.    Each of the participants in the conspiracy received revenue, directly or indirectly, and/or otherwise benefitted from the scheme to promote opioids as safe and non-addictive.

720.    At all relevant times, each Defendant was a knowing and willing participant in the conspiracy, and reaped profits from the conspiracy in the form of increased sales, distributions, rebates and kick-backs.   Distributor Defendants received kick-backs from Manufacturer Defendants if they reached particular monthly goals. PBM Defendants received rebates,

chargebacks, kickbacks, administrative fees, and other financial incentives to promote the Manufacturer Defendants' drugs. Manufacturer and Pharmacy Defendants received profits from increased sales of the Manufacturer Defendants' drugs.

721.   All participants of the enterprise described herein were aware of Defendants' control over the activities of the conspiracy in promoting opioids for use in every situation in which a patient is in pain and selling a grossly excessive amount of opioids. Each part of the conspiracy benefited from the existence of the other parts.

722.   The persons engaged in the conspiracy are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

723.   The Defendants' concerted actions caused excess opioids to enter Botetourt County, which were diverted into the black market.

724.   Botetourt County has been injured by reason of these violations in that it has incurred increased costs attempting to stop the flow of excess opioids into Botetourt County and bearing the costs of clean up, including, but not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above. Botetourt County would not have incurred these costs had Defendants not conspired together. The injuries suffered by Botetourt County were directly and proximately caused by Defendants' actions and inactions.

725.   Plaintiff was directly and proximately harmed by the Defendants' civil conspiracy.

**COUNT VI**
**NEGLIGENCE PER SE**
**(AGAINST MANUFACTURER DEFENDANTS)**

726.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

727.   The Manufacturer Defendants failed to perform their statutory and regulatory obligations under the Virginia Drug Control Act, Va. Code Ann. § 54.1-3400 et seq., and the CSA, which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

728.   The Virginia Drug Control Act imposes certain specific responsibilities upon drug manufacturers, such as the Manufacturer Defendants, who manufacture and sell pharmaceutical drugs in Virginia. Va. Code Ann. § 54.1-3457. Among those responsibilities is the requirement that drug manufacturers refrain from the "dissemination of any false advertisement" in the promotion of their drugs. *Id.* "Advertisement" is defined as "all representations disseminated in any manner or by any means, other than by labeling, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of drugs or devices." Va. Code Ann. § 54.1-3401.

729.   The Manufacturer Defendants continually violated their duty to Plaintiff and its residents by making and/or disseminating false advertisements about opioids, including but not limited to:

    a.   Making misleading statements about the true risk of addiction;
    b.   Making deceptive statements concerning the ability of opioids to improve patient function long-term;
    c.   Making deceptive statements about the efficacy of opioids for long-term treatment of chronic pain; and
    d.   Promoting chronic opioid therapy as safe and effective for long term use for high-risk patients.

730.   Manufacturer   Defendants,   by   disseminating   false   and/or   misleading advertisements, encouraged physicians to over-prescribe opioids to Plaintiff's residents, leading to addiction and causing excess opioids to be diverted to the black market. As a result, Plaintiff was saddled with the costs of harms arising from its residents' addictions.

731.    The Manufacturer Defendants also failed to maintain effective controls against diversion, failed to report suspicious orders to law enforcement and perform due diligence prior to filling orders, and failed to design and operate a system to disclose suspicious orders of controlled substances, as required by the CSA. As a result, excess opioids were shipped into Botetourt County and diverted into the black market, causing Botetourt County to incur substantial costs.

732.    Va. Code Ann.§ 54.1-3457 and the CSA were enacted, at least in part, to prevent the harms that can arise as a result of false advertisements and statements by drug manufacturers such as the Manufacturer Defendants and the other violations of the CSA as described herein.

733.    Plaintiff is among the persons and entities intended to benefit from the protections of Va. Code Ann. § 54.1-3457 and the CSA, and the harm that has occurred as a result of the Manufacturer Defendants' violations are among the types of harm that the statutes were intended to prevent.

734.    Therefore, as a proximate result of the false advertising and violations of the CSA, the Manufacturer Defendants have caused Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include, but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

### COUNT VII
### NEGLIGENCE PER SE
### (AGAINST DISTRIBUTOR DEFENDANTS)

735.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

736.    The Distributor Defendants failed to perform their statutory and regulatory obligations under the Virginia Drug Control Act, Va. Code Ann. § 54.1-3400 et seq., and the CSA,

164

which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

737.    Virginia and federal law impose certain specific responsibilities on Distributor Defendants, including the responsibility to design and operate a system to disclose suspicious orders of controlled substances. Va. Code Ann. § 54.1-3435.1(4); 21 C.F.R. § 1301.74(b). Furthermore, if Distributor Defendants cease distribution of opioids and certain other drugs "to a pharmacy, licensed physician dispenser, or licensed physician dispensing facility located in the Commonwealth due to suspicious orders of controlled substances" and inform the Virginia Board of Pharmacy within five days of the cessation. Va. Code Ann. § 54.1-3435. "'[S]uspicious orders of controlled substances' means, relative to the pharmacy's, licensed physician dispenser's, or licensed physician dispensing facility's order history and the order history of similarly situated pharmacies, licensed physician dispensers, or licensed physician dispensing facilities, (i) orders of unusual size, (ii) orders deviating substantially from a normal pattern, and (iii) orders of unusual frequency." *Id.*

738.    Distributor Defendants are further required to "provide and maintain appropriate inventory controls in order to detect and document any theft, counterfeiting, or diversion of prescription drugs." 18 VAC 110-50-90.

739.    Distributor Defendants failed or refused to disclose suspicious orders to the DEA, the Board of Pharmacy, and boards whose licensees have prescribing authority, in violation of Virginia law and regulation and therefore failed to meet their duties as registered distributors of controlled substances.

740.    The laws and regulations described above were enacted, at least in part, to prevent the harms that can arise as a result of an overabundance of opioids being made available in communities.

741.   Plaintiff is among the persons and entities intended to benefit from the protections of these laws and regulations. The harm that has occurred is a proximate result of the Distributor Defendants' failure to abide by their legal obligations.

742.   As a proximate result of failing to report and/or continuing to fill suspicious transactions, the Distributor Defendants have caused Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include, but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

## COUNT VIII
## NEGLIGENCE PER SE
## (AGAINST PHARMACY DEFENDANTS)

743.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

744.   The Pharmacy Defendants failed to perform their statutory and regulatory obligations under Virginia law and the CSA, all of which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

745.   Pharmacy Defendants are to dispense prescriptions for controlled substances only for legitimate medicinal or therapeutic purposes. Va. Code Ann. § 54.1-3303. Before dispensing an opioid prescription, a pharmacy is required to confirm that the prescription is bona fide and that it was issued pursuant to a bona fide prescriber-patient relationship. *Id.*

746.   Furthermore, Pharmacy Defendants are required to keep and maintain thorough records of their receipt and dispensation of all opioids, and of the persons to whom they dispense opioids and certain other drugs. Va. Code Ann. § 54.1-3404.

747.    These statutes and regulations are designed for Pharmacist Defendants to identify persons who could use the prescriptions for non-legitimate, medical purposes and stop pharmacists from dispensing opioids to patients at risk for abuse.

748.    Pharmacy Defendants were negligent in failing to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids. Each Pharmacy Defendant sold opioids with the knowledge that the purchased opioids were likely being used for non-medical purposes, and therefore failed to meet their duties under Virginia Law.

749.    The laws and regulations that require Pharmacy Defendants to ensure that they dispense opioids only for legitimate medical and therapeutic purposes, and the laws and regulations that require Pharmacy Defendants to carefully monitor and record their dispensation of opioids were enacted, at least in part, to prevent the harms that can arise as a result of an overabundance of opioids being made available in communities.

750.    Plaintiff is among the persons and entities intended to benefit from the protections of the laws and regulations described above.  The harms that have occurred as a result of the Pharmacy Defendants' failure to abide by their legal obligations are among the types of harm that these laws and regulations were intended to prevent.

751.    As a proximate result of their failure to exercise their professional judgement and/or their failure to keep records, as required by the statute, in the continual dispensation of opioids, the Pharmacy Defendants have caused Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include, but are not limited to, increased policing, medical, fire, and court services, lost tax revenues, and lost communal benefits of the County's limited and diverted resources.

### COUNT IX
### NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

752.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

753.   Defendants have a duty to Plaintiff to employ a reasonable standard of care in the sale, distribution, dispensing, reimbursement and promotion of prescription opioids, as required to protect Botetourt's citizens and property.  This includes a duty to not create a foreseeable risk of harm to others.

754.   Defendants breached this duty by failing to take any action to prevent or reduce the unnecessary, non-medical or criminal use of opioids. Collectively, and individually, Defendants made prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger to patients who were using them for other than acute pain or palliative care.

755.   Specifically, the PBMs have a duty to Plaintiff to employ a reasonable standard of care in their role as the intermediary between the drug manufacturers, pharmacies, and patients, as required to protect Botetourt's citizens and property. This duty is independent of the PBMs' contractual obligations.

756.   The PBMs breached their duty to employ reasonable care, causing injuries to Botetourt beyond any contractual expectancy. In doing so, the PBMs caused foreseeable harm to Botetourt's citizens and property.

757.   The Purdue Individual Defendants, who are officers, directors and/or equity holders of Purdue and affiliates, directed and participated in the tortious conduct of Purdue and are individually liable.

758.   Defendants were negligent in failing to monitor and guard against third-party misconduct and participated and enabled such misconduct. This third-party misconduct, including criminal acts, were the foreseeable consequences of Defendants' negligence.

759.   Defendants placed their profit motives above their legal duty and enabled, encouraged and caused the over-prescribing and distribution of opioids.

760.   All Defendants knew of the highly addictive nature of prescription opioids and knew of the high likelihood of foreseeable harm to patients and communities from prescription opioid addiction and diversion.  Defendants should have anticipated an injury to Botetourt as a probable result of flooding the market with opioids. Where there is a flood of highly addictive drugs into a community, it is foreseeable – to the point of being a foregone conclusion – that there will be a secondary, 'black' market created for those drugs. It was further foreseeable that Botetourt would be responsible for combatting the creation of that market and mitigating its effects. Defendants breached their duties when they failed to act with reasonable care to prevent the diversion of prescription opioids.

761.   A negligent and/or intentional violation of the Defendants' duties poses distinctive and significant dangers to the Plaintiff and its residents, including epidemic levels of addiction and the  grossly excessive prescription and distribution of opioids.

762.   As a proximate result of the failure to prevent the over prescription and excessive distribution of opioids, the Defendants have caused the Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

## COUNT X
## GROSS NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

763.   Plaintiff incorporates all preceding and subsequent paragraphs by reference.

764.    Defendants' scheme to optimize profits regardless of the effect on Botetourt County was undertaken and executed intentionally.

765.    Defendants' failure to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids was grossly negligent in that it was done with indifference and an utter disregard of prudence that amounts to complete neglect of the safety of others and had a great probability of causing substantial harm.

766.    Defendants' utter disregard of prudence was such that it is shocking to any fair-minded person.

767.    As a proximate result of their grossly negligent conduct, the Defendants have caused the Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.


### COUNT XI
### WILLFUL AND WANTON NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

768.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

769.    Defendants' scheme to optimize profits regardless of the effect on Botetourt County was undertaken and executed intentionally.

770.    Defendants' failure to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids was willfully and wantonly negligent in that it was done in conscious disregard of the rights of Botetourt County and its residents and/or with reckless indifference to the consequences of their actions.

771.    At all relevant times, Defendants were aware, from their knowledge of existing circumstances and conditions, that their conduct would probably cause injury to Botetourt County and its residents.

772.    As a proximate result of their willfully and wantonly negligent conduct, the Defendants have caused the Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Botetourt County's limited and diverted resources as set forth more fully above.

773.    Furthermore, Defendants should be held liable for punitive damages to Botetourt County because they had prior knowledge of the specific dangerous conditions their willful and wanton negligence created, they consciously disregarded that knowledge and continued to engage in their exceedingly dangerous course of conduct, and the harm inflicted on Botetourt County and its residents by Defendants' conduct was the natural and probable result of that conduct.

## COUNT XII
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

774.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

775.    As an intended result of their intentional wrongful conduct as set forth in this Complaint, Defendants have knowingly profited and benefited from opioid purchases made by Plaintiff and its residents.

776.    In exchange for opioid purchases, and at the time Plaintiff and its residents made these payments, Plaintiff and its residents expected that Defendants had not misrepresented any

material facts regarding opioids, and had complied with their legal obligations in the manufacture, marketing, distribution, dispensation, and reimbursement of opioids.

777.    Defendants have been unjustly enriched in the form of profits because of their wrongful conduct, and as a matter of equity, Defendants should be required to disgorge their unjustly obtained profits from purchases of opioids made by Botetourt County.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Botetourt County, prays that the Court enter judgement against the Defendants, jointly and severally, as follows:

(1)  awarding compensatory damages in an amount not less than $50,000,000, or as determined at trial;

(2) awarding punitive damages in the amount of $350,000 per defendant;

(3) awarding treble damages, as well as all costs and expenses of maintaining this action, including reasonable attorneys' fees, pursuant to statute where appropriate;

(4) awarding pre- and post-judgment interest;

(5) compelling the defendants to abate and remove the public nuisance they have caused by immediately ceasing the unlawful conduct described throughout this Complaint;

(6) such other and further relief as the Court deems just and proper.

*[signature page follows]*

**Botetourt County**

**SANFORD HEISLER SHARP, LLP**
Grant Morris, Va. Bar No. 16290
gmorris@sanfordheisler.com
Kevin Sharp (*pro hac vice to be submitted*)
ksharp@sanfordheisler.com
Andrew Miller (*pro hac vice to be submitted*)
amiller@sanfordheisler.com
Jonathan Tepe (*pro hac vice to be submitted*)
jtepe@sanfordheisler.com
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Tel: (615) 434-7000
Fax: (615) 434-7020

**THE CICALA LAW FIRM PLLC**
Joanne Cicala (*pro hac vice to be submitted*)
joanne@cicalapllc.com
101 College Street
Dripping Springs, Texas 78620
Tel: (512) 275-6550
Fax: (512) 858-1801

**KAUFMAN & CANOLES, P.C.**
W. Edgar Spivey, Va. Bar No. 29125
wespivey@kaufcan.com
Patrick H. O'Donnell, Va. Bar No. 29637
phodonnell@kaufcan.com
R. Johan Conrod, Jr., Va. Bar No. 46764
rjconrod@kaufcan.com
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Tel: (757) 624-3196
Fax: (888) 360-9092

*Attorneys for Plaintiff*

Botetourt County Circuit Court
Filed in the Clerk's Office _____ 9-20- , 20 19

Total Paid $ _____

Teste: Tommy L. Moore, Clerk
_____ Linda Hewitt _____ Deputy Clerk

173

310 First St SW Suite 700
Roanoke VA 24011

Post Office Box 2200
Roanoke VA 24009

www.jamlaw.net
P 540.767.2000
F 540.982.1552

# JOHNSON AYERS & MATTHEWS

## COUNSELORS AT LAW

October 31, 2019

**Via Fed-Ex**
Hon. Tommy L. Moore
Botetourt Circuit Court
1 West Main Street Suite 120
Fincastle, VA 24090-0219

        In re:        Plaintiff v. Mallinckrodt LLC, et al defendants
                      Botetourt Circuit Court
                      Case No. CL19-538

Dear Mr. Moore:

        This law firm represents Malinckrodt, LLC in the above styled civil action pending in the Circuit Court of Botetourt County. Enclosed please find an original Unopposed Expedited Joint Motion for an Order Memorializing Parties' Agreement Regarding Time to Answer, Move, or Otherwise Respond to the Complaint, which we are this filing on behalf of the parties. Please file the motion among the other papers in your office pertaining to this action. Also enclosed is a proposed Consent Order granting the enclosed motion, which has been endorsed by counsel of record. We would appreciate your presenting the Order to the Court for consideration and, if appropriate, entry, and then furnish certified copies of the entered Order to all counsel of record.

        Thank you very much for your cooperation and assistance.

                              Very truly yours,

                              JOHNSON, AYERS & MATTHEWS P.L.C.

                              Brian J. Brydges

BJB/wla
Enclosures
cc:     Counsel of record (via email) (with enclosure)

## VIRGINIA:   IN THE CIRCUIT COURT FOR BOTETOURT COUNTY

BOTETOURT COUNTY, VIRGINIA )
)
    Plaintiff, )
)
v. )    Case No.:  CL19-538
)
MALLINCKRODT PLC., et al. )
)
    Defendants. )

## UNOPPOSED EXPEDITED JOINT MOTION FOR AN ORDER MEMORIALIZING PARTIES' AGREEMENT REGARDING TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND TO THE COMPLAINT

Defendants McKesson Corporation; McKesson Medical-Surgical Inc.; AmerisourceBergen Drug Corporation; Cardinal Health Inc.; Mylan Pharmaceuticals Inc.; Mylan Institutional Inc.; Teva Pharmaceutical USA, Inc.; Cephalon, Inc.; Barr Laboratories, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; Actavis LLC; Mallinckrodt LLC.; SpecGx LLC; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical Companies, Inc.; Par Pharmaceutical, Inc.; CVS Health Corporation, CVS Pharmacy, Inc.; CVS TN Distribution, L.L.C.; Virginia CVS Pharmacy, L.L.C.; Caremark, L.L.C.; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; CaremarkPCS, L.L.C.; Express Scripts Holding Company; Express Scripts, Inc.; Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy Service, Inc.; UnitedHealth Group Incorporated; Optum, Inc.; OptumRx, Inc.; Henry Schein, Inc.; General Injectables & Vaccines, Inc.; Insource, Inc.; and Walgreen Co. ("Moving Defendants") submit this unopposed expedited motion for an order memorializing the parties' prior agreement regarding the timing of responsive pleadings in this matter and, in support thereof, state as follows:

1.　　On October 23, 2019, Plaintiff served the Complaint on certain Defendants via email pursuant to a prior service agreement between the parties ("Service Agreement").

2.　　The Service Agreement provided, among other things, that certain Defendants would have a 60 day extension to respond to the Complaint.  Under the Service Agreement, the current response deadline is January 13, 2020.

3.　　Rule 1:9 of the Rules of the Supreme Court of Virginia provides, in pertinent part, "[t]he time allowed for filing pleadings may be extended by the court in its discretion and such extension may be granted although the time fixed already has expired." R. Sup. Ct. Va. 1:9.  The time for responding has not yet expired.

4.　　By filing this Motion, Moving Defendants do not waive and expressly reserve all defenses, including lack of personal jurisdiction.  *See* Va. Code Ann. § 8.01-277.1(B).

Wherefore, the Moving Defendants respectfully request that this Court enter an Order memorializing the parties' prior agreement extending Moving Defendants' time to respond to Plaintiff's Complaint to January 13, 2020.　　A proposed Order is submitted herewith for the Court's convenience.

Dated: October 31, 2019　　　　　　　　　Respectfully submitted,


**MALLINCKRODT LLC AND SPECGX LLC**
By Counsel:

_____ *

Brian J. Brydges, Esquire
Virginia State Bar No. 43883
JOHNSON, AYERS & MATTHEWS, P.L.C.
P. O. Box 2200
Roanoke, Virginia 24009
Telephone:　　540-767-2042
Facsimile:　　540-982-1552
Email:　　　bbrydges@jamlaw.net

2

\*By signing here, counsel represents that he has permission to sign for all counsel below whose signatures are typed.

/s/ Sarah B. Miller

Sarah B. Miller (VSB No. 77087)
smiller@bassberry.com
Jessalyn H. Zeigler (*pro hac vice* forthcoming)
jzeigler@bassberry.com
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Tel: (615) 742-6200

Andrew J. O'Connor (*pro hac vice* forthcoming)
andrew.o'connor@ropesgray.com
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000

*Counsel for Mallinckrodt LLC and SpecGx LLC*

**McKESSON CORPORATION AND
McKESSON MEDICAL-SURGICAL INC.
By Counsel:**

s/Benjamin C. Block *

Benjamin C. Block (VSB No. 46669)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for McKesson Corporation and
McKesson Medical-Surgical, Inc.*

\*By signing here, counsel represents that he has permission to sign for all counsel below whose signatures are typed.

3

**AMERISOURCEBERGEN DRUG CORPORATION**
**By Counsel:**

s/ Brent R. Gary
Brent R. Gary (VSB No. 66592)
bgary@reedsmith.com
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, VA 22102
Telephone: (703) 641-4200
Facsimile: (703) 641-4240

*Counsel for AmerisourceBergen Drug Corporation*


**CARDINAL HEALTH INC.**

**By Counsel:**

s/ Ashley W. Hardin
Ashley W. Hardin (VSB No. 68221)
ahardin@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(P) 202-434-5960
(F) 202-434-5029

*Counsel for Cardinal Health Inc.*


**MYLAN PHARMACEUTICALS INC. AND MYLAN INSTITUTIONAL INC.**

**By Counsel:**

s/ Rebecca C. Mandel
Rebecca C. Mandel (VA Bar No. 91936)
Adam K. Levin* (DC Bar No. 460362)
HOGAN LOVELLS US LLP
555 13th St., NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
rebecca.mandel@hoganlovells.com
adam.levin@hoganlovells.com

4

*pro hac vice forthcoming*

Jon M. Talotta (VA Bar No. 44590)
Park Place II, Ninth Floor
7930 Jones Branch Drive
McLean, Virginia 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
jon.talotta@hoganlovells.com

*Counsel for Defendant Mylan Pharmaceuticals Inc.
and Mylan Institutional Inc.*

**TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.; BARR LABORATORIES,
INC.; WATSON LABORATORIES, INC.;
ACTAVIS PHARMA, INC.; AND
ACTAVIS LLC**

**By Counsel:**

s/ James Kevin Fee
James Kevin Fee (VSB No. 88376)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004-2541
Tel: 202.739.3000
Fax: 202.739.3001
kevin.fee@morganlewis.com

Steven A. Reed (*pro hac vice* forthcoming)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5603
Fax: (215) 963-5001
steven.reed@morganlewis.com

Brian M. Ercole (*pro hac vice* forthcoming)
Morgan, Lewis & Bockius LLP
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3416
Fax: (305) 415-3001
brian.ercole@morganlewis.com

Steven A. Luxton (*pro hac vice* forthcoming)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel: (202) 739-3000
Fax: (202) 739-3001
steven.luxton@morganlewis.com

*Counsel for Defendants Teva Pharmaceutical USA, Inc.; Cephalon, Inc.; Barr Laboratories, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; and Actavis LLC*

**UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., AND OPTUMRX, INC.**

**By Counsel:**

/s/ Turner A. Broughton
Turner A. Broughton
Virginia Bar No.: 42627
WILLIAMS MULLEN
200 South 10th Street
Suite 1600
Richmond, VA 23219
Tel.: (804) 420-6926
Fax: (804)644-0957
tbroughton@williamsmullen.com

*Counsel for Defendants UnitedHealth Group Incorporated, Optum, Inc., and OptumRx, Inc.*

ENDO HEALTH SOLUTIONS INC.,
ENDO PHARMACEUTICALS INC.,
PAR PHARMACEUTICAL COMPANIES, INC.,
AND PAR PHARMACEUTICAL, INC.
**By Counsel:**

/s/ Ryan Watts
ARNOLD & PORTER KAYE SCHOLER LLP
Ryan Watts (VSB No. 47513)
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-6609
Tirzah.Lollar@arnoldporter.com
Ryan.Watts@arnoldporter.com

*Counsel for Endo Health Solutions Inc.; Endo
Pharmaceuticals Inc.; Par Pharmaceutical
Companies, Inc.; Par Pharmaceutical, Inc.*

CVS HEALTH CORPORATION,
CVS PHARMACY, INC.,
CVS TN DISTRIBUTION, L.L.C.,
VIRGINIA CVS PHARMACY, L.L.C.,
CAREMARK, L.L.C., CAREMARK RX, L.L.C.,
CAREMARKPCS HEALTH, L.L.C., AND
CAREMARKPCS, L.L.C.

By Counsel:

/s/ Michael W. Smith
Michael W. Smith (VSB No. 01125)
S. Perry Coburn (VSB No. 78372)
Shannan M. Fitzgerald (VSB No. 90712)
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Tel. (804) 697-4100
Fax (804) 697-4112
msmith@cblaw.com
pcoburn@cblaw.com
sfitzgerald@cblaw.com

Adam L. Fotiades*
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036–5807
(202) 778–1800
afotiades@zuckerman.com
*denotes national counsel who will seek *pro hac vice*
admission

*Counsel for CVS Health Corporation, CVS Pharmacy,
Inc., CVS TN Distribution, L.L.C., Virginia CVS
Pharmacy, L.L.C., Caremark, L.L.C., Caremark Rx,
L.L.C., CaremarkPCS Health, L.L.C., and
CaremarkPCS, L.L.C.*

**EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS
HOLDING COMPANY; EXPRESS SCRIPTS
PHARMACY, INC.; ESI MAIL PHARMACY
SERVICE, INC.**

8

**By Counsel:**

*s/Emily Scott*
Emily M. Scott (VSB No. 86327)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, VA 23223
Tel.: (804) 771-9500
Fax: (804) 644-0957
escott@hirschlerlaw.com

*Counsel for Defendants Express Scripts, Inc., Express Scripts Holding Company, Express Scripts Pharmacy, Inc., and ESI Mail Pharmacy Service, Inc.*

**WALGREEN CO.**

*s/ Ashley L. Taylor*
Ashley L. Taylor, Esq.
Jonathan P. Floyd, Esq.
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA  23219
Ashley.taylor@troutman.com
Jonathan.floyd@troutman.com

*Counsel for Walgreen Co.*

**HENRY SCHEIN, INC.; GENERAL INJECTABLES & VACCINES, INC.; AND INSOURCE, INC.**

**By Counsel:**

9

s/ Paul C. Kuhnel
Paul C. Kuhnel (VSB No. 28151)
Paul.Kuhnel@leclairryan.com
LECLAIRRYAN
1800 Wells Fargo Tower, Drawer 1200
Roanoke, Virginia 24006
(540) 510-3051 Direct
(540) 510-3050 Fax

John P. McDonald
jpmcdonald@lockelord.com
C. Scott Jones
sjones@lockelord.com
Lauren M. Fincher
lfincher@lockelord.com
Brandan J. Montminy
brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc.; General Injectables & Vaccines, Inc.; and Insource, Inc.*

**BOTETOURT COUNTY, VIRGINIA**

**By Counsel:**

s/ Grant Morris
Grant Morris (VSB No. 16290)
gmorris@sanfordheisler.com
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
Tel:  (615) 434-7000
Fax: (615) 434-7020

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2019, the foregoing was served via e-mail and/or

U.S. Mail Postage Prepaid to the following parties:

**Attorneys for Plaintiff**

Grant Morris
Sanford Heisler Sharp, LLP
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Tel: (615) 434-7000
Fax: (615) 434-7020
gmorris@sanfordheisler.com

Joanne Cicala
The Cicala Law Firm PLLC
101 College Street
Dripping Springs, Texas 78620
Tel: (512) 275-6550
Fax: (512) 858-1801
joanne@cicalapllc.com

W. Edgar Spivey
Lauren Tallent Rogers, Esq.
Richard Johan Comod, Jr., Esq.
Kaufman Canoles, PC
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Tel: (757) 624-3196
Fax: (888) 360-9092
wespivey@kaufcan.com
ltrogers@kaufcan.com
rjcomod@kaufcan.com

*(Attorneys for Botetourt County, Virginia)*

11

**Attorneys for Defendants**

| | |
|---|---|
| Thomas M. Trucksess<br>HOGAN LOVELLS US LLP<br>8350 Broad Street, 17th Floor<br>Tysons, Virginia 22102<br>Email: thomas.trucksess@hoganlovells.com<br><br>Counsel for Indivior, Inc. | |
| All signing Defendants served via e-mail | |

Dated: October 31, 2019

Respectfully Submitted,

By: _____

12

**VIRGINIA:  IN THE CIRCUIT COURT FOR BOTETOURT COUNTY**

BOTETOURT COUNTY, VIRGINIA      )
                                     )
       Plaintiff,                  )
                                     )
v.                                   )     Case No.: CL19-538
                                     )
MALLINCKRODT PLC., et al.        )
                                     )
       Defendants.              )

### [PROPOSED] CONSENT ORDER

THIS DAY CAME Defendants McKesson Corporation; McKesson Medical-Surgical Inc.; AmerisourceBergen Drug Corporation; Cardinal Health Inc.; Mylan Pharmaceuticals Inc.; Mylan Institutional Inc.; Teva Pharmaceutical USA, Inc.; Cephalon, Inc.; Barr Laboratories, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; Actavis LLC; Mallinckrodt LLC.; SpecGx LLC; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical Companies, Inc.; Par Pharmaceutical, Inc.; CVS Health Corporation, CVS Pharmacy, Inc.; CVS TN Distribution, L.L.C.; Virginia CVS Pharmacy, L.L.C.; Caremark, L.L.C.; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; CaremarkPCS, L.L.C.; Express Scripts Holding Company; Express Scripts, Inc.; Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy Service, Inc.; UnitedHealth Group Incorporated; Optum, Inc.; OptumRx, Inc.; Henry Schein, Inc.; General Injectables & Vaccines, Inc.; Insource, Inc.; and Walgreen Co. (collectively, "Moving Defendants") upon their Unopposed Expedited Joint Motion for an Order Memorializing the Parties' Agreement Regarding Time to Answer, Move, or Otherwise Respond to the Complaint (the "Motion"), and the Court having reviewed the Motion and having been informed that Plaintiff's counsel has no objection to the requested Order, it is hereby,

1

ORDERED AND ADJUDGED that the Motion is **GRANTED**.

The Moving Defendants shall answer, move, or otherwise respond to the Complaint on or

before <u>January 13, 2020</u>.


THIS CAUSE CONTINUES.

Entered this ____ day of _____, 2019


_____

CIRCUIT COURT JUDGE



**WE ASK FOR THIS:**

Respectfully submitted,

**MALLINCKRODT LLC AND SPECGX LLC**

**By Counsel:**

<u>/s/ Sarah B. Miller</u>
Sarah B. Miller (VSB No. 77087)
smiller@bassberry.com
Jessalyn H. Zeigler (*pro hac vice* forthcoming)
jzeigler@bassberry.com
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Tel: (615) 742-6200

Andrew J. O'Connor (*pro hac vice* forthcoming)
andrew.o'connor@ropesgray.com
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000

*Counsel for Mallinckrodt LLC and SpecGx LLC*

2

**McKESSON CORPORATION AND
McKESSON MEDICAL-SURGICAL INC.**

**By Counsel:**

*s/Benjamin C. Block*
Benjamin C. Block (VSB No. 46669)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for McKesson Corporation and
McKesson Medical-Surgical, Inc.*

**AMERISOURCEBERGEN DRUG
CORPORATION**

**By Counsel:**

*s/ Brent R. Gary*
Brent R. Gary (VSB No. 66592)
bgary@reedsmith.com
REED SMITH LLP
7900 Tysons One Place
Suite 500
McLean, VA 22102
Telephone: (703) 641-4200
Facsimile: (703) 641-4240

*Counsel for AmerisourceBergen Drug
Corporation*

**CARDINAL HEALTH INC.**

**By Counsel:**

*s/ Ashley W. Hardin*
Ashley W. Hardin (VSB No. 68221)
ahardin@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.

Washington, DC 20005
(P) 202-434-5960
(F) 202-434-5029

*Counsel for Cardinal Health Inc.*

**MYLAN PHARMACEUTICALS INC. AND
MYLAN INSTITUTIONAL INC.**

**By Counsel:**

s/ Rebecca C. Mandel
Rebecca C. Mandel (VA Bar No. 91936)
Adam K. Levin* (DC Bar No. 460362)
HOGAN LOVELLS US LLP
555 13th St., NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
rebecca.mandel@hoganlovells.com
adam.levin@hoganlovells.com
**pro hac vice forthcoming*

Jon M. Talotta (VA Bar No. 44590)
Park Place II, Ninth Floor
7930 Jones Branch Drive
McLean, Virginia 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
jon.talotta@hoganlovells.com

*Counsel for Defendant Mylan Pharmaceuticals Inc.*

4

**TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.; BARR LABORATORIES,
INC.; WATSON LABORATORIES, INC.;
ACTAVIS PHARMA, INC.; AND
ACTAVIS LLC
By Counsel:**

*s/ James Kevin Fee*
James Kevin Fee (VSB No. 88376)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004-2541
Tel: 202.739.3000
Fax: 202.739.3001
kevin.fee@morganlewis.com

Steven A. Reed (*pro hac vice* forthcoming)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5603
Fax: (215) 963-5001
steven.reed@morganlewis.com

Brian M. Ercole (*pro hac vice* forthcoming)
Morgan, Lewis & Bockius LLP
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3416
Fax: (305) 415-3001
brian.ercole@morganlewis.com

Steven A. Luxton (*pro hac vice* forthcoming)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel: (202) 739-3000
Fax: (202) 739-3001
steven.luxton@morganlewis.com

*Counsel for Defendants Teva Pharmaceutical USA,
Inc.; Cephalon, Inc.; Barr Laboratories, Inc.;
Watson Laboratories, Inc.; Actavis Pharma, Inc.;
and Actavis LLC*

5

**UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., AND OPTUMRX, INC.**
**By Counsel:**

*/s/ Turner A. Broughton*
Turner A. Broughton
Virginia Bar No.: 42627
WILLIAMS MULLEN
200 South 10th Street
Suite 1600
Richmond, VA 23219
Tel.: (804) 420-6926
Fax: (804)644-0957
tbroughton@williamsmullen.com

*Counsel for Defendants UnitedHealth Group*
*Incorporated, Optum, Inc., and*
*OptumRx, Inc.*

**ENDO HEALTH SOLUTIONS INC.,**
**ENDO PHARMACEUTICALS INC.,**
**PAR PHARMACEUTICAL COMPANIES,**
**INC., AND PAR PHARMACEUTICAL, INC.**
**By Counsel:**

*/s/ Ryan Watts*
ARNOLD & PORTER KAYE SCHOLER LLP
Ryan Watts (VSB No. 47513)
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-6609
Tirzah.Lollar@arnoldporter.com
Ryan.Watts@arnoldporter.com

*Counsel for Endo Health Solutions Inc.; Endo*
*Pharmaceuticals Inc.; Par Pharmaceutical*
*Companies, Inc.; Par Pharmaceutical, Inc.*

**CVS HEALTH CORPORATION,
CVS PHARMACY, INC.,
CVS TN DISTRIBUTION, L.L.C.,
VIRGINIA CVS PHARMACY, L.L.C.,
CAREMARK, L.L.C., CAREMARK RX,
L.L.C., CAREMARKPCS HEALTH, L.L.C.,
AND CAREMARKPCS, L.L.C.**

**By Counsel:**

*/s/ Michael W. Smith*
Michael W. Smith (VSB No. 01125)
S. Perry Coburn (VSB No. 78372)
Shannan M. Fitzgerald (VSB No. 90712)
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Tel. (804) 697-4100
Fax (804) 697-4112
msmith@cblaw.com
pcoburn@cblaw.com
sfitzgerald@cblaw.com

Adam L. Fotiades*
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036–5807
(202) 778–1800

afotiades@zuckerman.com
*denotes national counsel who will seek *pro hac vice* admission

*Counsel for CVS Health Corporation, CVS Pharmacy, Inc., CVS TN Distribution, L.L.C., Virginia CVS Pharmacy, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and CaremarkPCS, L.L.C.*

7

**EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS HOLDING COMPANY; EXPRESS SCRIPTS PHARMACY, INC.; ESI MAIL PHARMACY SERVICE, INC.**

**By Counsel:**

*s/Emily M. Scott*
Emily M. Scott (VSB No. 86327)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, VA 23223
Tel.: (804) 771-9500
Fax: (804) 644-0957
escott@hirschlerlaw.com

*Counsel for Defendants Express Scripts, Inc., Express Scripts Holding Company, Express Scripts Pharmacy, Inc., and ESI Mail Pharmacy Service, Inc.*

**WALGREEN CO.**

*s/ Ashley L. Taylor*
Ashley L. Taylor, Esq.
Jonathan P. Floyd, Esq.
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA  23219
Ashley.taylor@troutman.com
Jonathan.floyd@troutman.com

*Counsel for Walgreen Co.*

8

**HENRY SCHEIN, INC.; GENERAL
INJECTABLES & VACCINES, INC.; AND
INSOURCE, INC.**

**By Counsel:**

*s/ Paul C. Kuhnel*
Paul C. Kuhnel (VSB No. 28151)
Paul.Kuhnel@leclairryan.com
LECLAIRRYAN
1800 Wells Fargo Tower, Drawer 1200
Roanoke, Virginia 24006
(540) 510-3051 Direct
(540) 510-3050 Fax

John P. McDonald
jpmcdonald@lockelord.com
C. Scott Jones
sjones@lockelord.com
Lauren M. Fincher
lfincher@lockelord.com
Brandan J. Montminy
brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc.; General Injectables
& Vaccines, Inc.; and Insource, Inc.*

## BOTETOURT COUNTY, VIRGINIA

**By Counsel:**

*s/ Grant Morris*
Grant Morris (VSB No. 16290)
gmorris@sanfordheisler.com
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
Tel: (615) 434-7000
Fax: (615) 434-7020

*Counsel for Plaintiff*

9